Clifford Hirsch, Esq. (SBN 102085)
chirsch@hirschclosson.com
Christopher T. Hicks, Esq. (SBN 300462)
chicks@hirschclosson.com
HIRSCH CLOSSON, APLC
1600 South Main Street, Suite 325-C
Walnut Creek, California 94596
Telephone (925) 935-9800
Facsimile  (925) 935-9825

Attorneys for Plaintiff,
United Specialty Insurance Company

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO

| | |
|---|---|
| UNITED SPECIALTY INSURANCE COMPANY, a Delaware Corporation,<br><br>Plaintiff,<br><br>v.<br><br>CERTAIN UNDERWRITERS AT LLOYD'S OF LONDON SUBSCRIBING TO POLICY NO. AC1601986 (OCTOBER 1, 2016 TO OCTOBER 1, 2017); and DOES 1-10,<br><br>Defendant. | CASE NO. 18-7504<br><br>**PLAINTIFF UNITED SPECIALTY INSURANCE  COMPANY'S COMPLAINT FOR:**<br><br>**1)   DECLARATORY RELIEF - DUTY TO DEFEND;**<br><br>**2)   EQUITABLE CONTRIBUTION** |

Plaintiff UNITED SPECIALTY INSURANCE COMPANY ("USIC" or "Plaintiff") hereby brings this Complaint against Defendant CERTAIN UNDERWRITERS AT LLOYD'S OF LONDON SUBSCRIBING TO POLICY NO. AC1601986 (OCTOBER 1, 2016 TO OCTOBER 1, 2017) ("LLOYDS") and DOES 1-10 (collectively, "Defendants"), and alleges herein as follows:

**JURISDICTION**

1.      This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. §1332(a) as Plaintiff is domiciled in Delaware and the two subscribing syndicates which

1

Hirsch Closson, APLC
1600 South Main Street
Suite 325-C
Walnut Creek, CA 94596
(925) 935-9800

Complaint for Declaratory Relief - Duty to Defend; Equitable Contribution        Case No. 18-7504

comprise LLOYDS are both foreign corporations.  As provided in the hereinafter described LLOYDS Policy, such policy was underwritten by syndicates AFB 623 and AFB 2623, whose proportion of liability is listed as 18.00% and 82.00%, respectively.  USIC is informed and believes that AFB 623 and AFB 2623 are syndicates established and managed by Beazley Furlonge Limited, which is incorporated under the laws of England and has its principal place of business in London, England.  USIC is further informed and believes that AFB 623 and AFB 2623 have the same lead underwriter, Neil Patrick Maidmen, who is domiciled in London, England.

2.       The amount in controversy exceeds $75,000 and represents disputed indemnity exposure and fees and costs sought in connection with the defense and indemnification of the parties' mutual insureds with regard to the hereinafter defined Underlying Action.

### VENUE/INTRADISTRICT ASSIGNMENT

3.       USIC is informed and believes and thereon alleges that the acts and/or omissions at issue in this litigation took place in this judicial district within the State of California.  The hereinafter described Underlying Action is pending in the Superior Court for the State of California, County of San Francisco, within this judicial district.  Accordingly, venue is proper in the Northern District of California in San Francisco pursuant to 28 U.S.C. § 1391(b)(2).

### THE PARTIES

4.       At all times material to this Complaint, Plaintiff USIC was and is a Delaware corporation and an insurer which is duly licensed, authorized and engaged in the business of issuing insurance policies in the State of California.

5.       At all times material to this Complaint, USIC is informed and believes that LLOYDS, which is comprised of one or more participating syndicates that are all foreign corporations, is engaged in the business of issuing insurance policies as a surplus lines insurer in the State of California.

6.       Plaintiff is unaware of the true names and capacities of the Defendants sued in this complaint as DOES 1 through 10, inclusive, and therefore sues said

Hirsch Closson, APLC
1600 South Main Street
Suite 325-C
Walnut Creek, CA 94596
(925) 935-9800

1   Defendants by such fictitious names and prays leave of this Court to amend this complaint

2   to set forth their true names and capacities when the same have been ascertained.

3       7.      USIC is informed and believes and thereon alleges that Defendants, and each

4   of them, were individuals, corporations and/or other entities either having residence in,

5   adequate contacts with and/or are authorized to do and/or are doing business within the

6   jurisdiction of this Court.

7                           **THE INSURANCE POLICIES**

8   **The USIC Policy:**

9       8.      USIC issued commercial general liability coverage to Our Neighborhood Place,

10   LLC dba The Tipsy Pig ("TIPSY PIG") as the named insured through policy number ENT

11   000180-01-15, effective February 17, 2015 through February 17, 2016, subject to a $1 million

12   per occurrence limit ("the USIC Policy"). A true and correct copy of the USIC Policy is

13   attached hereto and incorporated herein as Exhibit "A."

14   **The LLOYDS Policy:**

15       9.      LLOYDS issued Combined Employment Practices, Directors' & Officers',

16   Fiduciary and Crime Insurance Policy no. AC1601986, effective October 1, 2016 to October

17   1, 2017, to TIPSY PIG, subject to a $1 million per claim limit ("the LLOYDS Policy").  The

18   LLOYDS Policy affords coverage under Coverage Section A (Employment Practices

19   Liability Coverage) and Coverage Section B (Directors' & Officers' Liability Coverage), but

20   does not include coverage under Coverage Section C (Fiduciary Liability Coverage) or

21   Coverage Section D (Crime Coverage).  Coverage Section B contains three distinct Insuring

22   Agreements; Insuring Agreement A (Directors' and Officers' Liability Coverage), B (Insured

23   Company Reimbursement Coverage) and C (Insured Company Liability Coverage). A true

24   and correct copy of the LLOYDS Policy is attached hereto and incorporated herein as Exhibit

25   "B."

26       10.     The LLOYDS Policy contains the following three Insuring Agreements under

27   Coverage Section B:

28   ///

Hirsch Closson, APLC
1600 South Main Street
Suite 325-C
Walnut Creek, CA 94596
(925) 935-9800

Complaint for Declaratory Relief - Duty to Defend; Equitable Contribution          Case No. 18-7504

## I. INSURING AGREEMENTS

### A. Directors' and Officers' Liability Coverage

We will pay all **Loss** that an **Insured** becomes legally obligated to pay as a result of **Claims** first made against such **Insured** during the **Policy Period**, or the Extended Reporting Period if applicable, and reported in accordance with the notice provisions of Section VIII, of the General Terms and Conditions, for **Wrongful Acts**, except for **Loss** for which the **Insured Company** is permitted or required to indemnify such **Insured**.

### B. Insured Company Reimbursement Coverage

We will pay all **Loss** for which the **Insured Company** is permitted or required to indemnify **Insured Persons** as a result of **Claims** first made against the **Insured Persons** during the **Policy Period**, or the Extended Reporting Period if applicable, and reported in accordance with the notice provisions of Section VIII. of the General Terms and Conditions, for **Wrongful Acts**.

### C. Insured Company Liability Coverage

We will pay all **Loss** resulting from **Claims** first made against the **Insured Company** during the **Policy Period**, or the Extended Reporting Period if applicable, and reported in accordance with the notice provisions of Section VIII. of the General Terms and Conditions, for **Wrongful Acts**.

11.     Plaintiff is informed and believes and thereon alleges that the LLOYDS Policy contains a self-insured retention ("SIR") provision, which applies differently, if at all, depending upon which Coverage Section and/or Insuring Agreement therein the claims potentially fall within.  Plaintiff is further informed and believes and thereon alleges that the LLOYDS Policy provides that: (1) a $35,000 SIR is applicable for claims within Coverage Section A for "wrongful employment practices"; (2) a $15,000 SIR is applicable for claims within Coverage Section B under Insuring Agreement B (Insured Company Reimbursement Coverage) and C (Insured Company Liability Coverage); and (3) no SIR is applicable for claims within Coverage Section B under Insuring Agreement A (Directors' and Officers' Liability Coverage).  Accordingly, claims potentially within Insuring Agreement A of Coverage Section B are not subject to an SIR, and the existence of such claims triggers an

Hirsch Closson, APLC
1600 South Main Street
Suite 325-C
Walnut Creek, CA 94596
(925) 935-9800

Complaint for Declaratory Relief - Duty to Defend; Equitable Contribution          Case No. 18-7504

1   immediate duty to defend the entire action.

2        12.    The LLOYDS Policy also contains the following general terms and conditions,

3   which are generally applicable to the entire policy:

4   **II.    DEFENSE AND SETTLEMENT**

5   Except with respect to Coverage Section D., we have the right and duty to defend any
**Claim** covered by the **Policy** and such obligation is limited to amounts constituting

6   **Defense Costs**.

7   ...

8   **III.    DEFINITIONS**
...

9   B.    **Defense Costs** means reasonable and necessary fees, costs, and expenses

10   incurred by counsel, experts or investigators appointed or pre-approved by us in the

11   investigation, defense and appeal of any **Claim**; but **Defense Costs** do not include any

    wages, salaries, fees, or expenses of any **Insured**. **Defense Costs** will include legal

12   and investigation fees necessary to respond to potential claims, if incurred at our

13   request and direction.

14   C.    **Employee** means any individual whose labor or service is engaged by and

15   directed by the **Insured Company**, including volunteers and all staff members,

    whether part-time, full-time, seasonal, or temporary.

16   ...

17   L.    **Loss**, with respect to each Coverage Section except Coverage Section D, shall

    include **Defense Costs**, and shall have the meaning set forth in that Coverage Section;

18   provided, however, with respect to all such Coverage Sections, **Loss** shall also include

19   punitive, multiple, and exemplary damages, to the extent insurable under the law of

20   any applicable jurisdiction most favorable to insurability.

    ...

21

22   **V.    SELF-INSURED RETENTION**

23

24   A.    Our liability under Coverage Sections A., B. and C. with respect to **Loss**,

    including **Defense Costs**, arising from any single **Claim** shall apply only to that part

25   of such **Loss**, including **Defense Costs**, in excess of the applicable Self-Insured

    Retention set forth in the Declarations for such Coverage Section. If **Loss** on account

26   of a single **Claim** is subject to different Self-Insured Retentions under different

27   Coverage Sections, the total applicable Self-Insured Retentions shall not exceed the

    single largest applicable Self-Insured Retention. The Self-Insured Retention amount

28

5

Hirsch Closson, APLC
1600 South Main Street
Suite 325-C
Walnut Creek, CA 94596
(925) 935-9800

shall be your uninsured responsibility and shall apply to **Defense Costs** as well as other **Loss**. We shall have no responsibility to make any payment unless the Self-Insured Retention has been exhausted or unless the **Insured Company** is unable to meet its uninsured responsibility on account of **Financial Impairment**.

13.     The LLOYDS Policy generally provides primary coverage for third-party claims for wrongful acts that are first made against its insureds, which includes both the TIPSY PIG and others qualifying as insureds thereunder, during the policy period, subject to certain limitations, exclusions and exceptions.

14.     Plaintiff is informed and believes and thereon alleges that the claims asserted against the TIPSY PIG (and/or others qualifying as insureds under the LLOYDS Policy) in the hereinafter described Underlying Action are potentially covered within Coverage Section B under Insuring Agreement A, to which no SIR is applicable.  LLOYDS therefore owes an immediate duty to defend its insureds in the hereinafter described Underlying Action.

## THE UNDERLYING ACTION

15.     On or about January 18, 2017, Kambiz Ali Kazemi ("KAZEMI") filed suit against the TIPSY PIG, Samuel Scott Josi, Nathan Devin Valentine, Stryker McGalliard Scales and Does 1-50 in San Francisco Superior Court, case no. CGC-17-556547 ("the Underlying Action").   Mr. Josi, Mr. Valentine and Mr. Scales (collectively, "the PRINCIPALS") are officers, directors and/or managers of the TIPSY PIG.  KAZEMI's complaint asserts all claims against the TIPSY PIG and the PRINCIPALS by referring to them collectively as "TIPSY PIG," such that no claim is made separately as against the TIPSY PIG or any of the three PRINCIPALS.  KAZEMI's complaint identifies Does 1-10 as individuals who "owned, operated, managed, maintained, and/or otherwise exercised control over 'the Tipsy Pig,'" and further identifies Does 11-20 as "individuals employed by Defendant TIPSY PIG and/or Does 1 through 10 as managers, directors, officers, managing agents, doormen, bartenders, employees, security personnel and/or bouncers."  KAZEMI's complaint additionally identifies Does 11-12 as "employees and/or agents of TIPSY PIG," who were "hired to act as security guards for the TIPSY PIG."  KAZEMI asserts causes of

6

Hirsch Closson, APLC
1600 South Main Street
Suite 325-C
Walnut Creek, CA 94596
(925) 935-9800

Complaint for Declaratory Relief - Duty to Defend; Equitable Contribution          Case No. 18-7504

action for assault, battery, intentional infliction of emotional distress, defamation per se, premises liability, violation of the Unruh Civil Rights Act (Civ. Code § 51.7), violation of the Ralph Act (Civ. Code § 51.7) and negligent hiring, supervision and retention.  All causes of action are asserted against all defendants.  In the Underlying Action, it is alleged that on February 13, 2016, KAZEMI, while at the Tipsy Pig restaurant located at 2231 Chestnut St., San Francisco, California 94123, was forcibly removed therefrom by Does 11-12, and was thereafter violently attacked and injured by Does 11-20, which conduct is alleged to have been committed on behalf of, or otherwise attributable to, the TIPSY PIG, the PRINCIPALS and/or Does 1-10.  A true and correct copy of the Complaint in the Underlying Action is attached hereto and incorporated herein as Exhibit "C."

16.    USIC is informed and believes and thereon alleges that the PRINCIPALS and Does 1-20 qualify as "Insureds" and "Insured Persons" as those terms are defined in Coverage Section B of the LLOYDS Policy, such that claims first made against the PRINCIPALS and Does 1-20 for wrongful acts are potentially covered within Coverage Section B under Insuring Agreement A, to which no SIR is applicable.

17.    On or about March 2, 2017, the TIPSY PIG and the PRINCIPALS (collectively, "the INSUREDS") tendered defense and indemnity of the Underlying Action to USIC.  USIC accepted the defense of the INSUREDS subject to a reservation of rights. USIC's defense of the INSUREDS was not "voluntary" within the meaning of any "voluntary payments" clause of the LLOYDS Policy.

18.    In or about early 2017, the INSUREDS tendered defense and indemnity of the Underlying Action to LLOYDS.  On or about April 6, 2017, Cory Stumpf of Kaufman, Borgeest & Ryan LLP, coverage and monitoring counsel appointed by LLOYDS, provided via email that "[w]e are agreeable to the retention of Joe Ehrlich as defense counsel and [LLOYDS] is willing to split Mr. Ehrlich's defense fees 50/50."  However, upon receipt of the first invoice for such defense fees from Mr. Ehrlich, which was sent to Mr. Stumpf via email on or about April 20, 2017, he replied that "[c]laims made under Tipsy Pig's Policy with [LLOYDS] are subject to a $35,000 Retention.  The Policy specifies that the Retention

7

Hirsch Closson, APLC
1600 South Main Street
Suite 325-C
Walnut Creek, CA 94596
(925) 935-9800

is Tipsy Pig's 'uninsured responsibility.'  As such, Tipsy Pig is responsible for the first $35,000 of [LLOYDS'] portion of defense fees."  No facts, information, analysis, or other explanation was proffered in support of LLOYDS' position that a $35,000 SIR applied. Despite multiple correspondence between USIC (or those on behalf of USIC) and LLOYDS (or those on behalf of LLOYDS) regarding LLOYDS' coverage position, LLOYDS continues to maintain its reliance that the TIPSY PIG must satisfy a $35,000 SIR as a "condition precedent to coverage."

19.     To date, LLOYDS has failed and/or refused to participate in the defense of its insureds, the TIPSY PIG and the PRINCIPALS, by erroneously relying on the TIPSY PIG's satisfaction of an entirely inapplicable SIR, and failing and/or refusing to acknowledge that a potential for coverage exists within Coverage Section B under Insuring Agreement A, which does not require satisfaction of an SIR.  USIC, on the other hand, has provided a complete defense to the INSUREDS in the Underlying Action in compliance with California law.  LLOYDS has yet to contribute any funds toward the defense of the parties' mutual insureds, and has thereby caused, and will continue to cause, USIC to expend monies for defense costs beyond its rightful, equitable and proportionate share of responsibility.

20.     The LLOYDS Policy is a primary policy triggered by claims first made against an "insured" (other than the TIPSY PIG, which is the "Insured Company") for wrongful acts, which are potentially covered within Coverage Section B under Insuring Agreement A to which no SIR is applicable, and therefore LLOYDS is required to immediately defend its INSUREDS with respect to the entire Underlying Action.  Under California law and the terms of the LLOYDS Policy, LLOYDS cannot require satisfaction of any SIR that may be potentially under any other coverage part of the LLOYDS Policy to which an SIR is applicable as a condition precedent to coverage.  USIC and the parties' mutual insured, the INSUREDS, have demanded and continue to demand that LLOYDS participate in the defense and indemnity of the INSUREDS with respect to the Underlying Action, and LLOYDS has failed to respond to and/or rejected those demands.

21.     USIC is informed and believes and thereon alleges, that the claims against the

8

Hirsch Closson, APLC
1600 South Main Street
Suite 325-C
Walnut Creek, CA 94596
(925) 935-9800

Complaint for Declaratory Relief - Duty to Defend; Equitable Contribution          Case No. 18-7504

1 INSUREDS in the Underlying Action are claims against which the Defendants, and each of

2 them, should have defended immediately without requiring satisfaction of an SIR to trigger

3 such duty to defend, and are obligated under the terms of their policies, including the

4 LLOYDS Policy, and California law to defend the INSUREDS pursuant to the Defendants'

5 respective policies, including the LLOYDS Policy.

6 **FIRST CAUSE OF ACTION**

7 **Declaratory Relief - Duty to Defend**

8 **(Against All Defendants)**

9   22. Paragraphs 1 through 21 of this Complaint are incorporated herein by reference

10 in this cause of action as though fully set forth herein.

11   23. Plaintiff asserts that Defendants, and each of them, have independent duties

12 under their respective primary policies of liability insurance, including the LLOYDS Policy,

13 to provide a complete defense to the INSUREDS, including payment of the costs, fees and

14 expenses (collectively hereinafter, "defense costs") of said defense.  Defendants' policies,

15 including the LLOYDS Policy, provide primary coverage and a duty to defend and indemnify

16 for covered "Loss" resulting from claims first made against an "insured" during the

17 applicable policy period for "wrongful acts."  When such claims are first made against any

18 other "insured" aside from the TIPSY PIG (i.e., the "Insured Company"), said claims

19 potentially come within Coverage Section B under Insuring Agreement A, to which no SIR

20 is applicable.  USIC is informed and believes and thereon alleges that the Underlying Action

21 includes claims that were first made against an "insured" (other than the TIPSY PIG), which

22 includes the PRINCIPALS and Does 1-20 as set forth in the complaint in the Underlying

23 Action, during the applicable policy period for "wrongful acts," as that term is defined by

24 Defendants' policies, including the LLOYDS Policy, which are not otherwise excluded by

25 the terms of the those policies.  Accordingly Defendants, and each of them, have an

26 immediate duty to participate in the defense of the INSUREDS in the Underlying Action,

27 which defense obligation is not conditioned upon the satisfaction of an SIR.

28   24. As a result of the wrongful failure and/or refusal by Defendants, and each of

Hirsch Closson, APLC
1600 South Main Street
Suite 325-C
Walnut Creek, CA 94596
(925) 935-9800

1    them, to pay an equitable share of the defense costs of the INSUREDS in the Underlying

2    Action, USIC has been caused and/or will be caused to expend monies for defense costs

3    beyond its rightful, equitable and proportionate share of responsibility.

4        25.    There is an actual and present controversy between USIC, on the one hand, and

5    Defendants LLOYDS and DOE Defendants 1-10, and each of them, on the other, as to the

6    respective rights and obligations under the aforementioned insurance policies with regard to

7    defense obligations owed to the INSUREDS relative to the Underlying Action.   Plaintiff

8    contends that the Defendants' policies, including the LLOYDS Policy, provide potential

9    coverage to which no SIR is applicable, for the defense and indemnity in the Underlying

10   Action, and the obligation to defend and indemnify the INSUREDS in the Underlying Action

11   should be prorated and shared equally between Plaintiff and Defendants, and each of them;

12   or to the extent it is determined that USIC has no coverage, to bear the entire cost of defense.

13   Defendants, including LLOYDS, contend that they owe no duty to defend the INSUREDS

14   unless and until the TIPSY PIG satisfies a $35,000 SIR.   By reason thereof, an actual

15   controversy has arisen and now exists between Plaintiff on one hand and LLOYDS and DOE

16   Defendants 1-10 on the other, and a judicial determination of such controversy is necessary

17   and appropriate at this time.   As a result of the wrongful failure and/or refusal by Defendants,

18   and each of them, to pay an equitable share of the defense costs of the INSUREDS in the

19   Underlying Action, USIC has been caused and/or will be caused to expend monies for

20   defense costs beyond its rightful, equitable and proportionate share of responsibility.

21       26.    By reason of the foregoing, a controversy exists between the parties hereto,

22   which requires a declaratory judgment of this Court.

23                        **SECOND CAUSE OF ACTION**

24                           **Equitable Contribution**

25                          **(Against All Defendants)**

26       27.    Paragraphs 1 through 26 of this Complaint are incorporated herein by reference

27   in this cause of action as though fully set forth herein.

28       28.    As a result of the claims against the INSUREDS in the Underlying Action,

Hirsch Closson, APLC
1600 South Main Street
Suite 325-C
Walnut Creek, CA 94596
(925) 935-9800

USIC was required to incur defense costs.  As a consequence of the refusal of LLOYDS and DOE Defendants 1-10, and each of them, to participate in the defense of the INSUREDS, USIC has been compelled to pay a disproportionate percentage of the INSUREDS' defense costs relative to the claims in the Underlying Action, and may be compelled to pay a disproportionate share of indemnity in the Underlying Action in the form of either a disproportionate share of any covered judgement in the Underlying Action or such settlement as may be negotiated therein.

29.    If it is determined that there is a potential for coverage under Defendants' primary liability policies, including the LLOYDS Policy, to which no SIR is applicable, and as a result thereof Defendants, and each of them, owed an immediate duty to defend the INSUREDS in the Underlying Action, Plaintiff is entitled to equitable contribution of a share of said defense costs and/or indemnity from said Defendants, and each of them.

30.    Plaintiff is informed and believes and thereon alleges that as a result of claims first made against an insured (other than the TIPSY PIG), which includes the PRINCIPALS and Does 1-20, during the applicable policy period for wrongful acts, which claims are potentially covered within Coverage Section B under Insuring Agreement A to which no SIR applies, and because their policies are primary policies; under California law, Defendants, and each of them, have an obligation to participate in the defense and indemnity of the INSUREDS and to reimburse Plaintiff for an equitable share of the costs of defense and/or indemnity expended by Plaintiff in the Underlying Action.

WHEREFORE, USIC prays for judgment against Defendants, and each of them, as follows:

1.    A declaratory judgment that LLOYDS and DOE Defendants 1-10 are obligated to participate in the defense of the INSUREDS in the Underlying Action;

2.    A determination that USIC is entitled to contribution from Defendants, and each of them, of an equitable share of the defense costs paid by USIC on behalf of the INSUREDS in the Underlying Action;

3.    A determination of the amount of contribution to which USIC is entitled from

11

Hirsch Closson, APLC
1600 South Main Street
Suite 325-C
Walnut Creek, CA 94596
(925) 935-9800

Complaint for Declaratory Relief - Duty to Defend; Equitable Contribution          Case No. 18-7504

1    Defendants, and each of them, for defense costs and/or indemnity in the

2    Underlying Action;

3    4.    For prejudgment interest at the legal rate;

4    5.    For costs of suit incurred herein; and

5    6.    For such other and further relief as the Court deems just and proper.

6

7                                    HIRSCH CLOSSON, APLC

8

9    DATED: December 12, 2018              By_____
                                              Clifford Hirsch, Esq.
10                                            Christopher T. Hicks, Esq.
                                              Attorneys for Plaintiff,
11                                            United Specialty Insurance Company

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Hirsch Closson, APLC
1600 South Main Street
Suite 325-C
Walnut Creek, CA 94596
(925) 935-9800

Complaint for Declaratory Relief - Duty to Defend; Equitable Contribution          Case No. 18-7504

**Exhibit A**



United Specialty Insurance Company


PROGRAM ADMINISTRATOR



Entertainment Risk
11350 McCormick Rd.
Executive Plaza II
Suite 1002
Hunt Valley, MD 21031
844-ENT-RISK (368-7475)


In the event you need additional information, claim handling or a general inquiry, please call
your local independent agent or the Program Administrator listed above.

## NOTICE:

1.    THE INSURANCE POLICY THAT YOU HAVE PURCHASED IS BEING ISSUED BY AN INSURER THAT IS NOT LICENSED BY THE STATE OF CALIFORNIA. THESE COMPANIES ARE CALLED "NONADMITTED" OR "SURPLUS LINE" INSURERS.

2.    THE INSURER IS NOT SUBJECT TO THE FINANCIAL SOLVENCY REGULATION AND ENFORCEMENT THAT APPLY TO CALIFORNIA LICENSED INSURERS.

3.    THE INSURER DOES NOT PARTICIPATE IN ANY OF THE INSURANCE GUARANTEE FUNDS CREATED BY CALIFORNIA LAW. THEREFORE, THESE FUNDS WILL NOT PAY YOUR CLAIMS OR PROTECT YOUR ASSETS IF THE INSURER BECOMES INSOLVENT AND IS UNABLE TO MAKE PAYMENTS AS PROMISED.

4.    THE INSURER SHOULD BE LICENSED EITHER AS A FOREIGN INSURER IN ANOTHER STATE IN THE UNITED STATES OR AS A NON-UNITED STATES (ALIEN) INSURER. YOU SHOULD ASK QUESTIONS OF YOUR INSURANCE AGENT, BROKER, OR "SURPLUS LINE" BROKER OR CONTACT THE CALIFORNIA DEPARTMENT OF INSURANCE AT THE FOLLOWING TOLL-FREE TELEPHONE NUMBER: 1-800-927-4357. ASK WHETHER OR NOT THE INSURER IS LICENSED AS A FOREIGN OR NON-UNITED STATES (ALIEN) INSURER AND FOR ADDITIONAL INFORMATION ABOUT THE INSURER. YOU MAY ALSO CONTACT THE NAIC'S INTERNET WEB SITE AT WWW.NAIC.ORG.

5.    FOREIGN INSURERS SHOULD BE LICENSED BY A STATE IN THE UNITED STATES AND YOU MAY CONTACT THAT STATE'S DEPARTMENT OF INSURANCE TO OBTAIN MORE INFORMATION ABOUT THAT INSURER.

6.    FOR NON-UNITED STATES (ALIEN) INSURERS, THE INSURER SHOULD BE LICENSED BY A COUNTRY OUTSIDE OF THE UNITED STATES AND SHOULD BE ON THE NAIC'S INTERNATIONAL INSURERS DEPARTMENT (IID) LISTING OF

APPROVED NONADMITTED NON-UNITED STATES INSURERS. ASK YOUR AGENT, BROKER, OR "SURPLUS LINE" BROKER TO OBTAIN MORE INFORMATION ABOUT THAT INSURER.

7.   CALIFORNIA MAINTAINS A LIST OF APPROVED SURPLUS LINE INSURERS. ASK YOUR AGENT OR BROKER IF THE INSURER IS ON THAT LIST, OR VIEW THAT LIST AT THE INTERNET WEB SITE OF THE CALIFORNIA DEPARTMENT OF INSURANCE: WWW.INSURANCE.CA.GOV.

8.   IF YOU, AS THE APPLICANT, REQUIRED THAT THE INSURANCE POLICY YOU HAVE PURCHASED BE BOUND IMMEDIATELY, EITHER BECAUSE EXISTING COVERAGE WAS GOING TO LAPSE WITHIN TWO BUSINESS DAYS OR BECAUSE YOU WERE REQUIRED TO HAVE COVERAGE WITHIN TWO BUSINESS DAYS, AND YOU DID NOT RECEIVE THIS DISCLOSURE FORM AND A REQUEST FOR YOUR SIGNATURE UNTIL AFTER COVERAGE BECAME EFFECTIVE, YOU HAVE THE RIGHT TO CANCEL THIS POLICY WITHIN FIVE DAYS OF RECEIVING THIS DISCLOSURE. IF YOU CANCEL COVERAGE, THE PREMIUM WILL BE PRORATED AND ANY BROKER'S FEE CHARGED FOR THIS INSURANCE WILL BE RETURNED TO YOU.

**D-2 (Effective July 21, 2011)**

POLICY NUMBER: **ENT 000180-01-15**                    Form: **ER CPD 10 14**

# COMMON POLICY DECLARATIONS

| | |
|---|---|
| **United Specialty Insurance Company**<br>**C/O Entertainment Risk, LLC**<br>**11350 McCormick Road**<br>**Executive Plaza II; Ste 1002**<br>**Hunt Valley, MD 21031** | **Baldinger Insurance Services, Inc.**<br>**6656 Dume Dr.**<br>**Malibu, CA 90265** |

NAMED INSURED:   Our Neighborhood Place, LLC  dba: The Tipsy Pig
MAILING ADDRESS:   2231 Chestnut St., San Francisco, CA 94123

POLICY PERIOD:   FROM   2/17/2015        TO   2/17/2016        AT 12:01 A.M. STANDARD

LOCATION OF BUSINESS: **SEE FORM: ER 10 34 04 14**
BUSINESS DESCRIPTION: **Lounge**

THE NAMED INSURED IS A:
☐ Individual     ☐ Partnership     ☒ Limited Liability Company     ☐ Organization/Corporation     ☐ Trust
☐ Other _____

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

| THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM IS INDICATED. THIS PREMIUM MAY BE SUBJECT TO ADJUSTMENT. | |
|---|---|
| | **PREMIUM** |
| COMMERCIAL GENERAL LIABILITY COVERAGE PART | $ ▬▬▬ |
| LIQUOR LIABILITY COVERAGE PART | $ ▬▬▬ |
| TERRORISM RISK INSURANCE ACT COVERAGE | $ ▬▬▬ |
| POLICY FEE | $ ▬▬▬ |
| INSPECTION FEE | $ ▬▬▬ |
| SURPLUS LINES TAX | $ _____ |
| SURPLUS LINES ASSOCIATION FEE | $ _____ |
| | $ |
| **TOTAL ADVANCE PREMIUM:** | $ ▬▬▬ |
| Premium shown is payable: | |

| **FORMS APPLICABLE TO ALL COVERAGE PARTS:** |
|---|
| **REFER TO FORM: ER SCF 04 14** |

THESE DECLARATIONS TOGETHER WITH THE COVERAGE PART DECLARATIONS, THE COMMON POLICY CONDITIONS, COVERAGE FORMS AND ANY ENDORSEMENTS COMPLETE THE ABOVE NUMBERED POLICY.

| Countersigned: | By: |
|---|---|
| (Date) | (Authorized Representative) |

**NOTE**

OFFICERS' FACSIMILE SIGNATURES MAY BE INSERTED HERE, ON THE POLICY COVER OR ELSEWHERE AT THE COMPANY'S OPTION.

POLICY NUMBER: **ENT 000180-01-15**

**ER SCF 04 14**

| | | **Common Policy Forms** |
|---|---|---|
| | | |
| **ER PC 10 14** | | POLICY COVER PAGE |
| **D2** | | CALIFORNIA SURPLUS LINES DISCLOSURE |
| **ER CPD 10 14** | | COMMON POLICY DECLARATIONS |
| **ER SCF 04 14** | | SCHEDULE OF COMMON FORMS |
| **ER IL 01 04 14** | | COMMON POLICY CONDITIONS |
| **IL 00 21 09 08** | | NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT (BROAD FORM) |
| **ER IL 02 10 14** | | CLAIMS REPORTING |
| **CG 24 02 12 04** | | BINDING ARBITRATION |
| **ER 10 35 04 14** | | CLASSIFICATION LIMITATION |
| **ER IL 04 04 14** | | IN-WITNESS CLAUSE |
| **ER IL 06 07 14** | | NON STACKING OF LIMITS ENDORSEMENT |
| **ER 10 34 04 14** | | LIMITATION OF COVERAGE- DESIGNATED PREMISES OR PROJECT |
| **ER 10 05 04 14** | | ASSAULT OR BATTERY EXCLUSION |
| **ER 10 19 04 14** | | PUNITIVE DAMAGES EXCLUSION |
| **ER 10 03 04 14** | | AMUSEMENT DEVICE EXCLUSION |
| **ER 10 06 04 14** | | ATHLETIC PARTICIPANTS EXCLUSION |
| **CG 21 73 01 15** | | EXCLUSION OF CERTIFIED ACTS OF TERRORISM |
| **ER 10 14 04 14** | | DESIGNATED PROMOTIONS EXCLUSION |
| **ER 10 31 04 14** | | STUNT ACTIVITY EXCLUSION |
| **ER AI 02 04 14** | | ADDITIONAL INSURED- BLANKET ENDORSEMENT |
| **IL 02 70 09 12** | | CALIFORNIA CHANGES- CANCELLATION OR NONRENEWAL |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

POLICY NUMBER: **ENT 000180-01-15**                                    Form: **ER IL 01 04 14**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# COMMON POLICY CONDITIONS

**All Coverage Parts included in this policy are subject to the following conditions:**

**A. Cancellation**

   **1.** The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

   **2.** We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

      **a.** 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

      **b.** 30 days before the effective date of cancellation if we cancel for any other reason.

   **3.** We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

   **4.** Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

   **5.** If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

   **6.** If notice is mailed, proof of mailing will be sufficient proof of notice.

**B. Changes**

This policy contains all the agreements between you and us concerning the insurance afforded.  The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

**C. Examination Of Your Books And Records**

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

**D. Inspections And Surveys**

   **1.** We have the right to:

      **a.** Make inspections and surveys at any time;

      **b.** Give you reports on the conditions we find; and

      **c.** Recommend changes.

   **2.** We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

      **a.** Are safe or healthful; or

      **b.** Comply with laws, regulations, codes or standards.

   **3.** Paragraphs **1.** and **2.** of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

4.  Paragraph **2.** of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification under state or municipal statutes, ordinances or regulation of boilers, pressure vessels or elevators.

5.  You are required to comply with any written recommendations for any "discrepancy" described and detailed in a Compliance Safety Accountability Letter ("CSA") that is mailed to the address found on the Declarations page of this Policy, within the requested timespan.

    a.  For the purpose of this insurance, "discrepancy" shall mean any on premises conflict, variation or disparity between law, regulation, standard, ordinance, rule, guideline, code or otherwise, governing or adopted for the designated premises and the design, construction, maintenance, operation or use of the designated premises of the insured which creates a material change in risk.

6.  We have the right to suspend coverage afforded to you under this Policy specifically for a designated "discrepancy" on the CSA mailed to the address found on the Declarations page of this Policy, for your failure to comply within the requested timespan.

    a.  A notice of suspension, accompanied with the exclusion that has been endorsed onto the Policy, will be mailed to the address found on the Declarations page of the Policy.

    b.  The notice of suspension will include:

        i.   The date suspension began;
        ii.  A description of "discrepancy" coverage has been suspended for; and
        iii. Copies of all CSA's previously sent to the address found on the Declarations page of this Policy.

7.  Suspended coverage for a "discrepancy", may be reinstated upon compliance verification by us. A reinstatement notice, accompanied with the applicable endorsement removing the exclusion from the Policy, will be mailed to the address found on the Declarations page of this Policy.

**E.  Premiums**

The first Named Insured shown in the Declarations:

1.  Is responsible for the payment of all premiums; and

2.  Will be the payee for any return premiums we pay.

**F.  Transfer Of Your Rights And Duties Under This Policy**

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual Named Insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

**G.  Premium Basis**

One or more of the following symbols may be entered under the Premium Basis/Base column of the Coverage Part Declarations. These symbols designate the basis used for determining your premium.  The following is a definition of these symbols when used as a premium basis.

Symbol   Definition

a        "Admissions" means:

         The total number of persons, other than employees of the Named Insured, admitted to the event insured or to events conducted on the premises whether on paid admissions, tickets, complimentary tickets or passes.  The rates apply per 1,000 admissions.

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

b      "Area" means:

    The total number of square feet of floor space at the insured premises, computed as follows:

    1.  For entire buildings, by multiplying the product of the horizontal dimensions of the outside of the outer building walls by the number of floors, including basements but do not use the area of the following:

      a.  Courts and mezzanine types of floor openings.

      b.  Portions of basements or floors where 50% or more of the area is used for shop or storage for  building maintenance, dwelling by building  maintenance  employees, heating units, power plants or air-conditioning equipment.

    2.  For tenants, determine the area they occupy in the same manner as for the entire buildings.

    3.  The rates apply per 1,000 square feet of area.

c      "Total Cost" means:

    The total cost of all work let or sublet in connection with each specific project including:

    1.  The cost of all labor, materials and equipment furnished, used or delivered for use in the execution of the work; however, do not include the cost of finished equipment installed but not furnished by the subcontractor if the subcontractor does no other work on or in connection with such equipment; and

    2.  All fees, bonuses or commissions made, paid or due.

    3.  The rates apply per $1,000 of total cost.

e      "Each" means:

    A quantity comprising one unit of exposure as described in the classification description.

p      "Payroll" means:

    1.  Remuneration which including money or substitutes for money.

    2.  Payroll includes:

    a.  Commissions, bonuses, pay for holidays, vacations or periods of illness;

    b.  Extra pay for overtime in accordance with the manuals in use by us;

    c.  Payments by an employer of amounts otherwise required by law to be paid by employees to statutory insurance or pension plans, such as the Federal Social Security Act;

    d.  Payments to employees on any basis other than time worked, such as piecework, profit sharing or incentive plans;

    e.  Payment or allowance for hand tools or power tools used by hand provided by employees and used in their work or operations for the insured;

    f.  The rental value of an apartment or a house provided for an employee based on comparable accommodations;

    g.  Value of meals and lodging other than an apartment or house received by employees as part of their pay;

    h.  The value of store certificates, merchandise, credits or any other substitute for money received by employees as part of their pay;

    i.  The payroll of mobile equipment operators and their helpers, whether or not the operators are designated or licensed to operate automobiles.  If the operators and their helpers are provided to the insured along with equipment hired under contract and their actual payroll is not known, use 1/3 of the total amount paid out by the insured for the hire of the equipment;

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

FORM: ER IL 01 04 14

    j.  The payroll of executive officers and individual insureds and co-partners in accordance with the manuals in use by us;

    k.  Fees paid to employment agencies for temporary personnel provided to the insured; and

    l.  90% of fees to personnel leasing firms for workers provided to the insured.

3. Payroll does not include:

    a.  Tips and other gratuities received by employees;

    b.  Payments by an employer to group insurance or group pension plans for employees in accordance with the manuals in use by us;

    c.  The value of special rewards for individual invention or discovery;

    d.  Dismissal or severance payments except for time worked or accrued vacation;

    e.  The payroll of clerical office employees;

    f.  The payroll of salespersons, collectors or messengers who work principally away from the insured's premises. Salespersons, collectors or messengers are those employees engaged principally in any such duties away from the premises of the employer;

       This term does not apply to any employee whose duties include the delivery of any merchandise handled, treated or sold.

    g.  The payroll of drivers and their helpers if their principal duties are to work on or in connection with automobiles; and

    h.  The payroll of aircraft pilots or co-pilots if their principal duties are to work on or in connection with aircraft in either capacity.

4. The rates apply per $1,000 of payroll.

s    "Gross Sales" means:

1. The gross amount charged by the Named Insured, concessionaires of the Named Insured or by others trading under the insured's name for:

    a.  All goods or products, sold or distributed;

    b.  Operations performed during the policy period;

    c.  Rentals; and

    d.  Dues or fees.

2. Inclusions

    The following items shall not be deducted from gross sales

    a.  Foreign exchange discounts;

    b.  Freight allowance to customers;

    c.  Total sales of consigned goods and warehouse receipts;

    d.  Trade or cash discounts;

    e.  Bad debts; and

    f.  Repossession of items sold on installments (amount actually collected).

3. Exclusions

    The following items shall be deducted from gross sales:

    a.  Sales or excise taxes which are collected and submitted to a governmental division;

    b.  Credits for repossessed merchandise and products returned. Allowances for damages and spoiled goods;

    c.  Finance charges for items sold on installments;

    d.  Freight charges on sales if freight is charged as a separate item on customers invoice; and

    e.  Royalty income from patent rights or copyrights which are not product sales.

4. The rates apply per $1,000 of gross sales.

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

**FORM: ER IL 01 04 14**

**H. Calculation of Premium**

The premium shown in the Declarations was computed based on rates in effect at the time the policy was issued. On each renewal, continuation, or anniversary of the effective date of this policy, we will compute the premium in accordance with our rates and rules then in effect.

I. **Minimum Earned Premium**

This policy is subject to a "minimum earned premium". "Minimum earned premium" means the total policy premium.

Audits will not reduce the "minimum earned premium". The due date for audit premiums is the date shown as the due date on the bill.  If after our request you fail to supply us with the necessary information to accurately complete an audit you will be charged an assumed audit rate of 25% of the "minimum earned premium".  Additional premium developed by audit is deemed 100% earned.

**J. Cancellation and Minimum Earned Premium**

1. If you cancel this policy, the return premium will be 90% of the pro rata balance of any remaining unearned premium but no less than 25% of the "minimum earned premium".

2. If we cancel the policy for any reason, other than for non-payment of premium, the "minimum earned premium" shall not apply. We will return to you the pro rata amount of the unearned premium.

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

POLICY NUMBER: **ENT 000180-01-15**                                              **IL 00 21 09 08**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
### (Broad Form)

This endorsement modifies insurance provided under the following:

    COMMERCIAL AUTOMOBILE COVERAGE PART
    COMMERCIAL GENERAL LIABILITY COVERAGE PART
    FARM COVERAGE PART
    LIQUOR LIABILITY COVERAGE PART
    MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
    OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
    POLLUTION LIABILITY COVERAGE PART
    PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
    RAILROAD PROTECTIVE LIABILITY COVERAGE PART
    UNDERGROUND STORAGE TANK POLICY

**1.** The insurance does not apply:

**A.** Under any Liability Coverage, to "bodily injury" or "property damage":

**(1)** With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

**(2)** Resulting from the "hazardous properties" of "nuclear material" and with respect to which **(a)** any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or **(b)** the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

**B.** Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

**C.** Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

**(1)** The "nuclear material" **(a)** is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or **(b)** has been discharged or dispersed therefrom;

**(2)** The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured"; or

**(3)** The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion **(3)** applies only to "property damage" to such "nuclear facility" and any property thereat.

**2.** As used in this endorsement:

"Hazardous properties" includes radioactive, toxic or explosive properties.

"Nuclear material" means "source material", "special nuclear material" or "by-product material".

"Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

"Waste" means any waste material **(a)** containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and **(b)** resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

   **(a)** Any "nuclear reactor";

   **(b)** Any equipment or device designed or used for **(1)** separating the isotopes of uranium or plutonium, **(2)** processing or utilizing "spent fuel", or **(3)** handling, processing or packaging "waste";

   **(c)** Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

   **(d)** Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

© ISO Properties, Inc., 2007

POLICY NUMBER: **ENT 000180-01-15**                    **Form: ER IL 02 10 14**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# CLAIMS REPORTING

All claims are to be reported to:

**Entertainment Risk**
11350 McCormick Road
Executive Plaza II, Ste 1002
Hunt Valley, MD 21031
claims@entertainmentrisk.com

POLICY NUMBER: **ENT 000180-01-15**

**COMMERCIAL GENERAL LIABILITY**
**CG 24 02 12 04**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# BINDING ARBITRATION

This endorsement modifies insurance provided under the following:

    COMMERCIAL GENERAL LIABILITY COVERAGE PART
    ELECTRONIC DATA LIABILITY COVERAGE PART
    LIQUOR LIABILITY COVERAGE PART
    OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
    POLLUTION LIABILITY COVERAGE PART
    PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
    PRODUCT WITHDRAWAL COVERAGE PART
    RAILROAD PROTECTIVE LIABILITY COVERAGE PART
    UNDERGROUND STORAGE TANK POLICY

If we and the insured do not agree whether coverage is provided under this Coverage Part for a claim made against the insured, then either party may make a written demand for arbitration.

When this demand is made, each party will select an arbitrator. The two arbitrators will select a third. If they cannot agree within 30 days, either may request that selection be made by a judge of a court having jurisdiction. Each party will:

    **1.** Pay the expenses it incurs; and

    **2.** Bear the expenses of the third arbitrator equally.

Unless both parties agree otherwise, arbitration will take place in the county or parish in which the address shown in the Declarations is located. Local rules of law as to procedure and evidence will apply. A decision agreed to by two of the arbitrators will be binding.

© ISO Properties, Inc., 2003

POLICY NUMBER: **ENT 000180-01-15**                                      **Form: ER 10 35 04 14**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# CLASSIFICATION LIMITATION

**This endorsement modifies insurance provided under all coverage parts.**

This insurance is specifically limited to those classification codes listed in the policy. No coverage is provided for, and this insurance does not apply to, any classification code or operation performed by any Named Insured not specifically listed in the Declarations of this policy.

POLICY NUMBER: **ENT 000180-01-15**                    **Form: ER IL 04 04 14**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# IN WITNESS CLAUSE

This policy is signed by officers of the Company shown on the Declaration page of this policy.

For: United Specialty Insurance Company

President

Secretary

POLICY NUMBER: **ENT 000180-01-15**                    **FORM: ER IL 06 07 14**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# NON-STACKING OF LIMITS ENDORSEMENT
**TWO OR MORE COVERAGE FORMS, COVERAGE PARTS OR POLICIES ISSUED BY US**

**This endorsement modifies insurance provided under all coverage forms or coverage parts.**

If any Coverage Form, Coverage Part or policy issued to you by us or any company affiliated with us apply to the same claim for damages, the maximum Limit of Insurance for Liability Coverage under all of the Coverage Forms, Coverage Parts or policies shall not exceed the highest applicable per occurrence or per claim Limit of Insurance available under any one Coverage Form, Coverage Part or policy.

This endorsement does not apply to any Coverage Form, Coverage Part, or policy issued by us or an affiliated company specifically to apply as excess insurance over this policy.

POLICY NUMBER: **ENT 000180-01-15**                                    **Form: ER 10 34 04 14**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# LIMITATION OF COVERAGE-DESIGNATED PREMISES OR PROJECT

**This endorsement modifies insurance provided under the following:**

> **GENERAL LIABILITY COVERAGE PART**
> **LIQUOR LIABILITY COVERAGE PART**

**SCHEDULE**

| |
|---|
| **Premises:**<br>1.   2231 Chestnut St., San Francisco, CA 94123<br>2.   2215 Chestnut St., #2, San Francisco, CA 94123 |
| **Project:** |

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

This insurance applies only to "bodily injury", "property damage", "personal and advertising injury" and "injury" arising out of:

1. The ownership, maintenance or use of the premises shown in the SCHEDULE and operations necessary or incidental to those premises; or

2. The project shown in the SCHEDULE.

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

POLICY NUMBER: **ENT 000180-01-15**                    **Form: ER 10 05 04 14**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ASSAULT OR BATTERY EXCLUSION

**This endorsement modifies insurance provided under the following:**

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**
**LIQUOR LIABILITY COVERAGE PART**

1. **Section I-Coverage A-Bodily Injury and Property Damage Liability, 2. Exclusions, a.** is deleted and replaced with the following:
   a. Expected or Intended Injury
      "Bodily injury", "property damage", or "personal and advertising injury" expected or intended from the standpoint of any insured, or any insured's "employees", contractors, or agents.

2. **Section I-Coverage B-Personal and Advertising Injury Liability, 2. Exclusions, a.** is deleted and replaced with the following:
   a. Knowing Violation Of Rights Of Another
      "Personal and advertising injury" actually or allegedly caused by or at the direction of the insured, any insured's "employees", contractors, or agents with the actual or alleged knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

3. **Section I-Liquor Liability Coverage, 2. Exclusions, a.** is deleted and replaced with the following:
   a. Expected or Intended Injury
      "Injury" expected or intended from the standpoint of any insured or any insured's "employees", contractors, or agents.

4. This insurance does not apply to, and we have no duty to defend or indemnify any insured or any other person against, any loss, claim or "suit" for "bodily injury", "property damage", "injury" or "personal and advertising injury", including claims or "suits" for negligence, directly or indirectly, actually or allegedly, arising out of or related to any: assault, battery, molestation, abuse, harmful or offensive contact, false arrest, wrongful detention, false imprisonment, malicious prosecution and/or threat, whether committed by any insured, patron, agent, employee, or any other individual.

   This exclusion applies regardless of fault or intent.

   For purposes of this exclusion, negligence includes but is not limited to allegations or claims for: negligent hiring, negligent employment, negligent training, negligent supervision, the failure to intervene, the failure to render aid, the failure to contact law enforcement, the failure to contact emergency medical services or the failure to detain potentially responsible parties.

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

POLICY NUMBER: **ENT 000180-01-15**                                    **Form: ER 10 19 04 14**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# PUNITIVE DAMAGES EXCLUSION

**This endorsement modifies insurance provided under the following:**

> **COMMERCIAL GENERAL LIABILITY COVERAGE PART**
> **LIQUOR LIABILITY COVERAGE PART**

This insurance does not apply to:

      1. Punitive or exemplary damages;

      2. Fines;

      3. Penalties;

      4. Treble damages; or

      5. Multiplied or multiple damages;

imposed upon any "insured" including any defense or legal expenses incurred as a result of items 1., 2., 3., 4. or 5., above.

POLICY NUMBER: **ENT 000180-01-15**                          **Form: ER 10 03 04 14**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# AMUSEMENT DEVICES EXCLUSION

**This endorsement modifies insurance provided under the following:**

  **COMMERCIAL GENERAL LIABILITY COVERAGE PART**
  **LIQUOR LIABILITY COVERAGE PART**

This insurance does not apply to any loss, claim, "suit", "bodily injury", "property damage", "injury" or "personal injury and advertising injury", actually or allegedly resulting directly or indirectly from the ownership, maintenance, instruction, supervision or use of "amusement devices".

For the purpose of this insurance, "amusement devices" shall include, but not be limited to:

(a) Any device or apparatus which jostles, bucks or in any similar fashion, moves, or is intended to move, or;

(b) Any mechanical riding devices, including but not limited to, a mechanical bull, steer, shark, surf board, skate board or horse, or;

(c) Any device which requires the user to punch, kick, or strike the device, or;

(d) Dunk tanks, Climbing walls, Trampolines, Inflatables, Playground equipment.

All other terms and conditions shall remain unchanged.

POLICY NUMBER: **ENT 000180-01-15**                                        **Form: ER 10 06 04 14**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ATHLETICS OR SPORTS PARTICIPANTS EXCLUSION

**This endorsement modifies insurance provided under the following:**

    **COMMERCIAL GENERAL LIABILITY COVERAGE PART**
    **LIQUOR LIABILITY COVERAGE PART**

This insurance does not apply to "bodily injury", "property damage", "injury" or "personal injury and advertising injury" to any person practicing for or participating in any sports or athletic contest or exhibition.

POLICY NUMBER: **ENT 000180-01-15**

**COMMERCIAL GENERAL LIABILITY**
**CG 21 73 01 15**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION OF CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**A.** The following exclusion is added:

This insurance does not apply to:

**TERRORISM**

"Any injury or damage" arising, directly or indirectly, out of a "certified act of terrorism".

**B.** The following definitions are added:

**1.** For the purposes of this endorsement, "any injury or damage" means any injury or damage covered under any Coverage Part to which this endorsement is applicable, and includes but is not limited to "bodily injury", "property damage", "personal and advertising injury", "injury" or "environmental damage" as may be defined in any applicable Coverage Part.

**2.** "Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**a.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**b.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**C.** The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for injury or damage that is otherwise excluded under this Coverage Part.

POLICY NUMBER: **ENT 000180-01-15**                                  **Form: ER 10 14 04 14**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# DESIGNATED PROMOTIONS EXCLUSION

**This endorsement modifies insurance provided under the following:**

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**
**LIQUOR LIABILITY COVERAGE PART**

This insurance does not apply to any claim, loss, "suit", "bodily injury", "property damage", "injury" or "personal injury and advertising injury" actually or allegedly arising directly or indirectly from, or resulting in whole or in part out of, or resulting in whole or in part from the use of, failure to use, or is based upon or attributable to:

1. Drinking games, including, but not limited to, beer pong, flip cup, funneling, or any game which may lead to the over consumption of alcohol; or
2. Any event where your employees, agents or patrons voluntarily spray large quantities of liquids into or onto crowds and/or groups of patrons including, but not limited to, champagne wars; or
3. Foam parties, including, but not limited to, the manufacturing and delivering of foam or similar substance into or onto all or a portion of the premises while patrons are present; or
4. The use of liquid nitrogen; or
5. Any beverage which has been ignited prior to consumption.

POLICY NUMBER: **ENT 000180-01-15**                                          **Form: ER 10 31 04 14**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# STUNT ACTIVITY EXCLUSION

**This endorsement modifies insurance provided under the following:**

> **COMMERCIAL GENERAL LIABILITY COVERAGE PART**
> **LIQUOR LIABILITY COVERAGE PART**

This insurance does not apply to any loss, claim, "suit", "bodily injury", "property damage", "injury" or "personal and advertising injury" arising directly or indirectly or in any way related to "stunt activity".

"Stunt activity" means: any activity, feat or trick requiring special skills, expertise, device or daring.

POLICY NUMBER: **ENT 000180-01-15**                          **FORM: ER AI 02 04 14**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – BLANKET ENDORSEMENT

**This endorsement modifies insurance provided under the following:**

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**
**LIQUOR LIABILITY COVERAGE PART**

### SCHEDULE

| **Name of Person(s) or Organization(s):** |
| --- |
| 1.  Any landlord, owner and manager of premises leased to you and shown in the SCHEDULE on form ER 10 34 04 14, as required by written contract, with respect to its ownership or management of the part of premises leased to you. The foregoing shall not extend to any "occurrence" which takes place after you cease to be a tenant in that premises, or structural alterations, new construction or demolition operations performed by or on behalf of any owner, landlord or manager of the leased premises. |
| This endorsement only applies to the premises or location(s) specifically described in this schedule. |

**A. Section II – Who Is An Insured** is amended to include as an insured any person or organization shown in the schedule, whom you are required to add as an additional insured on this policy under a written contract or written agreement;  but  the written contract or written agreement must be:

**1.** Currently in effect or becoming effective during the term of this policy; and

**2.** Executed prior to the "bodily injury," "property damage," or "personal and advertising injury".

However:

**1.** The insurance afforded to such additional insured only applies to the extent permitted by law; and

**2.** The insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**3.** The person or organization is an additional insured solely with respect to liability imposed or sought to be imposed on the person or organization due to the actual or alleged acts or omissions of a Named Insured. This insurance does not apply to any liability or damages imposed or sought to be imposed on any additional insured due to the actual or alleged acts or omissions of the additional insured, their employee's, agent's or contractor's.

**B.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III – Limits Of Insurance:**

The most we will pay on behalf of the additional insured is the amount of insurance:

**1.** Required by the contract or agreement; or

**2.** Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

Includes copyrighted material of Insurance Services Office, Inc. with its permission.                          **Page 1 of 1**

POLICY NUMBER: **ENT 000180-01-15**                                          **IL 02 70 09 12**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# CALIFORNIA CHANGES – CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**A.** Paragraphs **2.** and **3.** of the **Cancellation** Common Policy Condition are replaced by the following:

**2. All Policies In Effect For 60 Days Or Less**

If this policy has been in effect for 60 days or less, and is not a renewal of a policy we have previously issued, we may cancel this policy by mailing or delivering to the first Named Insured, at the mailing address shown in the policy, and to the producer of record, advance written notice of cancellation, stating the reason for cancellation, at least:

**a.** 10 days before the effective date of cancellation if we cancel for:

**(1)** Nonpayment of premium; or

**(2)** Discovery of fraud by:

**(a)** Any insured or his or her representative in obtaining this insurance; or

**(b)** You or your representative in pursuing a claim under this policy.

**b.** 30 days before the effective date of cancellation if we cancel for any other reason.

**3. All Policies In Effect For More Than 60 Days**

**a.** If this policy has been in effect for more than 60 days, or is a renewal of a policy we issued, we may cancel this policy only upon the occurrence, after the effective date of the policy, of one or more of the following:

**(1)** Nonpayment of premium, including payment due on a prior policy we issued and due during the current policy term covering the same risks.

**(2)** Discovery of fraud or material misrepresentation by:

**(a)** Any insured or his or her representative in obtaining this insurance; or

**(b)** You or your representative in pursuing a claim under this policy.

**(3)** A judgment by a court or an administrative tribunal that you have violated a California or Federal law, having as one of its necessary elements an act which materially increases any of the risks insured against.

**(4)** Discovery of willful or grossly negligent acts or omissions, or of any violations of state laws or regulations establishing safety standards, by you or your representative, which materially increase any of the risks insured against.

**(5)** Failure by you or your representative to implement reasonable loss control requirements, agreed to by you as a condition of policy issuance, or which were conditions precedent to our use of a particular rate or rating plan, if that failure materially increases any of the risks insured against.

**(6)** A determination by the Commissioner of Insurance that the:

  **(a)** Loss of, or changes in, our reinsurance covering all or part of the risk would threaten our financial integrity or solvency; or

  **(b)** Continuation of the policy coverage would:

    **(i)** Place us in violation of California law or the laws of the state where we are domiciled; or

    **(ii)** Threaten our solvency.

**(7)** A change by you or your representative in the activities or property of the commercial or industrial enterprise, which results in a materially added, increased or changed risk, unless the added, increased or changed risk is included in the policy.

**b.** We will mail or deliver advance written notice of cancellation, stating the reason for cancellation, to the first Named Insured, at the mailing address shown in the policy, and to the producer of record, at least:

**(1)** 10 days before the effective date of cancellation if we cancel for nonpayment of premium or discovery of fraud; or

**(2)** 30 days before the effective date of cancellation if we cancel for any other reason listed in Paragraph **3.a.**

**B.** The following provision is added to the **Cancellation** Common Policy Condition:

**7. Residential Property**

This provision applies to coverage on real property which is used predominantly for residential purposes and consisting of not more than four dwelling units, and to coverage on tenants' household personal property in a residential unit, if such coverage is written under one of the following:

Commercial Property Coverage Part

Farm Coverage Part – Farm Property – Farm Dwellings, Appurtenant Structures And Household Personal Property Coverage Form

**a.** If such coverage has been in effect for 60 days or less, and is not a renewal of coverage we previously issued, we may cancel this coverage for any reason, except as provided in **b.** and **c.** below.

**b.** We may not cancel this policy solely because the first Named Insured has:

**(1)** Accepted an offer of earthquake coverage; or

**(2)** Cancelled or did not renew a policy issued by the California Earthquake Authority (CEA) that included an earthquake policy premium surcharge.

However, we shall cancel this policy if the first Named Insured has accepted a new or renewal policy issued by the CEA that includes an earthquake policy premium surcharge but fails to pay the earthquake policy premium surcharge authorized by the CEA.

**c.** We may not cancel such coverage solely because corrosive soil conditions exist on the premises. This restriction **(c.)** applies only if coverage is subject to one of the following, which exclude loss or damage caused by or resulting from corrosive soil conditions:

**(1)** Commercial Property Coverage Part – Causes Of Loss – Special Form; or

**(2)** Farm Coverage Part – Causes Of Loss Form – Farm Property, Paragraph **D.** Covered Causes Of Loss – Special.

 © Insurance Services Office, Inc., 2012 IL 02 70 09 12

**C.** The following is added and supersedes any provisions to the contrary:

**Nonrenewal**

**1.** Subject to the provisions of Paragraphs **C.2.** and **C.3.** below, if we elect not to renew this policy, we will mail or deliver written notice, stating the reason for nonrenewal, to the first Named Insured shown in the Declarations, and to the producer of record, at least 60 days, but not more than 120 days, before the expiration or anniversary date.

We will mail or deliver our notice to the first Named Insured, and to the producer of record, at the mailing address shown in the policy.

**2. Residential Property**

This provision applies to coverage on real property used predominantly for residential purposes and consisting of not more than four dwelling units, and to coverage on tenants' household property contained in a residential unit, if such coverage is written under one of the following:

Commercial Property Coverage Part

Farm Coverage Part – Farm Property – Farm Dwellings, Appurtenant Structures And Household Personal Property Coverage Form

**a.** We may elect not to renew such coverage for any reason, except as provided in **b., c.** and **d.** below.

**b.** We will not refuse to renew such coverage solely because the first Named Insured has accepted an offer of earthquake coverage.

However, the following applies only to insurers who are associate participating insurers as established by Cal. Ins. Code Section 10089.16. We may elect not to renew such coverage after the first Named Insured has accepted an offer of earthquake coverage, if one or more of the following reasons applies:

**(1)** The nonrenewal is based on sound underwriting principles that relate to the coverages provided by this policy and that are consistent with the approved rating plan and related documents filed with the Department of Insurance as required by existing law;

**(2)** The Commissioner of Insurance finds that the exposure to potential losses will threaten our solvency or place us in a hazardous condition. A hazardous condition includes, but is not limited to, a condition in which we make claims payments for losses resulting from an earthquake that occurred within the preceding two years and that required a reduction in policyholder surplus of at least 25% for payment of those claims; or

**(3)** We have:

**(a)** Lost or experienced a substantial reduction in the availability or scope of reinsurance coverage; or

**(b)** Experienced a substantial increase in the premium charged for reinsurance coverage of our residential property insurance policies; and

the Commissioner has approved a plan for the nonrenewals that is fair and equitable, and that is responsive to the changes in our reinsurance position.

**c.** We will not refuse to renew such coverage solely because the first Named Insured has cancelled or did not renew a policy, issued by the California Earthquake Authority, that included an earthquake policy premium surcharge.

**d.** We will not refuse to renew such coverage solely because corrosive soil conditions exist on the premises. This restriction **(d.)** applies only if coverage is subject to one of the following, which exclude loss or damage caused by or resulting from corrosive soil conditions:

**(1)** Commercial Property Coverage Part – Causes Of Loss – Special Form; or

**(2)** Farm Coverage Part – Causes Of Loss Form – Farm Property, Paragraph **D.** Covered Causes Of Loss – Special.

**3.** We are not required to send notice of nonrenewal in the following situations:

**a.** If the transfer or renewal of a policy, without any changes in terms, conditions or rates, is between us and a member of our insurance group.

**b.** If the policy has been extended for 90 days or less, provided that notice has been given in accordance with Paragraph **C.1.**

**c.** If you have obtained replacement coverage, or if the first Named Insured has agreed, in writing, within 60 days of the termination of the policy, to obtain that coverage.

**d.** If the policy is for a period of no more than 60 days and you are notified at the time of issuance that it will not be renewed.

**e.** If the first Named Insured requests a change in the terms or conditions or risks covered by the policy within 60 days of the end of the policy period.

**f.** If we have made a written offer to the first Named Insured, in accordance with the timeframes shown in Paragraph **C.1.,** to renew the policy under changed terms or conditions or at an increased premium rate, when the increase exceeds 25%.

© Insurance Services Office, Inc., 2012

**IL 02 70 09 12**

COMMERCIAL GENERAL LIABILITY
ER GLD 10 14

POLICY NUMBER:  **ENT 000180-01-15**

# COMMERCIAL GENERAL LIABILITY DECLARATIONS

| | |
|---|---|
| **United Specialty Insurance Company**<br>**C/O Entertainment Risk, LLC**<br>**11350 McCormick Road**<br>**Executive Plaza II; Ste 1002**<br>**Hunt Valley, MD 21031** | **Baldinger Insurance Services, Inc.**<br>**6656 Dume Dr.**<br>**Malibu, CA 90265** |

NAMED INSURED:     Our Neighborhood Place, LLC  dba: The Tipsy Pig

MAILING ADDRESS:   2231 Chestnut St., San Francisco, CA 94123

POLICY PERIOD:  FROM   2/17/2015        TO  2/17/2016         AT 12:01 A.M.

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

**LIMITS OF INSURANCE**

| | | |
|---|---|---|
| EACH OCCURRENCE LIMIT | $ 1,000,000 | |
| DAMAGE TO PREMISES RENTED TO YOU LIMIT | $ 300,000 | Any one premises |
| MEDICAL EXPENSE LIMIT | $ EXCLUDED | Any one person |
| PERSONAL & ADVERTISING INJURY LIMIT | $ 1,000,000 | Any one person or organization |
| GENERAL AGGREGATE LIMIT | $ 2,000,000 | |
| PRODUCTS/COMPLETED OPERATIONS AGGREGATE LIMIT | $ 2,000,000 | |

LOCATION OF BUSINESS: **SEE FORM: ER 10 34 04 14**

BUSINESS DESCRIPTION: **Lounge**

THE NAMED INSURED IS A:

☐ Individual    ☐ Partnership    ☒ Limited Liability Company    ☐ Organization/Corporation    ☐ Trust

☐ Other _____

| | | | | RATE | | ADVANCE PREMIUM | |
|---|---|---|---|---|---|---|---|
| LOC # | CLASSIFICATION | CODE NO. | PREMIUM BASE | Prem/ Ops | Prod/Comp Ops | Prem/ Ops | Prod/Comp Ops |
| 1 | Restaurants- With sale of alcoholic beverages that are 30% or more but less than 75% of the total annual receipts of the restaurant- Without Dance Floor | 16916 | 4,600,000 | 6.290 | .666 | ▓▓▓▓ | ▓▓▓▓ |
| 2 | Building or Premises- Office- Premises occupied by employees of the insured- Other than Not for Profit | 61224 | 200 | 165.00 | INCL | ▓▓▓ | INCL |
| ALL | Damage to Premises Increased Limit | DMPIL | 1 | 200.00 | INCL | ▓▓▓ | INCL |
| ALL | Additional Insured-Blanket Endorsement | AI-BLNK | 1 | 300.00 | INCL | ▓▓▓ | INCL |
| ALL | Hired and Non Owned Auto Liability | HNOAL | 1 | 600.00 | INCL | ▓▓▓ | INCL |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

**CLASSIFICATION AND PREMIUM**

TOTAL PREMIUM
(SUBJECT TO AUDIT)                    ▓▓▓▓▓

PREMIUM SHOWN IS PAYABLE:        AT INCEPTION        $ ▓▓▓▓▓

$ _____

| AUDIT PERIOD (IF APPLICABLE) | ☒ ANNUALLY | ☐ SEMI-AN-NUALLY | ☐ QUARTERLY | ☐ MONTHLY |
|---|---|---|---|---|

**FORMS APPLICABLE TO COMMERCIAL GENERAL LIABILITY COVERAGE PART**
**SEE FORM: ER SGLF 04 14**

**THESE DECLARATIONS, TOGETHER WITH THE COMMON POLICY CONDITIONS AND COVERAGE FORM(S) AND ANY ENDORSEMENT(S) COMPLETE THE ABOVE NUMBERED POLICY.**

| Countersigned: | By: |
|---|---|
| (Date) | (Authorized Representative) |

**NOTE**

OFFICERS' FACSIMILE SIGNATURES MAY BE INSERTED HERE, ON THE POLICY COVER OR ELSEWHERE AT THE COMPANY'S OPTION.

POLICY NUMBER: **ENT 000180-01-15**                                    **ER SGLF 04 14**

| **General Liability Policy Forms** | | |
|---|---|---|
| | | |
| **ER GLD 10 14** | | COMMERCIAL GENERAL LIABILITY DECLARATIONS |
| **ER SGLF 04 14** | | SCHEDULE OF GENERAL LIABILITY FORMS |
| **ER 01 08 14** | | COMMERCIAL GENERAL LIABILITY COVERAGE FORM |
| **CG 21 65 12 04** | | TOTAL POLLUTION EXCLUSION WITH A BUILDING HEATING, COOLING, AND DEHUMIDIFYING EQUIPMENT EXCEPTION AND A HOSTILE FIRE EXCEPTION |
| **ER 10 18 04 14** | | PYROTECHNICS AND FIREWORKS EXCLUSION |
| **ER 10 11 04 14** | | CROSS SUITS EXCLUSION |
| **ER 20 05 04 14** | | SUBLIMIT ASSAULT OR BATTERY |
| **ER 20 07 04 14** | | HIRED AND NON OWNED AUTO LIABILITY |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

POLICY NUMBER: **ENT 000180-01-15**

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section **II** – Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **V** – Definitions.

## SECTION I – COVERAGES

## COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section **III** – Limits Of Insurance; and

**(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B..**

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B.**

If we initially defend an insured ("insured") or pay for an insured's ("insured's") defense but later determine that the claim(s) is (are) not covered under this insurance, we will have the right to reimbursement for the defense costs we have incurred.

The right to reimbursement for the defense costs under this provision will only apply to defense costs we have incurred after we notify you in writing that there may not be coverage, and that we are reserving our rights to terminate the defense and seek reimbursement for defense costs.

**b.** This insurance applies to "bodily injury" and "property damage" only if:

**(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

**(2)** The "bodily injury" or "property damage" occurs during the policy period; and

**(3)** Prior to the policy period, no insured listed under Paragraph **1.** of Section **II** – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

**c.** "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph **1.** of Section **II** – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

**d.** "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.** of Section **II** – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

**(1)** Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

**(2)** Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

**(3)** Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

**e.** Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

## 2. Exclusions

This insurance does not apply to:

### a. Expected Or Intended Injury

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

### b. Contractual Liability

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

**(1)** That the insured would have in the absence of the contract or agreement; or

**(2)** Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorneys' fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

**(a)** Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

**(b)** Such attorneys' fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

### c. Liquor Liability

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

**(1)** Causing or contributing to the intoxication of any person;

**(2)** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

**(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in:

**(a)** The supervision, hiring, employment, training or monitoring of others by that insured; or

**(b)** Providing or failing to provide transportation with respect to any person that may be under the influence of alcohol; or

**(c)** Failing to prevent any person who may be under the influence of alcohol from driving;

if the "occurrence" which caused the "bodily injury" or "property damage", involved that which is described in Paragraph **(1)**, **(2)** or **(3)** above.

An insured who permits any person to bring any alcoholic beverage on to their premises, for consumption on the premises, whether or not a fee is charged for such activity, will also be considered selling, serving or furnishing alcoholic beverages.

### d. Workers' Compensation And Similar Laws

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

### e. Employer's Liability

"Bodily injury" to:

**(1)** An "employee" of the insured arising out of and in the course of:

**(a)** Employment by the insured; or

**(b)** Performing duties related to the conduct of the insured's business; or

**(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **(1)** above.

This exclusion applies whether the insured may be liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

**f. Pollution**

**(1)** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

**(a)** At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

**(i)** "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests;

**(ii)** "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

**(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

**(b)** At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

**(c)** Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

**(i)** Any insured; or

**(ii)** Any person or organization for whom you may be legally responsible; or

**(d)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

**(i)** "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

**(ii)** "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

**(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

**(e)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

**(2)** Any loss, cost or expense arising out of any:

  **(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

  **(b)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

**g. Aircraft, Auto Or Watercraft**

Any claim, loss, "suit", "bodily injury" or "property damage" arising directly or indirectly out of the ownership, operation, maintenance, or use of an "auto", aircraft or watercraft.

**h. Mobile Equipment**

Any claim, loss, "suit", "bodily injury" or "property damage" arising directly or indirectly out of the ownership, operation, maintenance, or use of "mobile equipment".

**i. War**

"Bodily injury" or "property damage", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**j. Damage To Property**

"Property damage" to:

**(1)** Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

**(2)** Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

**(3)** Property loaned to you;

**(4)** Personal property in the care, custody or control of the insured;

**(5)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs **(1)**, **(3)** and **(4)** of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of seven or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section **III** – Limits Of Insurance.

Paragraph **(2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs **(3)**, **(4)**, **(5)** and **(6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

**k. Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l. Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n. Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)** "Your product";

**(2)** "Your work"; or

**(3)** "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**o. Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

**p. Electronic Data**

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

However, this exclusion does not apply to liability for damages because of "bodily injury".

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**q. Recording And Distribution Of Material Or Information In Violation Of Law**

"Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**(3)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

**(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

Exclusions **c.** through **n.** do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section **III** – Limits Of Insurance.

**r. Discrimination**

Any claim, loss, "suit", "bodily injury", or "property damage", arising directly or indirectly from:

**(1)** the actual or alleged discrimination of any person or persons based upon, but not limited to, color, creed, gender, race, natural origin, age, disability, handicap, illness, religion, or sexual preference; or

**(2)** the actual or alleged failure to comply with the Americans with Disabilities Act or any other similar federal, state or municipal laws.

**s. Employment Related Practices**

"Bodily injury" to:

**(1)** A person arising out of any:

**(a)** Refusal to employ that person;

**(b)** Termination of that person's employment; or

**(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in Paragraphs **(a)**, **(b)**, or **(c)** above is directed.

This exclusion applies:

**(1)** Whether the injury-causing event described in Paragraphs **(a)**, **(b)** or **(c)** above occurs before employment, during employment or after employment of that person;

**(2)** Whether the insured may be liable as an employer or in any other capacity; or

**(3)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**t. Lead**

Any loss, claim, "suit", "bodily injury", or "property damage" arising directly or indirectly out of lead.

This exclusion applies to past, present or future claims arising in whole or in part, either directly or indirectly, out of the manufacture, distribution, sale, resale, re-branding, installation, inhalation of, repair, removal, encapsulation, abatement, replacement or handling of, exposure to, ingestion of, or testing for, lead whether or not the lead is or was at any time airborne as a particle, contained in a product, carried on clothing, transmitted in any fashion or found in any form whatsoever.

**u. Asbestos**

Any loss, claim or "suit" for "bodily injury", or "property damage", directly or indirectly out of asbestos in any manner or form, including without limitation:

**(1)** any cost or expense relating to investigation and/or defense of any loss, claim, "suit" or other proceeding; or

**(2)** any cost or expense relating to request, demand or order that any insured or others test for, monitor, remediate, clean up, remove, contain, treat, detoxify, neutralize or in any way respond to or assess the presence of or the effects of asbestos; and/or

**(3)** any fine, penalty or assessment.

**v. Fungi or Bacteria**

Any loss, claim or "suit" for "bodily injury" or "property damage", which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

We have no obligation to defend or indemnify any insured for any loss, cost or expenses arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

This exclusion does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for bodily consumption.

**w. Silica or Silica Related Dust**

**(1)** "Bodily injury" arising, in whole or in part, out of the actual, alleged, threatened or suspected inhalation of, or ingestion of, "silica" or "silica-related dust".

**(2)** "Property damage" arising, in whole or in part, out of the actual, alleged, threatened or suspected contact with, exposure to, existence of, or presence of, "silica" or "silica-related dust".

**(3)** Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, "silica" or "silica-related dust", by any insured or by any other person or entity.

**x. Securities**

Any claim, loss, "suit", "bodily injury" or "property damage" based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged violation of:

**(1)** The Securities Act of 1933, the Securities Exchange Act of 1934, the Investment Company Act of 1940, any other federal law, rule or regulation with respect to the regulation of securities, any rules or regulations of the United States Securities and Exchange Commission, or any amendment of such laws, rules or regulations; or'

**(2)** Any state securities or "Blue Sky" laws or rules or regulations or any amendment of such laws, rules or regulations; or

**(3)** Any provision of the common law imposing liability in connection with the offer, sale or purchase of securities.

**y. Professional Services**

Any claim, loss, "suit", "bodily injury" or "property damage" arising out of the rendering of, or failure to render, any service or advice relating to "professional services".

**z. Communicable Disease**

Any loss, claim, "suit", "bodily injury" or "property damage" arising directly or indirectly out of actual or alleged transmission of a communicable disease.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the:

**(1)** Supervising, hiring, employing, training or monitoring of others that may be infected with and spread a communicable disease;

**(2)** Testing for a communicable disease;

**(3)** Failure to prevent the spread of the disease; or

**(4)** Failure to report the disease to authorities.

**aa. Chromated Copper Arsenate**

"Bodily injury", "property damage", "personal injury" or "advertising injury" arising out of or caused directly or indirectly, in whole or in part, by the use or existence of:

**(1)** Chromated copper arsenate; or

**(2)** Any product or material which contains chromated copper arsenate; or

**(3)** Any product or material to which chromated copper arsenate has been applied by any party (including, but not limited to, any manufacturer, processor or distributor of such products or materials).

**COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY**

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section **III** – Limits Of Insurance; and

**(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B.**

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B.**

If we initially defend an insured ("insured") or pay for an insured's ("insured's") defense but later determine that the claim(s) is (are) not covered under this insurance, we will have the right to reimbursement for the defense costs we have incurred.

The right to reimbursement for the defense costs under this provision will only apply to defense costs we have incurred after we notify you in writing that there may not be coverage, and that we are reserving our rights to terminate the defense and seek reimbursement for defense costs.

**b.** This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

**2. Exclusions**

This insurance does not apply to:

**a. Knowing Violation Of Rights Of Another**

"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

**b. Material Published With Knowledge Of Falsity**

"Personal and advertising injury" arising out of oral or written publication, in any manner, of material, if done by or at the direction of the insured with knowledge of its falsity.

**c. Material Published Prior To Policy Period**

"Personal and advertising injury" arising out of oral or written publication, in any manner, of material whose first publication took place before the beginning of the policy period.

**d. Criminal Acts**

"Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

**e. Contractual Liability**

"Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

**f. Breach Of Contract**

"Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

**g. Quality Or Performance Of Goods – Failure To Conform To Statements**

"Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

**h. Wrong Description Of Prices**

"Personal and advertising injury" arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

**i. Infringement Of Copyright, Patent, Trademark Or Trade Secret**

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement".

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

**j. Insureds In Media And Internet Type Businesses**

"Personal and advertising injury" committed by an insured whose business is:

**(1)** Advertising, broadcasting, publishing or telecasting;

**(2)** Designing or determining content of web sites for others; or

**(3)** An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **14.a., b.** and **c.** of "personal and advertising injury" under the Definitions section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

**k. Electronic Chatrooms Or Bulletin Boards**

"Personal and advertising injury" arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

**l. Unauthorized Use Of Another's Name Or Product**

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

**m. Pollution**

"Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**n. Pollution-related**

Any loss, cost or expense arising out of any:

**(1)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(2)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

**o. War**

"Personal and advertising injury", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**p. Recording And Distribution Of Material Or Information In Violation Of Law**

"Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

ER 01 08 14

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**(3)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

**(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

**q. Employment Related Practices**

"Personal and advertising injury" to:

**(1)** A person arising out of any:

   **(a)** Refusal to employ that person;

   **(b)** Termination of that person's employment; or

   **(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "personal and advertising injury" to that person at whom any of the employment-related practices described in Paragraphs **(a), (b),** or **(c)** above is directed.

This exclusion applies:

**(1)** Whether the injury-causing event described in Paragraphs **(a), (b)** or **(c)** above occurs before employment, during employment or after employment of that person;

**(2)** Whether the insured may be liable as an employer or in any other capacity; and

**(3)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**r. Lead**

"Personal and advertising injury" arising directly or indirectly out of lead.

This exclusion applies to past, present or future claims arising in whole or in part, either directly or indirectly, out of the manufacture, distribution, sale, resale, re-branding, installation, inhalation of, repair, removal, encapsulation, abatement, replacement or handling of, exposure to, ingestion of, or testing for, lead whether or not the lead is or was at any time airborne as a particle, contained in a product, carried on clothing, transmitted in any fashion or found in any form whatsoever.

**s. Asbestos**

"Personal and advertising injury" directly or indirectly out of asbestos in any manner or form, including without limitation:

**(1)** Any cost or expense relating to investigation and/or defense of any loss, claim, "suit" or other proceeding; or

**(2)** Any cost or expense relating to request, demand or order that any insured or others test for, monitor, remediate, clean up, remove, contain, treat, detoxify, neutralize or in any way respond to or assess the presence of or the effects of asbestos; and/or

**(3)** Any fine, penalty or assessment.

**t. Fungi or Bacteria**

"Personal and advertising injury" which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

We have no obligation to defend or indemnify any insured for any loss, cost or expenses arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

This exclusion does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for bodily consumption.

**u. Silica or Silica Related Dust**

**(1)** "Personal and advertising injury" arising, in whole or in part, out of the actual, alleged, threatened or suspected inhalation of, or ingestion of, "silica" or "silica-related dust".

**(2)** Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, "silica" or "silica-related dust", by any insured or by any other person or entity.

**v. Professional Services**

Any claim, loss, "suit", "bodily injury" or "property damage" arising out of the rendering of, or failure to render, any service or advice relating to "professional services".

**w. Communicable Disease**

"Personal and advertising injury" arising directly or indirectly out of actual or alleged transmission of a communicable disease.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the:

**(1)** Supervising, hiring, employing, training or monitoring of others that may be infected with and spread a communicable disease;

**(2)** Testing for a communicable disease;

**(3)** Failure to prevent the spread of the disease; or

**(4)** Failure to report the disease to authorities.

**x. Chromated Copper Arsenate**

"Bodily injury", "property damage", "personal injury" or "advertising injury" arising out of or caused directly or indirectly, in whole or in part, by the use or existence of:

**(1)** Chromated copper arsenate; or

**(2)** Any product or material which contains chromated copper arsenate; or

**(3)** Any product or material to which chromated copper arsenate has been applied by any party (including, but not limited to, any manufacturer, processor or distributor of such products or materials).

**SUPPLEMENTARY PAYMENTS – COVERAGES A AND B**

**1.** We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

**a.** All expenses we incur.

**b.** Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

**c.** The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

**d.** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

**e.** All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

**f.** Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

**g.** All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

**2.** If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

**a.** The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

**b.** This insurance applies to such liability assumed by the insured;

**c.** The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

**d.** The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

**e.** The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

**f.** The indemnitee:

**(1)** Agrees in writing to:

**(a)** Cooperate with us in the investigation, settlement or defense of the "suit";

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

**(b)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

**(c)** Notify any other insurer whose coverage is available to the indemnitee; and

**(d)** Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

**(2)** Provides us with written authorization to:

**(a)** Obtain records and other information related to the "suit"; and

**(b)** Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph 2.b.(2) of Section I – Coverage A – Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when we have used up the applicable limit of insurance in the payment of judgments or settlements or the conditions set forth above, or the terms of the agreement described in Paragraph **f.** above, are no longer met.

**SECTION II – WHO IS AN INSURED**

**1.** If you are designated in the Declarations as:

**a.** An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

**b.** A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

**c.** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

**d.** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

**e.** A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

**2.** Each of the following is also an insured:

**a.** Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business.

However, none of these "employees" or "volunteer workers" are insureds for:

**(1)** "Bodily injury" or "personal and advertising injury":

**(a)** To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

**(b)** To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph **(1)(a)** above;

**(c)** For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraph **(1)(a)** or **(b)** above; or

**(d)** Arising out of his or her providing or failing to provide professional health care services.

**(2)** "Property damage" to property:

**(a)** Owned, occupied or used by;

**(b)** Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by;

you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

**b.** Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

**c.** Any person or organization having proper temporary custody of your property if you die, but only:

**(1)** With respect to liability arising out of the maintenance or use of that property; and

**(2)** Until your legal representative has been appointed.

**d.** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

**SECTION III – LIMITS OF INSURANCE**

**1.** The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

**a.** Insureds;

**b.** Claims made or "suits" brought; or

**c.** Persons or organizations making claims or bringing "suits".

**2.** The General Aggregate Limit is the most we will pay for the sum of:

**a.** Damages under Coverage **A,** except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

**b.** Damages under Coverage **B.**

**3.** The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage **A** for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

**4.** Subject to Paragraph **2.** above, the Personal And Advertising Injury Limit is the most we will pay under Coverage **B** for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

**5.** Subject to Paragraph **2.** or **3.** above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of damages under Coverage **A** because of all "bodily injury" and "property damage" arising out of any one "occurrence".

**6.** Subject to Paragraph **5.** above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage **A** for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

**SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS**

**1. Bankruptcy**

Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

**2. Duties In The Event Of Occurrence, Offense, Claim Or Suit**

**a.** You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

**(1)** How, when and where the "occurrence" or offense took place;

**(2)** The names and addresses of any injured persons and witnesses; and

**(3)** The nature and location of any injury or damage arising out of the "occurrence" or offense.

**b.** If a claim is made or "suit" is brought against any insured, you must:

**(1)** Immediately record the specifics of the claim or "suit" and the date received; and

**(2)** Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

**c.** You and any other involved insured must:

**(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

**(2)** Authorize us to obtain records and other information;

**(3)** Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

**(4)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

   Includes copyrighted material of Insurance Services Office, Inc. with its permission.   ER 01 08 14

**d.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**3. Legal Action Against Us**

No person or organization has a right under this Coverage Part:

**a.** To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

**b.** To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

**4.Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as follows:

**a. Primary Insurance**

This insurance is primary except when Paragraph **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph **c.** below.

**b. Excess Insurance**

**(1)** This insurance is excess over:

**(a)** Any of the other insurance, whether primary, excess, contingent or on any other basis:

**(i)** That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

**(ii)** That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

**(iii)** That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

**(iv)** If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion **g.** of Section **I** – Coverage **A** – Bodily Injury And Property Damage Liability.

**(b)** Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured.

**(2)** When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

**(3)** When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

**(a)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

**(b)** The total of all deductible and self-insured amounts under all that other insurance.

**(4)** We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c. Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**5.Premium Audit**

**a.** We will compute all premiums for this Coverage Part in accordance with our rules and rates.

**b.** Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill.

**c.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**6. Representations**

By accepting this policy, you agree:

**a.** The statements in the Declarations are accurate and complete;

**b.** Those statements are based upon representations you made to us; and

**c.** We have issued this policy in reliance upon your representations.

**7. Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

**b.** Separately to each insured against whom claim is made or "suit" is brought.

**8. Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**9. When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**SECTION V – DEFINITIONS**

**1.** "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

**a.** Notices that are published include material placed on the Internet or on similar electronic means of communication; and

**b.** Regarding web sites, only that part of a web site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

**2.** "Auto" means:

**a.** A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

**b.** Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

However, "auto" does not include "mobile equipment".

**3.** "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

**4.** "Coverage territory" means:

**a.** The United States of America (including its territories and possessions), Puerto Rico and Canada;

**b.** International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in Paragraph **a.** above; or

**c.** All other parts of the world if the injury or damage arises out of:

**(1)** Goods or products made or sold by you in the territory described in Paragraph **a.** above;

**(2)** The activities of a person whose home is in the territory described in Paragraph **a.** above, but is away for a short time on your business; or

**(3)** "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication;

provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in Paragraph **a.** above or in a settlement we agree to.

**5.** "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

**6.** "Executive officer" means a person holding any of the officer positions created by your charter, constitution, bylaws or any other similar governing document.

**7.** "Fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi.

**8.** "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

9. "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

   **a.** It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

   **b.** You have failed to fulfill the terms of a contract or agreement;

   if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

10. "Insured contract" means:

   **a.** A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

   **b.** A sidetrack agreement;

   **c.** Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

   **d.** An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

   **e.** An elevator maintenance agreement;

   **f.** A contract specifically endorsed to this policy as an "insured contract".

11. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

12. "Loading or unloading" means the handling of property:

   **a.** After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

   **b.** While it is in or on an aircraft, watercraft or "auto"; or

   **c.** While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

   but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

13. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

   **a.** Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

   **b.** Vehicles maintained for use solely on or next to premises you own or rent;

   **c.** Vehicles that travel on crawler treads;

   **d.** Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

   **(1)** Power cranes, shovels, loaders, diggers or drills; or

   **(2)** Road construction or resurfacing equipment such as graders, scrapers or rollers;

   **e.** Vehicles not described in Paragraph **a., b., c.** or **d.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

   **(1)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

   **(2)** Cherry pickers and similar devices used to raise or lower workers;

   **f.** Vehicles not described in Paragraph **a., b., c.** or **d.** above maintained primarily for purposes other than the transportation of persons or cargo.

   However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

   **(1)** Equipment designed primarily for:

   **(a)** Snow removal;

   **(b)** Road maintenance, but not construction or resurfacing; or

   **(c)** Street cleaning;

   **(2)** Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

   **(3)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

   However, "mobile equipment" does not include any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

14. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

15. "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

   a. False arrest, detention or imprisonment;

   b. Malicious prosecution;

   c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

   d. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

   e. Oral or written publication, in any manner, of material that violates a person's right of privacy.

16. "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

17. "Products-completed operations hazard":

   a. Includes all "bodily injury" and "property damage" that arises out of "your products" if the "bodily injury" or "property damage" occurs after you have relinquished possession of those products.

   b. Does not include "bodily injury" or "property damage" arising out of:

      (1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

      (2) The existence of tools, uninstalled equipment or abandoned or unused materials; or

      (3) Products or operations for which the classification, listed in the Declarations or in a policy Schedule, states that products-completed operations are subject to the General Aggregate Limit.

18. "Professional Services" means an act or service arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill, and the labor or skill involved is predominantly mental or intellectual, rather than physical or manual.

19. "Property damage" means:

   a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

   b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

   For the purposes of this insurance, electronic data is not tangible property. As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

20. "Silica" means silicon dioxide (occurring in crystalline, amorphous and impure forms), silica particles, silica dust or silica compounds.

21. "Silica-related dust" means a mixture or combination of silica and other dust or particles.

22. "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

   a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

   b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

23. "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

24. "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

25. "Your product":

   a. Means:

      (1) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

         (a) You;

         (b) Others trading under your name; or

         (c) A person or organization whose business or assets you have acquired; and

**(2)** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

**(2)** The providing of or failure to provide warnings or instructions.

**c.** Does not include vending machines or other property rented to or located for the use of others but not sold.

**26.** "Your work":

**a.** Means:

**(1)** Work or operations performed by you or on your behalf; and

**(2)** Materials, parts or equipment furnished in connection with such work or operations.

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

**(2)** The providing of or failure to provide warnings or instructions.

COMMERCIAL GENERAL LIABILITY
CG 21 65 12 04

POLICY NUMBER: **ENT 000180-01-15**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# TOTAL POLLUTION EXCLUSION WITH A BUILDING HEATING, COOLING AND DEHUMIDIFYING EQUIPMENT EXCEPTION AND A HOSTILE FIRE EXCEPTION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Exclusion **f.** under Paragraph **2. Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** is replaced by the following:

This insurance does not apply to:

**f. Pollution**

**(1)** "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

This exclusion does not apply to:

**(a)** "Bodily injury" if sustained within a building which is or was at any time owned or occupied by, or rented or loaned to, any insured and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests; or

**(b)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire" unless that "hostile fire" occurred or originated:

**(i)** At any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste; or

**(ii)** At any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations to test for, monitor, clean up, remove, contain, treat, detoxify, neutralize or in any way respond to, or assess the effects of, "pollutants".

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(b)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

POLICY NUMBER: **ENT 000180-01-15**                                    **Form: ER 10 18  04 14**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# PYROTECHNICS OR FIREWORKS EXCLUSION

**This endorsement modifies insurance provided under the following:**

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**

This insurance does not apply to "bodily injury", "property damage", "injury" or "personal injury and advertising injury", actually or allegedly resulting directly or indirectly from the use, transportation, or storage of "pyrotechnics".

As used in this endorsement "pyrotechnics" includes, but is not limited to, airbursts, binary powders, comets, mines, preloaded smoke pots, concussions, falls, fire balls, mortar hits, flame projectors, torches, flash cotton, flash paper, flash trays, gerbs, lances, line rockets, multi-tube articles, pre-mixed powders, squibs, Saxons, or any item which contains gun powder or other chemical(s) that react(s) creating heat, combustion or explosion.

This endorsement does not apply to flash pots or sparklers.

POLICY NUMBER: **ENT 000180-01-15**                    **Form: ER 10 11 04 14**

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# CROSS SUITS EXCLUSION

**This endorsement modifies insurance provided under the following:**

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**

This insurance does not apply to any loss, claim or "suit" for "bodily injury", "property damage" or "personal and advertising injury" sustained by any insured whether or not such "bodily injury", "property damage" or "personal and advertising injury" arising out of the activities or operations of any other insured.

This exclusion does not apply if:

1. Any named insured has assumed liability for such claims or "suits" in a contract or agreement that is an "insured contract"; and
2. The person or entity bringing the claim or "suit" is not an entity, under any common ownership with or control by any person or entity qualifying as an insured under this policy.

All other terms and conditions of the policy remain the same.

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

POLICY NUMBER: ENT 000180-01-15                    Form: ER 20 05 04 14

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# LIMITED COVERAGE ASSAULT OR BATTERY RELATED CLAIMS

**This endorsement modifies insurance provided under the following:**

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**

In consideration of premiums paid, it is agreed that the specific coverage excluded by Form ER 10 05 04 14, Assault or Battery Exclusion is reinstated on a limited basis in accordance with the following additional terms and conditions:

**Section I-Coverage A-Bodily Injury and Property Damage Liability, 2. Exclusions, a.** is deleted and replaced with the following:

   a.  Expected or Intended Injury
       "Bodily injury", "property damage", or "personal and advertising injury" expected or intended from the standpoint of any insured, its "employees", contractors, or agents.

**Section I-Coverage B-Personal and Advertising Injury Liability, 2. Exclusions, a.** is deleted and replaced with the following:

   a.  Knowing Violation Of Rights Of Another
       "Personal and advertising injury" actually or allegedly caused by or at the direction of the insured, any insured's "employees", contractors or agents with the actual or alleged knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

Subject to the limits set forth below this insurance applies to any loss, claim, "suit" or expense for "bodily injury", "property damage", or "personal and advertising injury" including claims or "suits" for negligence, directly or indirectly arising out of, actually or allegedly arising out of, or related to any: assault, battery, molestation, abuse, harmful or offensive contact, false arrest, wrongful detention, false imprisonment, malicious prosecution or threat; whether committed by a patron, employee, or any other individual.

This endorsement applies regardless of fault or intent.

For purposes of this endorsement, negligence includes but is not limited to allegations or claims for: negligent hiring, negligent employment, negligent training, negligent supervision, failure to intervene, failure to render aid, failure to contact law enforcement, failure to contact emergency medical services or failure to detain potentially responsible parties.

Solely as to the coverage provided by this endorsement "SUPPLEMENTARY PAYMENTS-COVERAGES A AND B" do not apply.

Payment of judgments, settlements, defense costs, loss adjustment expenses, claim(s) or "suit(s)" to which this endorsement applies shall not exceed the limits of liability set forth below:

        Per Occurrence: $1,000,000

        Aggregate Limit: $1,000,000

        Deductible: $0.00

FORM: 20 05 04 14

NOTICE: The limit of liability available to pay judgments and settlements is reduced by the payment of judgments, settlements, defense costs, loss adjustment expenses, claim(s) or "suit(s)".  We will not be obligated to pay any judgments, settlements, defense costs, loss adjustment expenses, claim(s) or "suit(s)" or to defend or continue to defend any loss, claim or "suit" after the applicable limit of our liability has been exhausted by payment of judgments, settlements, defense costs or loss adjustment expenses.

The Per Occurrence Limit is the most we will pay as damages because of "bodily injury", "property damage" or "personal and advertising injury" sustained in any one claim and/or "suit". All claims for damages made by one or more persons because of any one act or series of acts to which this endorsement applies shall be deemed to be one claim.

The Aggregate Limit is the most, subject to the Each Occurrence Limit, we will pay as damages because of "bodily injury", "property damage" or "personal and advertising injury" sustained in a claim and/or "suit" regardless of how many persons assert claims and/or "suits" against you, any insured or any person.

The Each Occurrence and Aggregate Limits described above are the most we will pay regardless of the number of insureds. These Limits of Insurance are subject to and not in addition to the General Aggregate Limit shown in the Declarations of the policy. Payments under these Limits of Insurance are part of and decrease the policy General Aggregate Limit of Insurance shown in the Declarations.

**Liquor Liability Assault and Battery Coverage**

If, on the date of an "occurrence" to which this endorsement applies, you had a policy of insurance providing Liquor Liability Coverage with us in full force and effect, **Exclusion C. Liquor Liability** does not apply, solely with regard to the coverage provided by this endorsement.

**Two or More Coverage Forms**

If this Coverage Form and any other Coverage Form or policy under which you are an insured, issued by us or companies affiliated with us, apply to the same "occurrence", the Per Occurrence and Aggregate Limit shown on this form is the applicable limit for the "occurrence" and SUPPLEMENTARY PAYMENTS-COVERAGES A AND B does not apply.

POLICY NUMBER: ENT 000180-01-15                                    Form: ER 20 07 04 14

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# HIRED AUTO AND/OR NON-OWNED AUTO LIABILITY INSURANCE

**This endorsement modifies insurance provided under the following:**

### COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Insurance is provided only with respect to those coverages for which a specific premium charge is shown in the Declarations or in the SCHEDULE:

### SCHEDULE

| Coverage | Limit Of Insurance Per "Occurrence" | Premium |
|---|---|---|
| Hired Auto Liability | $1,000,000 | INCLUDED |
| Non-Owned Auto Liability | $1,000,000 | INCLUDED |

**A. Hired Auto Liability**
The insurance provided under **Coverage A – Bodily Injury And Property Damage Liability (Section I – Coverages)** applies to "bodily injury" or "property damage" arising out of the maintenance or use of a "hired auto" by you or your "employees" in the course of your business. If there is no per "occurrence" limit and premium shown in the SCHEDULE above then there is no coverage provided by this endorsement.

**B. Non-Owned Auto Liability**
The insurance provided under **Coverage A – Bodily Injury And Property Damage Liability (Section I – Coverages)** applies to "bodily injury" or "property damage" arising out of the use of a "non-owned auto" by any person in the course of your business. If there is no per "occurrence" limit and premium shown in the SCHEDULE above then there is no coverage provided by this endorsement

**C. Changes In Exclusions**
With respect to the insurance provided by this endorsement:

**1.** Subparagraphs **b., c., j., k., l., m.** and **n.** of Paragraph **2., Exclusions** do not apply.

**2.** Subparagraph **g.** of Paragraph **2., Exclusions** does not apply to a "hired auto" or a "non-owned auto".

**3.** The following exclusions are added to **Paragraph 2., Exclusions:**

This insurance does not apply to:
**a.** "Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

**(1)** That the insured would have in the absence of the contract or agreement; or

FORM: ER 20 07 04 14

**(2)** Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement.

**b.** "Property damage" to:

**(1)** Property owned or being transported by, or rented or loaned to the insured; or
**(2)** Property in the care, custody or control of the insured.

**c.** "Bodily injury" or "property damage" arising out of the use of a "hired auto" or "non-owned auto" by an unlicensed operator.

**d.** "Bodily injury" or "property damage" arising from the use of a "hired auto" or "non-owned auto" while the "hired auto" or "non-owned auto" is being used for the delivery of "your products". Delivery includes the entire trip to the delivery location and returning to your designated premises.

**e.** "Bodily injury" or "property damage" resulting directly or indirectly from valet operations.  Valet operations includes the act or service of parking vehicles by you or anyone on your behalf.

**D.  Who Is An Insured**
For the purposes of this endorsement only, **Section II – WHO IS AN INSURED** is replaced by the following:

**1.** Each of the following is an insured under this insurance to the extent set forth below:

**a.** You;

**b.** Any other person using a "hired auto" with your permission;

**c.** With respect to a "non-owned auto", any partner or "executive officer" of yours, but only while such "non-owned auto" is being used in the course of your business;

**d.** Any other person or organization, but only with respect to their liability because of acts or omissions of an insured under Paragraphs **a., b. or c.** above.

**2.** None of the following is an insured:

**a.** Any person engaged in the business of his or her employer with respect to "bodily injury" to any co-employee of such person injured in the course of employment;

**b.** Any partner or "executive officer" with respect to any "auto" owned by such partner or officer or a member of his or her household;

**c.** Any person while employed in or otherwise engaged in performing duties related to the conduct of an "auto business";

**d.** The owner or lessee (of whom you are a sublessee) of a "hired auto" or the owner of a "non-owned auto" or any agent or "employee" of any such owner or lessee;

**e.** Any person or organization with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

FORM: ER 20 07 04 14

**E.  Changes In Conditions**
For the purposes of this endorsement only, **Paragraph 4. Other Insurance** is replaced by the following:

This insurance is excess over any insurance covering the "hired auto" or "non-owned auto".

**F.  Additional Definitions**
For the purposes of this endorsement only, the following definitions are added to **SECTION V - DEFINITIONS**:

**1.** "Auto business" means the business or occupation of selling, repairing, servicing, storing or parking "autos".

**2.** "Hired auto" means any "auto" you lease, hire, rent or borrow. This does not include any "auto" you lease, hire, rent or borrow from any of your "employees", your partners or your "executive officers", or members of their households, or any "auto" you lease for six months or more.

**3.** "Non-owned auto" means any "auto" you do not own, lease, hire, rent or borrow which is used in connection with your business. This includes "autos" owned by your "employees", your partners or your "executive officers", or members of their households, but only while used in your business or your personal affairs.

POLICY NUMBER: **ENT 000180-01-15**

COMMERCIAL GENERAL LIABILITY
ER LLD 10 14

# LIQUOR LIABILITY DECLARATIONS

| | |
|---|---|
| **United Specialty Insurance Company**<br>**C/O Entertainment Risk, LLC**<br>**11350 McCormick Road**<br>**Executive Plaza II; Ste 1002**<br>**Hunt Valley, MD 21031** | **Baldinger Insurance Services, Inc.**<br>**6656 Dume Dr.**<br>**Malibu, CA 90265** |

NAMED INSURED    Our Neighborhood Place, LLC  dba: The Tipsy Pig
MAILING ADDRESS   2231 Chestnut St., San Francisco, CA 94123

POLICY PERIOD:  FROM  2/17/2015      TO  2/17/2016      AT 12:01 A.M. STANDARD

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

| LIMITS OF INSURANCE | |
|---|---|
| EACH COMMON CAUSE  LIMIT | $  1,000,000 |
| AGGREGATE LIMIT | $  2,000,000 |

| LOCATION OF BUSINESS: | **SEE FORM: ER 10 34 04 14** |
|---|---|
| BUSINESS DESCRIPTION: | **Lounge** |

THE NAMED INSURED IS A:
☐ Individual    ☐ Partnership   ☒ Limited Liability Company   ☐ Organization/Corporation   ☐ Trust
☐ Other _____

| CLASSIFICATION AND PREMIUM | | | | |
|---|---|---|---|---|
| **CLASSIFICATION** | **CODE NO.** | **PREMIUM BASE** | **RATE** | **ADVANCE PREMIUM** |
| Restaurants, Taverns, Hotels, Motels, including package sales | 58161 | ▉▉▉▉ | ▉▉▉▉ | ▉▉▉▉ |
| | | $ | $ | $ |
| | | $ | $ | $ |
| | | STATE TAX OR OTHER (if applicable) | | $ _____ |
| | | TOTAL PREMIUM | | $ ▉▉▉▉ |
| | | (SUBJECT TO AUDIT) | | |
| PREMIUM SHOWN IS PAYABLE: | | AT INCEPTION | | $ ▉▉▉▉ |
| | | | | $ |

| AUDIT PERIOD (IF APPLICABLE) | ☒ ANNUALLY | ☐ SEMI-AN-NUALLY | ☐ QUARTERLY | ☐ MONTHLY |
|---|---|---|---|---|

| FORMS APPLICABLE TO ALL COVERAGE PARTS: |
| REFER TO FORM: ER SLLF 04 14 |

**THESE DECLARATIONS, TOGETHER WITH THE COMMON POLICY CONDITIONS AND COVERAGE FORM(S) AND ANY ENDORSEMENT(S) COMPLETE THE ABOVE NUMBERED POLICY.**

| Countersigned: | By: |
|---|---|
| (Date) | (Authorized Representative) |

**NOTE**

OFFICERS' FACSIMILE SIGNATURES MAY BE INSERTED HERE, ON THE POLICY COVER OR ELSEWHERE AT THE COMPANY'S OPTION.

POLICY NUMBER: **ENT 000180-01-15**                                              **ER SLLF 04 14**

| **Liquor Liability Policy Forms** | | |
|---|---|---|
| | | |
| **ER LLD 10 14** | | COMMERCIAL LIQUOR LIABILITY DECLARATIONS |
| **ER SLLF 04 14** | | SCHEDULE OF LIQUOR LIABILITY FORMS |
| **ER 02 08 14** | | LIQUOR LIABILITY COVERAGE FORM |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

POLICY NUMBER: **ENT 000180-01-15**

# LIQUOR LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section **II** – Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **V** – Definitions.

## SECTION I – LIQUOR LIABILITY COVERAGE

### 1. Insuring Agreement

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "injury" to which this insurance applies if liability for such "injury" is imposed on the insured by reason of the selling, serving or furnishing of any alcoholic beverage. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "injury" to which this insurance does not apply. We may, at our discretion, investigate any "injury" and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section **III** – Limits Of Insurance; and

**(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments.

If we initially defend an "insured" or pay for an "insured's" defense but later determine that the claim(s) is (are) not covered under this insurance, we will have the right to reimbursement for the defense costs we have incurred.

The right to reimbursement for the defense costs under this provision will only apply to defense costs we have incurred after we notify you in writing that there may not be coverage, and that we are reserving our rights to terminate the defense and seek reimbursement for defense costs.

**b.** This insurance applies to "injury" only if:

**(1)** The "injury" occurs during the policy period in the "coverage territory"; and

**(2)** Prior to the policy period, no insured listed under Paragraph **1.** of Section **II** – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "injury" or claim, knew that the "injury" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "injury" occurred, then any continuation, change or resumption of such "injury" during or after the policy period will be deemed to have been known prior to the policy period.

**c.** "Injury" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph **1.** of Section **II** – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "injury" or claim, includes any continuation, change or resumption of that "injury" after the end of the policy period.

**d.** "Injury" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.** of Section **II** – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "injury" or claim:

**(1)** Reports all, or any part, of the "injury" to us or any other insurer;

**(2)** Receives a written or verbal demand or claim for damages because of the "injury"; or

**(3)** Becomes aware by any other means that "injury" has occurred or has begun to occur.

An insured who permits any person to bring any alcoholic beverage on their premises, for consumption on the premises, whether or not a fee is charged for such activity, will also be considered selling, serving or furnishing alcoholic beverages.

   Includes copyrighted material of Insurance Services Office, Inc. with its permission.

## 2. Exclusions

This insurance does not apply to:

### a. Expected Or Intended Injury

"Injury" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

### b. Workers' Compensation And Similar Laws

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

### c. Employer's Liability

"Bodily injury" to:

**(1)** An "employee" of the insured arising out of and in the course of:

  **(a)** Employment by the insured; or

  **(b)** Performing duties related to the conduct of the insured's business; or

**(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **(1)** above.

This exclusion applies whether the insured may be liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages because of the "injury".

### d. Liquor License Not In Effect

"Injury" arising out of any alcoholic beverage sold, served or furnished while any required license is not in effect.

### e. Your Product

"Injury" arising out of "your product". This exclusion does not apply to "injury" for which the insured or the insured's indemnitees may be held liable by reason of:

**(1)** Causing or contributing to the intoxication of any person;

**(2)** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

**(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

### f. Other Insurance

Any "injury" with respect to which other insurance is afforded, or would be afforded but for the exhaustion of the limits of insurance.

This exclusion does not apply if the other insurance responds to liability for "injury" imposed on the insured by reason of the selling, serving or furnishing of any alcoholic beverage.

### g. War

"Injury", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

### h. Professional Services

Any claim, loss, "suit", "bodily injury," "property damage," "injury" or "personal and advertising injury" arising out of the rendering of, or failure to render, any service or advice relating to "professional services".

### i. Communicable Disease

This insurance does not apply to any loss, claim, "suit", "bodily injury", "property damage", "injury" or "personal or advertising injury" arising directly or indirectly out of actual or alleged transmission of a communicable disease.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the:

**(1)** Supervising, hiring, employing, training or monitoring of others that may be infected with and spread a communicable disease;

**(2)** Testing for a communicable disease;

**(3)** Failure to prevent the spread of the disease; or

**(4)** Failure to report the disease to authorities.

### j. Contractual Liability

"Injury" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

**(1)** That the insured would have in the absence of the contract or agreement; or

**(2)** Assumed in a contract or agreement that is an "insured contract", provided the "injury" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorneys' fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "injury", provided:

  **(a)** Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

  **(b)** Such attorneys' fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

**SUPPLEMENTARY PAYMENTS**

**1.** We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

  **a.** All expenses we incur.

  **b.** The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

  **c.** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

  **d.** All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

  **e.** Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

  **f.** All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

  **g.** Expenses incurred by the insured for first aid administered to others at the time of an event to which this insurance applies.

These payments will not reduce the limits of insurance.

**2.** If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

  **a.** The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

  **b.** This insurance applies to such liability assumed by the insured;

  **c.** The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

  **d.** The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

  **e.** The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

  **f.** The indemnitee:

  **(1)** Agrees in writing to:

    **(a)** Cooperate with us in the investigation, settlement or defense of the "suit";

    **(b)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

    **(c)** Notify any other insurer whose coverage is available to the indemnitee; and

    **(d)** Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

  **(2)** Provides us with written authorization to:

    **(a)** Obtain records and other information related to the "suit"; and

    **(b)** Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph 2.b.(2) of Section I – Coverage A – Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when we have used up the applicable limit of insurance in the payment of judgments or settlements or the conditions set forth above, or the terms of the agreement described in Paragraph **f.** above, are no longer met.

## SECTION II – WHO IS AN INSURED

1. If you are designated in the Declarations as:

   **a.** An individual, you and your spouse are insureds.

   **b.** A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

   **c.** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

   **d.** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

   **e.** A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

2. Each of the following is also an insured:

   **a.** Your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" is an insured for:

   **(1)** "Injury":

      **(a)** To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), or to a co-"employee" while that co-"employee" is either in the course of his or her employment or performing duties related to the conduct of your business;

      **(b)** To the spouse, child, parent, brother or sister of that co-"employee" as a consequence of Paragraph **(a)** above; or

      **(c)** For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraph **(a)** or **(b)** above.

   **(2)** "Property damage" to property:

      **(a)** Owned or occupied by; or

      **(b)** Rented or loaned;

      to that "employee", any of your other "employees", by any of your partners or members (if you are a partnership or joint venture), or by any of your members (if you are a limited liability company).

   **b.** Any person or organization having proper temporary custody of your property if you die, but only:

   **(1)** With respect to liability arising out of the maintenance or use of that property; and

   **(2)** Until your legal representative has been appointed.

   **c.** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

## SECTION III – LIMITS OF INSURANCE

1. The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

   **a.** Insureds;

   **b.** Claims made or "suits" brought; or

   **c.** Persons or organizations making claims or bringing "suits".

2. The Aggregate Limit is the most we will pay for all "injury" as the result of the selling, serving or furnishing of alcoholic beverages.

3. Subject to the Aggregate Limit, the Each Common Cause Limit is the most we will pay for all "injury" sustained by one or more persons or organizations as the result of the selling, serving or furnishing of any alcoholic beverage to any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

**SECTION IV – LIQUOR LIABILITY CONDITIONS**

**1. Bankruptcy**

Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

**2. Duties In The Event Of Injury, Claim Or Suit**

**a.** You must see to it that we are notified as soon as practicable of an "injury" which may result in a claim. To the extent possible, notice should include:

**(1)** How, when and where the "injury" took place;

**(2)** The names and addresses of any injured persons and witnesses; and

**(3)** The nature and location of any "injury".

**b.** If a claim is made or "suit" is brought against any insured, you must:

**(1)** Immediately record the specifics of the claim or "suit" and the date received; and

**(2)** Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

**c.** You and any other involved insured must:

**(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

**(2)** Authorize us to obtain records and other information;

**(3)** Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

**(4)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of "injury" to which this insurance may also apply.

**d.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**3. Legal Action Against Us**

No person or organization has a right under this Coverage Part:

**a.** To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

**b.** To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

**4. Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under this Coverage Part, our obligations are limited as follows:

**a. Primary Insurance**

This insurance is primary. Our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in **b.** below.

**b. Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**5. Premium Audit**

**a.** We will compute all premiums for this Coverage Part in accordance with our rules and rates.

**b.** Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill.

**c.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**6. Representations**

By accepting this policy, you agree:

**a.** The statements in the Declarations are accurate and complete;

**b.** Those statements are based upon representations you made to us; and

**c.** We have issued this policy in reliance upon your representations.

**7. Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

**b.** Separately to each insured against whom claim is made or "suit" is brought.

**8. Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**9. When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**SECTION V – DEFINITIONS**

**1.** "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

**2.** "Coverage territory" means:

**a.** The United States of America (including its territories and possessions), Puerto Rico and Canada;

**b.** International waters or airspace, but only if the "injury" occurs in the course of travel or transportation between any places included in Paragraph **a.** above; or

**c.** All other parts of the world if the "injury" arises out of:

**(1)** Goods or products made or sold by you in the territory described in Paragraph **a.** above; or

**(2)** The activities of a person whose home is in the territory described in Paragraph **a.** above, but is away for a short time on your business;

provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in Paragraph **a.** above or in a settlement we agree to.

**3.** "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

**4.** "Executive officer" means a person holding any of the officer positions created by your charter, constitution, bylaws or any other similar governing document.

**5.** "Injury" means damages because of "bodily injury" and "property damage", including damages for care, loss of services or loss of support.

**6.** "Insured contract" means:

**a.** A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

**b.** A sidetrack agreement;

**c.** Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

**d.** An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

**e.** An elevator maintenance agreement;

**f.** A contract specifically endorsed to this policy as an "insured contract".

**6.** "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

**7.** "Property damage" means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the occurrence that caused it.

**8.** "Suit" means a civil proceeding in which damages because of "injury" to which this insurance applies are alleged. "Suit" includes:

**a.** An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

**b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

    Includes copyrighted material of Insurance Services Office, Inc. with its permission.    ER 02 08 14

**9.** "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**10.** "Your product":

   **a.** Means:

      **(1)** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

         **(a)** You;

         **(b)** Others trading under your name; or

         **(c)** A person or organization whose business or assets you have acquired; and

      **(2)** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

   **b.** Includes:

      **(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

      **(2)** The providing of or failure to provide warnings or instructions.

   **c.** Does not include vending machines or other property rented to or located for the use of others but not sold.

**Exhibit B**

 # Lloyd's Certificate

**This Insurance** is effected with certain Underwriters at Lloyd's, London.

**This Certificate** is issued in accordance with the limited authorization granted to the Correspondent by certain Underwriters at Lloyd's, London whose syndicate numbers and the proportions underwritten by them can be ascertained from the office of the said Correspondent (such Underwriters being hereinafter called "Underwriters") and in consideration of the premium specified herein, Underwriters hereby bind themselves severally and not jointly, each for his own part and not one for another, their Executors and Administrators.

**The Assured** is requested to read this Certificate, and if it is not correct, return it immediately to the Correspondent for appropriate alteration.

All inquiries regarding this Certificate should be addressed to the following Correspondent:

**ARCH INTERMEDIARIES LIMITED**
52-54 Gracechurch Street,
London EC3V 0EH
England

SLC-3 (USA) NMA 2868 (24/08/2000) - amended
Form approved by Lloyd's Underwriters' Non-Marine Association Limited

## CERTIFICATE PROVISIONS

1. **Signature Required.** This Certificate shall not be valid unless signed by the Correspondent on the attached Declaration Page.

2. **Correspondent Not Insurer.** The Correspondent is not an Insurer hereunder and neither is nor shall be liable for any loss or claim whatsoever. The Insurers hereunder are those Underwriters at Lloyd's, London whose syndicate numbers can be ascertained as hereinbefore set forth. As used in this Certificate "Underwriters" shall be deemed to include incorporated as well as unincorporated persons or entities that are Underwriters at Lloyd's, London.

3. **Cancellation.** If this Certificate provides for cancellation and this Certificate is cancelled after the inception date, earned premium must be paid for the time the insurance has been in force.

4. **Service of Suit.** It is agreed that in the event of the failure of Underwriters to pay any amount claimed to be due hereunder, Underwriters, at the request of the Assured, will submit to the jurisdiction of a Court of competent jurisdiction within the United States. Nothing in this Clause constitutes or should be understood to constitute a waiver of Underwriters' rights to commence an action in any Court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another Court as permitted by the laws of the United States or of any State in the United States. It is further agreed that service of process in such suit may be made upon the firm or person named in the attached Declaration Page, and that in any suit instituted against any one of them upon this contract, Underwriters will abide by the final decision of such Court or of any Appellate Court in the event of an appeal.

   The above-named are authorized and directed to accept service of process on behalf of Underwriters in any such suit and/or upon request of the Assured to give a written undertaking to the Assured that they will enter a general appearance upon Underwriters' behalf in the event such a suit shall be instituted.

   Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefor, Underwriters hereby designate the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as their true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Assured or any beneficiary hereunder arising out of this contract of insurance, and hereby designate the above-mentioned as the person to whom the said officer is authorized to mail such process or a true copy thereof.

5. **Assignment.** This Certificate shall not be assigned either in whole or in part without the written consent of the Correspondent endorsed hereon.

6. **Attached Conditions Incorporated.** This Certificate is made and accepted subject to all the provisions, conditions and warranties set forth herein, attached or endorsed, all of which are to be considered as incorporated herein.

7. **Short Rate Cancellation.** If the attached provisions provide for cancellation, the table below will be used to calculate the short rate proportion of the premium when applicable under the terms of cancellation.

### Short Rate Cancellation Table For Term of One Year.

| Days Insurance in Force | Per Cent of one year Premium | Days Insurance in Force | Per Cent of one year Premium | Days Insurance in Force | Per Cent of one year Premium | Days Insurance in Force | Per Cent of one year Premium |
|---|---|---|---|---|---|---|---|
| 1 | 5% | 66 - 69 | 29% | 154 - 156 | 53% | 256 - 260 | 77% |
| 2 | 6 | 70 - 73 | 30 | 157 - 160 | 54 | 261 - 264 | 78 |
| 3 - 4 | 7 | 74 - 76 | 31 | 161 - 164 | 55 | 265 - 269 | 79 |
| 5 - 6 | 8 | 77 - 80 | 32 | 165 - 167 | 56 | 270 - 273 ( 9 mos ) | 80 |
| 7 - 8 | 9 | 81 - 83 | 33 | 168 - 171 | 57 | 274 - 278 | 81 |
| 9 - 10 | 10 | 84 - 87 | 34 | 172 - 175 | 58 | 279 - 282 | 82 |
| 11 - 12 | 11 | 88 - 91 ( 3 mos ) | 35 | 176 - 178 | 59 | 283 - 287 | 83 |
| 13 - 14 | 12 | 92 - 94 | 36 | 179 - 182 ( 6 mos ) | 60 | 288 - 291 | 84 |
| 15 - 16 | 13 | 95 - 98 | 37 | 183 - 187 | 61 | 292 - 296 | 85 |
| 17 - 18 | 14 | 99 - 102 | 38 | 188 - 191 | 62 | 297 - 301 | 86 |
| 19 - 20 | 15 | 103 - 105 | 39 | 192 - 196 | 63 | 302 - 305 ( 10 mos ) | 87 |
| 21 - 22 | 16 | 106 - 109 | 40 | 197 - 200 | 64 | 306 - 310 | 88 |
| 23 - 25 | 17 | 110 - 113 | 41 | 201 - 205 | 65 | 311 - 314 | 89 |
| 26 - 29 | 18 | 114 - 116 | 42 | 206 - 209 | 66 | 315 - 319 | 90 |
| 30 - 32 ( 1 mos ) | 19 | 117 - 120 | 43 | 210 - 214 ( 7 mos ) | 67 | 320 - 323 | 91 |
| 33 - 36 | 20 | 121 - 124 ( 4 mos ) | 44 | 215 - 218 | 68 | 324 - 328 | 92 |
| 37 - 40 | 21 | 125 - 127 | 45 | 219 - 223 | 69 | 329 - 332 | 93 |
| 41 - 43 | 22 | 128 - 131 | 46 | 224 - 228 | 70 | 333 - 337 ( 11 mos ) | 94 |
| 44 - 47 | 23 | 132 - 135 | 47 | 229 - 232 | 71 | 338 - 342 | 95 |
| 48 - 51 | 24 | 136 - 138 | 48 | 233 - 237 | 72 | 343 - 346 | 96 |
| 52 - 54 | 25 | 139 - 142 | 49 | 238 - 241 | 73 | 347 - 351 | 97 |
| 55 - 58 | 26 | 143 - 146 | 50 | 242 - 246 ( 8 mos ) | 74 | 352 - 355 | 98 |
| 59 - 62 ( 2 mos ) | 27 | 147 - 149 | 51 | 247 - 250 | 75 | 356 - 360 | 99 |
| 63 - 65 | 28 | 150 - 153 ( 5 mos ) | 52 | 251 - 255 | 76 | 361 - 365 ( 12 mos ) | 100 |

Rules applicable to insurance with terms less than or more than one year:

A. If insurance has been in force for one year or less, apply the short rate table for annual insurance to the full annual premium determined as for insurance written for a term of one year.

B. If insurance has been in force for more than one year:
   1. Determine full annual premium as for insurance written for a term of one year.
   2. Deduct such premium from the full insurance premium, and on the remainder calculate the pro rata earned premium on the basis of the ratio of the length of time beyond one year the insurance has been in force to the length of time beyond one year for which the policy was originally written.
   3. Add premium produced in accordance with items (1) and (2) to obtain earned premium during full period insurance has been in force.

8. The Certificate is intended for use as evidence of the placement of the insurance described herein, in accordance with Section 1764 of the California Insurance Code.

NOTICE:

1. THE INSURANCE POLICY THAT YOU HAVE PURCHASED IS BEING ISSUED BY AN INSURER THAT IS NOT LICENSED BY THE STATE OF CALIFORNIA. THESE COMPANIES ARE CALLED "NONADMITTED" OR "SURPLUS LINE" INSURERS.

2. THE INSURER IS NOT SUBJECT TO THE FINANCIAL SOLVENCY REGULATION AND ENFORCEMENT THAT APPLY TO CALIFORNIA LICENSED INSURERS.

3. THE INSURER DOES NOT PARTICIPATE IN ANY OF THE INSURANCE GUARANTEE FUNDS CREATED BY CALIFORNIA LAW. THEREFORE, THESE FUNDS WILL NOT PAY YOUR CLAIMS OR PROTECT YOUR ASSETS IF THE INSURER BECOMES INSOLVENT AND IS UNABLE TO MAKE PAYMENTS AS PROMISED.

4. THE INSURER SHOULD BE LICENSED EITHER AS A FOREIGN INSURER IN ANOTHER STATE IN THE UNITED STATES OR AS A NON-UNITED STATES (ALIEN) INSURER. YOU SHOULD ASK QUESTIONS OF YOUR INSURANCE AGENT, BROKER, OR "SURPLUS LINE" BROKER OR CONTACT THE CALIFORNIA DEPARTMENT OF INSURANCE AT THE FOLLOWING TOLL-FREE TELEPHONE NUMBER 1-800-927-4357.  ASK WHETHER OR NOT THE INSURER IS LICENSED AS A FOREIGN OR NON-UNITED STATES (ALIEN) INSURER AND FOR ADDITIONAL INFORMATION ABOUT THE INSURER. YOU MAY ALSO CONTACT THE NAIC'S INTERNET WEB SITE AT WWW.NAIC.ORG .

5. FOREIGN INSURERS SHOULD BE LICENSED BY A STATE IN THE UNITED STATES AND YOU MAY CONTACT THAT STATE'S DEPARTMENT OF INSURANCE TO OBTAIN MORE INFORMATION ABOUT THAT INSURER.

6. FOR NON-UNITED STATES (ALIEN) INSURERS, THE INSURER SHOULD BE LICENSED BY A COUNTRY OUTSIDE OF THE UNITED STATES AND SHOULD BE ON THE NAIC'S INTERNATIONAL INSURERS DEPARTMENT (IID) LISTING OF APPROVED NONADMITTED NON-UNITED STATES INSURERS. ASK YOUR AGENT, BROKER, OR "SURPLUS LINE" BROKER TO OBTAIN MORE INFORMATION ABOUT THAT INSURER.

7. CALIFORNIA MAINTAINS A LIST OF APPROVED SURPLUS LINE INSURERS. ASK YOUR AGENT OR BROKER IF THE INSURER IS ON THAT LIST, OR VIEW THAT LIST AT THE INTERNET WEB SITE OF THE CALIFORNIA DEPARTMENT OF INSURANCE: WWW.INSURANCE.CA.GOV .

8. IF YOU, AS THE APPLICANT, REQUIRED THAT THE INSURANCE POLICY YOU HAVE PURCHASED BE BOUND IMMEDIATELY, EITHER BECAUSE EXISTING COVERAGE WAS GOING TO LAPSE WITHIN TWO BUSINESS DAYS OR BECAUSE YOU WERE REQUIRED TO HAVE COVERAGE WITHIN TWO BUSINESS DAYS, AND YOU DID NOT RECEIVE THIS DISCLOSURE FORM AND A REQUEST FOR YOUR SIGNATURE UNTIL AFTER COVERAGE BECAME EFFECTIVE, YOU HAVE THE RIGHT TO CANCEL THIS POLICY WITHIN FIVE DAYS OF RECEIVING THIS DISCLOSURE. IF YOU CANCEL COVERAGE, THE PREMIUM WILL BE PRORATED AND ANY BROKER'S FEE CHARGED FOR THIS INSURANCE WILL BE RETURNED TO YOU

07/11
LSW1147D

ARCH INTERMEDIARIES LIMITED

THIS IS A CLAIMS MADE AND REPORTED POLICY WITH DEFENSE COSTS INCLUDED IN THE LIMIT OF LIABILITY, EXCEPT FOR COVERAGE SECTION D, CRIME COVERAGE SECTION, WHERE CLAIM EXPENSES ARE INCLUDED IN THE LIMIT OF LIABILITY. PLEASE READ THE ENTIRE POLICY CAREFULLY.

# DECLARATIONS

# COMBINED EMPLOYMENT PRACTICES, DIRECTORS' & OFFICERS', FIDUCIARY AND CRIME INSURANCE POLICY

NOTICE: EXCEPT FOR COVERAGE SECTION D, CRIME COVERAGE SECTION, THIS IS A CLAIMS MADE AND REPORTED POLICY THAT APPLIES, SUBJECT TO ITS TERMS, ONLY TO CLAIMS 1) FIRST MADE DURING THE POLICY PERIOD OR, IF PURCHASED, ANY EXTENDED REPORTING PERIOD; AND 2) REPORTED WITHIN THE TIME SPECIFIED IN THE NOTICE PROVISIONS. THESE DECLARATIONS, THE COMPLETED AND SIGNED APPLICATION, AND THE POLICY WITH ENDORSEMENTS SHALL CONSTITUTE THE CONTRACT BETWEEN THE UNDERWRITERS AND THE INSUREDS.

| This insurance is provided by various insurers as per the attached Schedule. |
|---|

**POLICY NUMBER:** AC1601986

**UNIQUE MARKET REFERENCE:**    B0391 AC1601986

**Renewal of:**    AC1501986

| Item 1. | **INSURED COMPANY:** |
|---|---|
| | Name:    **TIPSY PIG and as more full stated within the application** |
| | Address:   2317 Chestnut Street, San Francisco, CA 94123 |

| Item 2. | **POLICY PERIOD:** |
|---|---|
| | (a)    Inception Date:    1st October 2016 |
| | (b)    Expiration Date:    1st October 2017 |
| | at 12:01 a.m., for both dates, at the principal address in Item 1. |

| Item 3. | **PREMIUM:** |
|---|---|
| | ███████████████████████████████████ |

| Item 4 | LIMITS OF LIABILITY, SELF-INSURED RETENTIONS AND COVERAGES PURCHASED: |
|--------|----------------------------------------------------------------------|

The Limit of Liability and Self-Insured Retention amounts applicable to each Coverage purchased and the Aggregate Limit of Liability are as indicated below. This **Policy** includes only those Coverages purchased, as designated by a "Yes" for "Included". If neither "Yes" or "No" is designated for a Coverage, such Coverage is not included.

| COVERAGE | COVERAGE INCLUDED (YES OR NO) | LIMIT OF LIABILITY | SELF-INSURED RETENTION |
|----------|-------------------------------|--------------------|------------------------|
| **COVERAGE SECTION A, Employment Practices Liability:** | Yes | USD 1,000,000 Each Claim | USD 35,000 Each Claim |
| Third-Party Discrimination Coverage: | Yes | USD 1,000,000 Each Claim and All Claims in the Aggregate | |
| Punitive, Exemplary and Multiple Damages Coverage: | | USD 1,000,000 Each Claim and All Claims in the Aggregate | |
| **4.A.** All Claims in the Aggregate, COVERAGE SECTION A, including Third-Party Discrimination (where included) and Punitive, Exemplary and Multiple Damages: | | USD 1,000,000 | |
| Defense-Only Limit: | No | USD NIL Each Claim and All Claims in the Aggregate | |
| **COVERAGE SECTION B, Directors and Officers Liability:** | Yes | USD 1,000,000 Each Claim | USD 15,000 For Insuring Agreements I.B. and I.C.;   USD **None** For Insuring Agreement I.A. |
| Punitive, Exemplary and Multiple Damages Coverage: | | USD 1,000,000 Each Claim and All Claims in the Aggregate | |
| **4.B.** All Claims in the Aggregate, COVERAGE SECTION B, including Punitive, Exemplary and Multiple Damages: | | USD 1,000,000 | |
| **COVERAGE SECTION C, Fiduciary Liability:** | No | USD NIL Each Claim | USD NIL Each Claim |
| Punitive, Exemplary and Multiple Damages Coverage: | | USD NIL Each Claim and All Claims in the Aggregate | |
| **4.C.** All Claims in the Aggregate, COVERAGE SECTION C, including Punitive, Exemplary and Multiple Damages: | | USD NIL | |

| COVERAGE SECTION D, Crime Coverage | No | USD NIL Each Covered Event | USD NIL Each and Every Covered Event |
|---|---|---|---|
| **4.D.** All Covered Events in the Aggregate, COVERAGE SECTION D: | | USD NIL | |
| **4.E. AGGREGATE LIMIT OF LIABILITY FOR ALL COVERAGES COMBINED:** | | USD 1,000,000 All Claims and Covered Events for all Coverage's Combined, for the Policy Period | |

| Item 5. | PRIOR AND PENDING DATE: | | |
|---|---|---|---|
| | Employment Practices (EPL): | Directors & Officers (D&O): | Fiduciary Liability: |
| | 1st October 2009 | 1st October 2009 | N/A |

Item 5. **PRIOR AND PENDING DATE:**

|  | Employment Practices (EPL): | Directors & Officers (D&O): | Fiduciary Liability: |
|---|---|---|---|
|  | 1st October 2009 | 1st October 2009 | N/A |

Item 6. **SERVICE OF SUIT:**

Eileen Ridley, FLWA Service Corp., c/o Foley & Lardner LLP,
555 California Street, Suite 1700, San Francisco, CA 94104-1520

Item 7. **AUTHORIZED REPRESENTATIVES:**

Claims Department Beazley
30 Batterson Park Road,
Farmington,
CT 06032.
claims@beazley.com
(860) 677 3765 (phone)
(860) 679 0247 (fax)

5

Additional Clause(s) and Endorsement(s) applicable to this Policy and attached:

Application Dated: 16th September
Wage & Hour Application Dated: 10th October 2016
California Mandatory Disclosure Clause – LSW 1147D
Endorsement Number 1
Policy Complaints Notice
Free Loss Control Service  - ARCH002
Choice of Law Clause - 623AFB00113
Small Additional or Return Premiums Clause (U.S.A.) – NMA 1168
Nuclear Incident Exclusion Clause - Liability - Direct - Broad - NMA 1256
Radioactive Contamination Exclusion - Liability - Direct - NMA 1477
War and Terrorism Exclusion – NMA 2918
US Terrorism Risk Insurance Act of 2002 as amended New
Renewal Business Endorsement – LMA 5218
Several Liability Notice – LSW 1001
Wage & Hour Enhancement Endorsement
(IRCA) Immigration Practices Enhancement Endorsement
Employment Event Endorsement (USD 5,000 Sub-limit)
Privacy Violation Endorsement
Advertising Exclusion
Breach of Contract Exclusion
Additional Side A D&O Endorsement
Occupational Safety and Health Act Enhancement Endorsement

**Dated in London:**  25th October 2016

Authorised Signature          Authorised Signature
Arch Intermediaries Limited (Correspondent)

6

ARCH INTERMEDIARIES LIMITED

# COMBINED EMPLOYMENT PRACTICES, DIRECTORS' & OFFICERS', FIDUCIARY AND CRIME INSURANCE POLICY

Various provisions in this **Policy** restrict coverage.  Please read the entire **Policy** carefully to determine rights, duties, and what is and is not covered.

Throughout this **Policy** the words "you" and "your" refer to the **Insured Company** shown in the Declarations. The words "we," "us," and "our" refer to the Underwriters providing this insurance.  The word **"Insured"** means any person or organization qualifying as such under the definition of **Insured** as defined in the General Terms and Conditions, below, and in each Coverage Section.

Other words and phrases that appear in **bold** have special meaning as described in the definitions found in the General Terms and Conditions, below, and in each Coverage Section.

In consideration of payment of the premium and in reliance upon the statements made in the **Application**, which is made a part of and deemed attached to this **Policy**, and subject to the Declarations and the limitations, conditions, provisions, and other terms of this **Policy**, the Underwriters and the **Insureds** agree as follows:

## GENERAL TERMS AND CONDITIONS

### I.    SEVERABILITY OF GENERAL TERMS AND CONDITIONS

Except for these General Terms and Conditions, or unless stated to the contrary in any Coverage Section, the terms and conditions of each Coverage Section of this **Policy** apply only to that Coverage Section and shall not apply to any other Coverage Section of this **Policy**.  If any provision in the General Terms and Conditions is inconsistent or in conflict with the terms and conditions of any Coverage Section, the terms and conditions of such Coverage Section shall control for purposes of that Coverage Section.

### II.    DEFENSE AND SETTLEMENT

Except with respect to Coverage Section D., we have the right and duty to defend any **Claim** covered by the **Policy** and such obligation is limited to amounts constituting **Defense Costs**.

Our duty to defend any **Claim** will end once the Limit of Liability, as stated in the Declarations, is exhausted by the payment of **Loss**, including **Defense Costs**.  If our duty to defend ends with respect to any **Claim,** we will notify you so that you can arrange to take control of the defense of the **Insureds**.  We will take whatever steps are necessary to avoid a default judgment during a transfer of control of the defense of any such **Claim.**  If we do so, you agree to repay the reasonable expenses incurred by us during the transfer and further agree that, in undertaking the steps necessary to avoid a default judgment during the transfer, we have not waived any rights under the **Policy**.

We may, with your consent, settle any **Claim** for any monetary amount that we consider reasonable.

The **Insureds** will not incur any **Defense Costs**, settle, or offer to settle any **Claim**, assume any contractual obligation, admit liability, voluntarily make any payment or confess or otherwise consent to any damages or judgments with respect to any **Claim** without our prior written consent, which will not be unreasonably withheld.

7

We will not be liable for any **Defense Costs**, settlement, assumed obligation, admitted liability, voluntary payment, or confessed damages or judgments to which we have not consented.

The **Insureds** will provide full cooperation and all information and particulars that we may request to conduct an investigation, defend a **Claim**, or to reach a settlement of a **Claim**. The **Insureds** agree that in the event of a **Claim**, they will do nothing that may prejudice our position or rights of recovery.

## III.   DEFINITIONS

A.   **Application** means all applications, including attachments and submitted materials, for this **Policy** or for any policy of which this **Policy** is a direct renewal or replacement. All such applications, attachments, and materials are deemed attached to and incorporated into this **Policy** in accordance with Section XI. of these General Terms and Conditions.

B.   **Defense Costs** means reasonable and necessary fees, costs, and expenses incurred by counsel, experts or investigators appointed or pre-approved by us in the investigation, defense and appeal of any **Claim**; but **Defense Costs** do not include any wages, salaries, fees, or expenses of any **Insured**. **Defense Costs** will include legal and investigation fees necessary to respond to potential claims, if incurred at our request and direction.

C.   **Employee** means any individual whose labor or service is engaged by and directed by the **Insured Company**, including volunteers and all staff members, whether part-time, full-time, seasonal, or temporary.

**Employee** does not mean any agent, broker, factor, commission merchant, consignee, independent contractor or representative or other person of the same general character, except that as respects Coverage Section A only, **Leased Employees** and independent contractors will also be considered **Employees**.

D.   **ERISA** shall mean the Employee Retirement Income Security Act of 1974, as amended.

E.   **Financial Impairment** means the status of the **Insured Company** resulting from the appointment by any state or federal official, agency or court of any receiver, trustee, examiner, conservator, liquidator, rehabilitator or similar official to take control of, supervise, manage or liquidate the **Insured Company**.

F.   **Insured Company** means the organization(s) listed in Item 1. of the Declarations, whether as a corporation, partnership, joint venture, association, or otherwise, and any **Insured Subsidiary**.

G.   **Insured Fiduciary**, either in the singular or plural, shall mean:

(1)   one or more natural persons who were, now are or shall hereafter be a director, officer, partner, trustee or employee of the **Sponsor Company** or of any **Insured Plan**; or

(2)   any other natural persons who were, now are or shall hereafter be a fiduciary of an **Insured Plan**, provided further that such fiduciary is sued solely in his or her capacity as a fiduciary of an **Insured Plan**.

**Insured Fiduciary** does not mean any agent, broker, independent contractor, broker/dealer, registered representative, investment advisor, custodian or other person or entity of the same general character.

H.   **Insured Plan**, either in the singular or plural, shall mean:

(1)    any government-mandated insurance program for unemployment, social security or disability benefits for employees of the **Sponsor Company**, except for workers' compensation;

(2)    any welfare benefit plan as defined in **ERISA** or any similar common or statutory law of the United States or other jurisdiction anywhere in the world, which is sponsored solely by the **Sponsor Company** or jointly by the **Sponsor Company** and a labor organization solely for the benefit of the employees of the **Sponsor Company** located anywhere in the world and which existed on the inception date of this **Policy**;

(3)    any non-qualified plan not subject to regulation under Title I of **ERISA** or which does not meet the qualification requirements under Section 401(a) of the Internal Revenue Code of 1986, as amended, but only for a **Fiduciary Wrongful Act** as defined herein; and

(4)    any plan, fund or program specifically listed in the **Application** to this **Policy**;

provided however, **Insured Plan** shall not include any multi-employer plan, as defined in **ERISA**.

I.    **Insured Subsidiary** means any organization in which more than 50% of the outstanding voting securities representing the present right to vote for election of directors is owned, directly or indirectly, by the **Insured Company**.

J.    **Interrelated Claims** means all **Claims** based upon or arising from **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of related facts, circumstances, situations, events, transactions, or causes.  **Claims** may be **Interrelated Claims** whether or not they involve the same cause, claimants, **Insured**, or legal theory.

All **Interrelated Claims** shall be deemed one **Claim**, and such **Claim** shall be deemed to have been first made on the date the earliest of such **Claims** was first made, regardless of whether such date was before or during the **Policy Period**.

K.    **Leased Employee** means any **Employee** who is leased to you to perform work at and for the **Insured Company** and over whom you control the means and manner of their work.

L.    **Loss**, with respect to each Coverage Section except Coverage Section D, shall include **Defense Costs**, and shall have the meaning set forth in that Coverage Section; provided, however, with respect to all such Coverage Sections, **Loss** shall also include punitive, multiple, and exemplary damages, to the extent insurable under the law of any applicable jurisdiction most favorable to insurability.

M.    **Policy** means, collectively, the Declarations, the **Application**, this **Policy** form, and any endorsements.

N.    **Policy Period** means the period of time specified in Item 2. of the Declarations, subject to any prior cancellation described in Section XXVI. of these General Terms and Conditions.

O.    **Sponsor Company** shall mean the entity named in Item 1 of the Declarations and any **Insured Subsidiary**.

P.    **Wrongful Act(s)** means, for purposes of these General Terms and Conditions, **Wrongful Employment Practices** and **Third-Party Discrimination** as defined in the Employment Practices Coverage Section, **Wrongful Acts** as defined in the Directors and Officers Liability

Coverage Section and **Fiduciary Wrongful Acts** as defined in the Fiduciary Liability Coverage Section, but only where each such Coverage Section is purchased and included.

## IV.   LIMITS OF LIABILITY

A.   The separate amounts set forth in Items 4.A., 4.B. and 4.C. of the Declarations shall be separate Limits of Liability for Coverage Sections A., B. and C. (where included) and shall be our maximum aggregate Limit of Liability for all Loss and **Defense Costs** combined on account of all **Claims** first made during the **Policy Period** with respect to each such Coverage Section.

B.   The separate amount set forth in Item 4.D. of the Declarations shall be a separate Limit of Liability for each Insuring Agreement under Coverage Section D (where included) and shall be our maximum aggregate Limit of Liability for all losses under all Insuring Agreements under Coverage Section D. combined.

C.   The scheduled Limit of Liability for Coverage Sections A., B. C. and D. are subject to the Aggregate Limit of Liability as specified in Item 4.E. of the Declarations.  As such, each Coverage Section's Limit of Liability is a sublimit which further limits and does not increase our maximum liability for all such Coverage Sections.  If no Aggregate Limit of Liability is specified in Item 4.E. of the Declarations, the Scheduled Limits of Liability set forth for each such Coverage Section are not subject to an Aggregate Limit of Liability, combined, for all such Coverage Sections.

Payments of **Loss** by us under Coverage Sections A., B. and C., including **Defense Costs**, shall reduce the Limit of Liability. If the Limit of Liability for any Coverage Section is exhausted by payment of **Loss**, including **Defense Costs**, our obligations under such Coverage Section shall be deemed completely fulfilled and extinguished.

D.   **Defense Costs** under Coverage Sections A., B. and C. shall be part of, and not in addition to, each of the Limits of Liability set forth in the Declarations, and **Defense Costs** shall reduce each such Limit of Liability.  **Claim Expenses** under Coverage Section D. shall be part of, and not in addition to, the Limit of Liability set forth in the Declarations.

E.   The Limits of Liability for the Extended Reporting Period, if exercised, shall be part of and not in addition to each of the Limits of Liability for the **Policy Period**.  The purchase of the Extended Reporting Period shall not increase or reinstate the Limits of Liability set forth in the Declarations, which shall be our maximum liability for all **Loss** and **Defense Costs** on account of all **Claims** first made during such **Policy Period** and Extended Reporting Period, combined.

## V.   SELF-INSURED RETENTION

A.   Our liability under Coverage Sections A., B. and C. with respect to **Loss**, including **Defense Costs**, arising from any single **Claim** shall apply only to that part of such **Loss**, including **Defense Costs**, in excess of the applicable Self-Insured Retention set forth in the Declarations for such Coverage Section.  If **Loss** on account of a single **Claim** is subject to different Self-Insured Retentions under different Coverage Sections, the total applicable Self-Insured Retentions shall not exceed the single largest applicable Self-Insured Retention.  The Self-Insured Retention amount shall be your uninsured responsibility and shall apply to **Defense Costs** as well as other **Loss**.  We shall have no responsibility to make any payment unless the Self-Insured Retention has been exhausted or unless the Insured Company is unable to meet its uninsured responsibility of account of **Financial Impairment**.

B.   The Self-Insured Retention amount applies to each **Claim** or **Interrelated Claims**, regardless of the number of claimants.

C.  Our liability under Coverage Section D. shall apply only to that part of loss excess of the applicable self-Insured Retention set forth in the Declarations.

D.  Solely in respect of Coverage Section A, if the **Insured Company** consents to a settlement of a **Claim** within twenty (20) days of the first request by Underwriters to consent and the settlement is accepted by the claimant, then the applicable Self-Insured Retention for that Coverage Section shall be retroactively reduced by ten percent (10%). Any consent to the same or another settlement after such time shall not reduce the Self-Insured Retention.

E.  Solely in respects of Coverage Sections A and B, in the event of: (1) a determination of No Liability of all **Insureds**; or (2) a dismissal or a stipulation to dismiss a **Claim** without prejudice and without payment by any **Insured**, then the applicable Self-Insured Retention for that Coverage Section shall be retroactively reduced by an amount up to twenty-five percent (25%) or $100,000, whichever is less; provided, however, that in the case of (2), any amounts to be returned shall be returned ninety (90) days after the date of dismissal or stipulation as long as the **Claim** is not reinstituted (or any other **Claim** which is subject to the same single Self-Insured Retention) within that time, and further subject to an undertaking by the **Insured Company** in a form acceptable to Underwriters that such amounts shall be paid back to Underwriters in the event the **Claim** (or any other **Claim** which is subject to the same single Self-Insured Retention) is brought after such 90-day period and before the expiration of the statute of limitations for such **Claim**.

"No Liability" for purposes of this provision means: (1) a final judgment of no liability obtained prior to trial, in favor of all **Insureds**, by reasons of a motion to dismiss or a motion for summary judgment, after the exhaustion of all appeals; or (2) a final judgment of no liability obtained after trial in favor of all **Insureds**, after the exhaustion of all appeals. In no event shall the term "No Liability" apply to a **Claim** made against an **Insured** for which a settlement has occurred.

## VI.   SPOUSAL AND DOMESTIC PARTNER EXTENSION

If a **Claim** against an **Insured** includes a claim against the lawful spouse or domestic partner of such **Insured** solely by reason of (a) such spouse's or domestic partner's legal status, or (b) such spouse's or domestic partner's ownership interest in property or assets that are sought as recovery for the **Wrongful Acts** of such **Insured**, all loss that such spouse or domestic partner shall become legally obligated to pay by reason of such claim shall be treated, for purposes of this **Policy**, as **Loss** that such **Insured** is legally obligated to pay on account of the **Claim** made against such **Insured**. The extension of coverage afforded by this Section VI. shall not apply to the extent the **Claim** alleges any act, error or omission by such spouse or domestic partner. All terms and conditions of this **Policy**, including the Self-Insured Retention, will be applicable to such **Claim**.

## VII.   EXCLUSIONS

The following exclusions are applicable to Coverage Sections A., B. and C., but are not applicable to Coverage Section D. Other exclusions are reflected in each Coverage Section.

We are not obligated to defend or pay **Loss**, including **Defense Costs**, on account of any **Claim.**

A.  based upon, arising out of, or attributable to any **Wrongful Act**, fact, circumstance, or situation:

(i)  that was the subject of written notice given under any similar prior policy of which this **Policy** is a renewal or replacement;

(ii)  that was the subject of any written demand, investigation, proceeding, arbitration or litigation against any **Insured**, whether administrative, regulatory, civil or criminal, as of

11

the applicable Prior and Pending Date identified in Item 5. of the Declarations, including but not limited to the same or substantially the same facts, circumstances, or situations underlying or alleged in the prior or pending matter; or

(iii) that was identified in any summary or statement of claims or potential claims or circumstances identified in connection with the **Application.**

B. for, based upon, arising from, or in any way related to:

(i) the actual, alleged or threatened discharge, dispersal, release or escape of pollutants; or

(ii) any direction, request or voluntary decision to test for, abate, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants, nuclear material or nuclear waste.

Pollutants include, but are not limited to, any solid, liquid, gaseous or thermal irritant or contaminant, or toxin including but not limited to smoke, vapor, soot, fumes, dust, fibers, mold, spores, fungi, germs, acids, alkalis, chemicals, odors, noise, lead, lead compounds, silica, oil or oil products, radiation, radon, asbestos or asbestos-containing products or any like substances, and waste, and any electric, magnetic or electromagnetic field of any frequency.    Waste includes, but is not limited to, material to be recycled, reconditioned or reclaimed.

Provided, however, this Exclusion shall not apply to Coverage Section B. in respect of any **Claim** brought by a shareholder of the **Insured Company** in its capacity as such.

## VIII. NOTICE PROVISIONS

The following provisions are applicable to Coverage Sections A., B. and C., but are not applicable to Coverage Section D.

A. The **Insureds** shall, as a condition precedent to their rights under this **Policy**, give our Authorized Representatives, as identified in Item 7. of the Declarations, written notice of any **Claim** made against the **Insureds** as soon as practicable after any **Insured**, who is chief executive officer, chief financial officer, general counsel or human resource manager, becomes aware that the **Claim** has been made, but in no event later than sixty (60) days after the expiry of the Policy. Along with the notice of the **Claim**, the **Insureds** shall provide our Authorized Representatives with copies of all documentation comprising the **Claim** as well as all authorization, cooperation, or assistance as we may require throughout the duration of the **Claim**.

Under no circumstances shall we be obligated to pay any **Defense Costs** incurred prior to **Claim** notification.

B. If, during the **Policy Period**, or the Extended Reporting Period if purchased, any **Insured** first becomes aware of a specific **Wrongful Act**, and if during the Policy Period, or the Extended Reporting Period if purchased, the **Insureds** give written notice to us, as soon as practicable, of:

(1) the specific **Wrongful Act**;

(2) the consequences which have resulted or may result therefrom; and

(3) the circumstances by which the **Insureds** first became aware thereof,

then any **Claim** made subsequently and arising out of such **Wrongful Act** shall be deemed for the purposes of this **Policy** to have been made at the time such notice was first given.

12

C.     Notice to us, as required by this Section VIII., shall be given to our Authorized Representatives, as identified in Item 7. of the Declarations, and shall be a condition precedent to coverage under this **Policy**.

## IX.    OTHER INSURANCE

Unless expressly written to be excess over other valid and collectible insurance, and except for: (i) **Claims** against **Leased Employees** and **Claims** for **Third-Party Discrimination** (where and if included), and (ii) Coverage Section D., which is governed by Section VII. of Coverage Section D., this **Policy** is intended to apply as primary insurance for **Wrongful Acts** covered by this **Policy**. With respect to **Claims** against **Leased Employees** and **Claims** for **Third-Party Discrimination**, this **Policy** applies excess of all indemnification and insurance available to any **Insured**. Nothing in this provision, however, shall prevent us or the **Insureds** from seeking contribution or coverage from any other insurer or indemnitor.

## X.    CHANGES IN EXPOSURE

A.     If during the **Policy Period** the **Insured Company** acquires securities in another entity or creates another entity, which as a result becomes an **Insured Subsidiary**, or if the **Insured Company** acquires another entity by merger or consolidation, coverage under Coverage Sections A., B. and C. only will automatically be available provided that (a) the fair value of such acquired or created entity, including all cash, securities, assumed liabilities and other consideration, does not exceed 50% of the total consolidated assets of the **Insured Company** as of the inception of the **Policy Period**; and (b) provided further, that the total number of your **Employees** does not increase by more than 50% as a result of such acquired or created entity and (c) provided further, that with respect to Coverage Section C., the plan assets of any created or acquired **Insured Plan(s)** in the aggregate do not exceed 50% of the total plan assets of the **Insured Plan(s)** as of the inception date of the **Policy Period**.

B.     If during the **Policy Period** the **Insured Company** or any **Insured Subsidiary** is acquired, or control assumed by another entity, coverage under this **Policy** will continue but only with respect to **Wrongful Acts** taking place prior to the effective date of the acquisition or change of control. The **Policy** may not be cancelled after the effective date of the acquisition or change of control and the premium will be deemed fully earned on such date.

C.     If the **Insured Company** acquires or creates another entity with a value of greater than 50% of the **Insured Company's** value as described in Section X.A., above, or if the total number of your **Employees** is increased by more than 50%, or if the plan assets of any newly created or acquired Insured Plan exceed the value stated above, coverage will not be available to such entity or merged operations unless and until we are notified of the circumstances as soon as practicable, but in any event within ninety (90) days. We will be entitled to impose such amended terms and conditions and adjust the premium as we may require.

D.     With respect to Coverage Section C., if during the **Policy Period** the **Sponsor Company** terminates any **Insured Plan**, coverage under this **Policy** shall apply solely with respect to **Fiduciary Wrongful Acts** that occurred prior to the date of asset distribution on condition that the **Sponsor Company** gives us notice of such termination as soon as practicable, but in any event within ninety (90) days.

## XI.    REPRESENTATIONS AND SEVERABILITY

In issuing this **Policy**, we relied upon the information, particulars, representations and statements contained in, attached to or referred to in the Application. The **Insureds** represent that all such information, particulars,

representations and statements are both true and deemed material to the acceptance of the risk or the hazard assumed by us under this **Policy**.

The **Insureds** agree that in the event any such information, particulars, representations and statements are untrue, the **Policy** will not afford coverage with respect to any of the following **Insureds**: (1) any **Insured** who knew the facts that were not truthfully disclosed in the **Application**; provided that, solely with respect to the coverage afforded under Coverage Section B.I.A., we shall not be entitled to rescind the **Policy**; and (2) the **Insured Company**, if the individual(s) who executed the **Application** knew the facts that were not truthfully disclosed.

For purposes of this provision, no knowledge possessed by an **Insured** shall be imputed to any other **Insured**.

## XII.   ALLOCATION

If both **Loss** covered under this **Policy** and loss not covered under this **Policy** are jointly incurred either because a **Claim** includes both covered and non-covered matters or because a **Claim** is made against both covered and uncovered parties, then you and we shall use our best efforts to fairly and reasonably allocate such amount between covered **Loss** and non-covered loss based on the relative legal exposures of the parties with respect to covered and non-covered matters.

## XIII.   COORDINATION AMONG COVERAGE SECTIONS

In the event that any **Claim** is a subject of coverage under more than a single Coverage Section, the terms, conditions, definitions and exclusions of each Coverage Section shall be applied separately to that part of the **Claim** covered by each such Coverage Section.   The **Insured Company** and Underwriters shall use their best efforts to reach agreement on the question of whether more than a single Coverage Section applies to any **Claim**. In the event that more than a single Coverage Section is applicable, the single largest applicable Limit of Liability, and its corresponding Self-Insured Retention, shall be applied to the **Claim**.   If the largest applicable Limit of Liability is equal to the Limit of Liability of another Coverage Section that also applies, then the largest applicable Self-Insured Retention shall be applied to the **Claim**.   Under no circumstances will more than one Limit of Liability be available to any **Claim** or **Interrelated Claims**.

## XIV.   BANKRUPTCY

The bankruptcy or insolvency of the **Insured Company** or any **Insured Subsidiary** shall not relieve us of any obligations hereunder.

## XV.   ORDER OF PAYMENTS

It is agreed that we will use best efforts to pay all **Loss** under this **Policy** in the following order of priority:

First, we will pay all **Loss** for which coverage is provided under Coverage Sections B.I.A. and B.I.B.; and

Second, with respect to whatever remaining amount of the Limit of Liability may be available after payment of **Loss** under Coverage Section B.I.A. and B.I.B., we will pay all **Loss** for which coverage is provided under Coverage Sections A., B.I.C. and C. and all loss for which coverage is provided under Coverage Section D.;

Provided always that should there be any dispute concerning priority of payment as between Coverage Sections B.I.A. and B.I.B., we and the **Insured Company** will use best efforts to agree upon priority, and failing agreement, will submit any such dispute to binding arbitration pursuant to Section XXI. of the General Terms and Conditions of this **Policy**.

## XVI.  AUTHORIZATION CLAUSE

By acceptance of this **Policy**, you agree to act on behalf of the **Insureds** with respect to the giving and receiving of notice of **Claim** or cancellation, the payment of premiums, and the receiving of any return premiums that may become due under this **Policy**, the agreement to and acceptance of endorsements and the giving or receiving of any notice provided for in this **Policy** (except the giving of notice to apply for the Extended Reporting Period), and the **Insureds** agree that you will act on their behalf.

## XVII. SUBROGATION

In the event of any payment under this **Policy**, we will be subrogated to the extent of such payment to all of your and any **Insured's** rights of recovery.  You and the **Insureds** will execute all required papers and do everything necessary to secure and preserve such rights.

## XVIII. ALTERATION AND ASSIGNMENT

This **Policy** cannot be changed, modified, or assigned without our written, signed endorsement.

## XIX.  TERRITORY

Coverage under Coverage Sections A., B. and C. of this **Policy** will extend to **Wrongful Acts** taking place and **Claims** made anywhere in the world.  Coverage under Coverage Section D. of this Policy will extend to losses anywhere in the world.

## XX.   ACTION AGAINST UNDERWRITERS

 No action shall lie against us unless, as a condition precedent thereto, there shall have been full compliance with all terms and conditions of this **Policy**.  No person or organization shall have any right under this **Policy** to join us as a party to any action against any **Insured** to determine the liability of such **Insured**, nor shall we be impleaded by any **Insured** or their legal representative.

## XXI.  ARBITRATION

Underwriters and the **Insureds** agree that any dispute, controversy, or claim arising out of or relating to this **Policy** or its breach, termination, or invalidity, will be submitted either: (a) to final and binding arbitration; or (b) to non-binding mediation, whichever the **Insured** shall select, pursuant to such rules and procedures as the parties may agree.  If the parties cannot agree, the arbitration or mediation shall be administered by the American Arbitration Association in accordance with its then prevailing commercial arbitration/mediation rules and such arbitration or mediation shall take place in New York, New York.  In the event of arbitration, the panel shall consist of one arbitrator selected by you, one arbitrator selected by us, and a third independent arbitrator selected by the first two arbitrators. In any arbitration or mediation, each party will bear its own legal fees and expenses.

This section XXI. shall not apply to Coverage Section D.

## XXII. SERVICE OF SUIT

In the event any non-binding mediation selected by the **Insured** in accordance with the preceding paragraph does not resolve disputes arising out of or related to this **Policy**, we agree, at the request of any **Insured**, to submit to the jurisdiction of a court of competent jurisdiction within the United States and we will comply with all requirements necessary to give such court jurisdiction.  Nothing in this paragraph constitutes or should be understood to constitute a waiver of our rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to United States District Court, or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States.  It is further agreed that

service of process in such suit may be made upon the firm shown under Item 1. of the Declarations, and that in such suit instituted against any of the Underwriters of this **Policy**, Underwriters will abide by the final decision of such court or of any appellate court in the event of an appeal.

The firm shown under Item 6. of the Declarations is authorized and directed to accept service of process on behalf of the Underwriters in any such suit and/or upon the request of any **Insured** to give a written undertaking to such **Insured** that they will enter general appearance upon Underwriters' behalf in the event such a suit is instituted.

Further, pursuant to the statute of any state, territory, or district of the United States which makes provision for such, Underwriters designate the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his or her successor or successors in office, as their true and lawful attorney, upon whom may be served any lawful process in any action, suit, or proceeding instituted by or on behalf of any **Insured** or any beneficiary of this **Policy**, and designate the firm shown under Item 1. of the Declarations as the firm to whom said officer is authorized to mail such process.

## XXIII. ESTATES AND LEGAL REPRESENTATIVES

Whenever the term **Insured**, as used in this **Policy**, refers to a natural person, such term shall include the estates and legal representatives of such natural person **Insured**. Neither death, bankruptcy, incapacity nor insolvency of any natural person **Insured**, will relieve us of any obligations under the **Policy**.

## XXIV. EXTENDED REPORTING PERIOD

In the event of non-renewal or cancellation of this **Policy**, you shall have the right, upon payment of an additional premium of 100% of the premium charged for the non-renewed or cancelled **Policy**, to an extension of the coverage available under this **Policy** in respect of Coverage Sections A., B. and C. for a period of twelve (12) months following the effective date of such non-renewal or cancellation, or 120% for a twenty-four (24) month extension, or 140% for a thirty-six (36) month extension, but only with respect to **Claims** otherwise covered by this **Policy** and only for **Wrongful Acts** taking place prior to the effective date of such non-renewal or cancellation.

A written request for the Extended Reporting Period must be received by us within thirty (30) days from the effective date of the non-renewal or cancellation. The premium due for the Extended Reporting Period must be received by us within forty-five (45) days of such effective date. The entire premium for the Extended Reporting Period shall be deemed fully earned and non-refundable upon payment.

## XXV. NON-RENEWAL

If we decide not to renew this **Policy**, we will mail or deliver to the **Insured Company** written notice of non-renewal not less than sixty (60) days before the expiration date. If the notice is mailed, proof of mailing will be sufficient notice of non-renewal.

## XXVI. CANCELLATION

You may cancel this **Policy** by mailing written notice to us stating when thereafter such cancellation shall be effective. We may cancel this **Policy** only for non-payment of premium, by mailing written notice to you at the address shown in the Declarations, stating when, not less than ten (10) days thereafter, such cancellation shall be effective. The mailing of such notice shall be sufficient proof of notice. Delivery of such written notice shall be equivalent to mailing. The effective date and hour of cancellation as stated in the notice shall become the end of the **Policy Period**.

If you cancel, earned premium shall be computed in accordance with the standard short rate table, but in no event will earned premium be less than twenty-five percent (25%) of the total premium indicated in the Declarations.

16

If we cancel, earned premium shall be computed pro rata.  Premium adjustment may be made at the time cancellation becomes effective, but payment or tender of unearned premium is not a condition of cancellation.

## XXVII.  LIBERALIZATION

In the event the identical unendorsed policy form is amended by us subsequent to the inception date of this **Policy** such that the coverage under such identical unendorsed policy form is broader as a result of the amendments, this **Policy** shall be construed to include the broadened coverage.

[THIS SPACE INTENTIONALLY LEFT BLANK]

COVERAGE SECTION A

**EMPLOYMENT PRACTICES LIABILITY COVERAGE SECTION**

**I.    INSURING AGREEMENT**

We will pay all **Loss** that an **Insured** becomes legally obligated to pay as a result of **Claims** first made against such **Insured** during the **Policy Period**, or the Extended Reporting Period if applicable, and reported in accordance with the notice provisions of Section VIII. of the General Terms and Conditions, for a **Wrongful Employment Practice** or **Third Party Discrimination** (where and if coverage for **Third Party Discrimination** is included, as reflected on Item 4. of the Declarations).

**II.    DEFINITIONS**

The following terms, whenever used in this Coverage Section, shall have the meanings indicated below. Other terms shall have the meanings found in the General Terms and Conditions of the **Policy**.

    A.    **Claim** means:

        (1)    a written demand for monetary damages or non-monetary relief, or written notice of an intention to hold an **Insured** responsible, for a **Wrongful Employment Practice** or **Third-Party Discrimination** (where and if included);

        (2)    a charge, complaint or other notice of commencement of federal, state, or local administrative proceedings by or before any agency with authority over the **Insured Company's** employment practices;

        (3)    the filing of a civil lawsuit or arbitration proceeding; or

        (4)    the filing of a criminal lawsuit or the institution of criminal proceedings; provided, however, that the decision to consider such lawsuit or proceedings a **Claim** shall be in the sole discretion of Underwriters and must be agreed to by the **Insured Company**.

        A **Claim** is deemed first made when it is received by an **Insured**.

    B.    **Insured** means the **Insured Company** and individuals who are your former, current or future principals, partners, officers, directors, trustees, shareholders, members of the Board of Management, management committee members, in-house general counsel and those **Employees** for whom you request coverage at the time of **Claim**, acting in their capacities as such. If, at any time during the **Claim**, you no longer want us to provide coverage for any such **Employee(s)**, you shall send us written notice requesting that coverage for the **Employee(s)** be withdrawn. Coverage for the **Employee** shall cease as of the date we receive such notice.

    C.    **Loss** means damages, judgments, settlements, verdicts, and awards, including compensatory damages, back pay, front pay, statutory attorneys' fees, pre-judgment and post-judgment interest, statutory liquidated damages and **Defense Costs** in excess of the applicable Self-Insured Retention.

        **Loss** does not include: (1) fines, penalties, or taxes; (2) any amount for which the **Insured** is absolved from payment; (3) stock options or amounts reflecting the value of stock options; (4) amounts owed under employment contracts, partnership, stock, or other ownership agreements, or any other type of contract; (5) severance pay, (6) disability, social security, workers' compensation, medical, insurance, retirement or pension benefits, or settlement amounts

18

representing benefits payments; (7) the cost to modify any premises or provide any accommodation to any disabled person; (8) the cost of instituting or conducting any program, procedure, or training; (9) the cost of instating or reinstating employment, or providing any non-monetary relief; or (10) any relief, whether pecuniary or injunctive, imposed or agreed to in connection with criminal lawsuits or proceedings.

D.   **Third-Party Discrimination** means any actual or alleged discrimination, including harassment, or civil rights violation by an **Insured** against any non-**Employee**.

E.   **Wrongful Employment Practice** means any actual or alleged:

   (1)   violation of any federal, state, local or common law, prohibiting any kind of employment-related discrimination;

   (2)   harassment, including any type of sexual or gender harassment as well as racial, religious, sexual orientation, pregnancy, disability, age, or national origin-based harassment and including workplace harassment by non-employees;

   (3)   abusive or hostile work environment;

   (4)   wrongful discharge or termination of employment, whether actual or constructive;

   (5)   breach of an implied employment contract;

   (6)   wrongful failure or refusal to hire or promote, or wrongful demotion;

   (7)   wrongful failure or refusal to provide equal treatment or opportunities;

   (8)   employment terminations, disciplinary actions, demotions or other employment decisions that violate public policy or the Family Medical Leave Act or similar state or local law;

   (9)   defamation, libel, slander, disparagement, false imprisonment, misrepresentation, malicious prosecution, or invasion of privacy;

   (10)   wrongful failure or refusal to adopt or enforce adequate workplace or employment practices, policies or procedures;

   (11)   wrongful, excessive or unfair discipline;

   (12)   wrongful infliction of emotional distress, mental anguish, or humiliation;

   (13)   retaliation, including retaliation for exercising protected rights, supporting in any way another's exercise of protected rights, or threatening or actually reporting wrongful activity of an **Insured** such as violation of any federal, state, or local "whistle blower" law,

   (14)   wrongful deprivation of career opportunity, negligent evaluation or failure to grant tenure;

   (15)   violations of the Uniformed Services Employment and Reemployment Rights Act;

   (16)   negligent hiring or negligent supervision of others, including wrongful failure to provide adequate training, in connection with (1) through (15) above,

but only if employment-related and claimed by or on behalf of an **Employee**, former **Employee**, or applicant for employment, and only if committed or allegedly committed by any of the **Insureds** in their capacity as such.

## III. EXCLUSIONS

We are not obligated to defend or pay **Loss**, including **Defense Costs**, on account of any **Claim**:

A.    for an actual or alleged violation of the Fair Labor Standards Act (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, **ERISA**, any workers' compensation, unemployment insurance, social security, or disability benefits law, other similar provisions of any federal, state, or local statutory or common law, including any actual or alleged violations of any federal, state or local wage and hour laws or regulations, whether or not such allegations are made in connection with any governmental or administrative proceedings *provided, however*, that: 1) this exclusion will not apply to any **Claim** of any actual or alleged retaliatory treatment on account of the exercise of rights pursuant to any such law; and 2) in the event such **Claim** also alleges unrelated **Wrongful Employment Practices** otherwise covered by this **Policy**, notwithstanding the provisions of Section II of this **Policy, Defense and Settlement**, we agree to pay **Defense Costs** or **Loss**, but solely for that portion of the **Claim** involving such unrelated **Wrongful Employment Practices** and subject to all other terms, conditions and exclusions contained in this **Policy**.

B.    arising out of, based upon, or attributable to, the adjudicated criminal or fraudulent act on the part of any **Insured** provided, however, that the criminal or fraudulent act of one **Insured** shall not be imputed to any other **Insured** for purposes of this exclusion;

C.    based upon, arising out of, or attributable to, liability of others assumed by any **Insured** under any contract or agreement, except to the extent any **Insured** would have been liable in the absence of the contract or agreement;

D.    based upon any wrongful act or omission of any **Insured** serving in any capacity other than as your principal, officer, director, trustee, or **Employee**; or

E.    by a non-**Employee** for bodily injury including assault and battery.

## IV. LIMIT OF LIABILITY AND SELF-INSURED RETENTION

A.    Notwithstanding the provisions of Section IV. of the General Terms and Conditions, an additional Limit of Liability for Coverage Section A., if purchased and indicated in Item 4. of the Declarations, shall apply for coverage of **Defense Costs** only (referred to as the "Defense-Only Limit"). This Defense-Only Limit shall apply to **Defense Costs** in the first instance, leaving the original Limits of Liability as indicated for all other coverages set forth under Item 4., Coverage Section A., of the Declarations to apply second to: (1) **Defense Costs** incurred in excess of, and after exhaustion of, the Defense-Only Limit and/or (2) any other **Loss**, such as damages, judgments, settlements, verdicts, and awards, until the original Limit of Liability is exhausted.

In no event shall the Defense-Only Limit apply to **Loss** other than **Defense Costs**, and in no event shall we be obligated to pay more than the original Limits of Liability indicated for all other coverages listed under Item 4., Coverage Section A., of the Declarations toward **Loss**.

In no event shall our obligations under the **Policy** exceed the combination of the Aggregate Limit of Liability for All Coverage Sections Combined in Item 4.E. of the Declarations plus the

Defense-Only Limit indicated in Item 4., Coverage Section A., of the Declarations. If a Defense-Only Limit is purchased, all references to a Limit of Liability for Coverage Section A. of Item 4. shall refer to the combination of the original Limit of Liability and the Defense-Only Limit, subject to all other limitations and conditions of coverage.

Purchase of the Defense-Only Limit shall not alter your Self-Insured Retention obligations.

B.   If, prior to the termination of any **Employee**, the **Insured** obtains and adopts the written advice of legal counsel recommended or approved by us as respects such termination, then the Self-Insured Retention amount stated in Item 4., Section A., of the Declarations for Coverage Section A shall be reduced by 25% for any **Claim** commenced by that **Employee** arising from the events of the termination.

[THIS SPACE INTENTIONALLY LEFT BLANK]

COVERAGE SECTION B

DIRECTORS' & OFFICERS' LIABILITY COVERAGE SECTION

## I.     INSURING AGREEMENTS

A.     **Directors' and Officers' Liability Coverage**

We will pay all **Loss** that an **Insured** becomes legally obligated to pay as a result of **Claims** first made against such **Insured** during the **Policy Period**, or the Extended Reporting Period if applicable, and reported in accordance with the notice provisions of Section VIII. of the General Terms and Conditions, for **Wrongful Acts**, except for **Loss** for which the **Insured Company** is permitted or required to indemnify such **Insured**.

B.     **Insured Company Reimbursement Coverage**

We will pay all **Loss** for which the **Insured Company** is permitted or required to indemnify **Insured Persons** as a result of **Claims** first made against the **Insured Persons** during the **Policy Period**, or the Extended Reporting Period if applicable, and reported in accordance with the notice provisions of Section VIII. of the General Terms and Conditions, for **Wrongful Acts**.

C.     **Insured Company Liability Coverage**

We will pay all **Loss** resulting from **Claims** first made against the **Insured Company** during the **Policy Period**, or the Extended Reporting Period if applicable, and reported in accordance with the notice provisions of Section VIII. of the General Terms and Conditions, for **Wrongful Acts**.

## II.    DEFINITIONS

The following terms, whenever used in this Coverage Section, shall have the meanings indicated below.  Other terms shall have the meanings found in the General Terms and Conditions of the **Policy**.

A.     **Claim** means:

(1)     a written demand for monetary damages, non-monetary or injunctive relief;

(2)     a civil, criminal, administrative or regulatory proceeding commenced against any **Insureds** in which they may be subjected to binding adjudication of liability for damages or other relief, including any appeal therefrom;

(3)     as respects **Insured Persons** only, a civil, criminal, administrative, or regulatory investigation commenced by the service upon or other receipt by an **Insured Person** of a written notice from an investigating authority specifically identifying such **Insured Person** as a target individual against whom formal charges may be commenced; or

(4)     any official request for **Extradition** of any **Insured Person** or the execution of a warrant for the arrest of any **Insured Person** where such execution is an element of **Extradition**.

A **Claim** is deemed first made when it is received by an **Insured**.

B.     **Defense Costs** means, for purposes of this Coverage Section B. only, and in addition to the meaning set forth in III.B. of the General Terms and Conditions, those reasonable and necessary fees, costs, and expenses incurred through legal counsel and consented to by us resulting from an

22

Insured Person lawfully opposing, challenging, resisting or defending against any request for or any effort to obtain the Extradition of such Insured Person, including but not limited to appealing any order or other grant of Extradition of such Insured Person.

C.     Extradition means any formal process by which an Insured Person located in any country is surrendered to any other country for trial or otherwise to answer any criminal accusation.

D.     Insured shall mean Insured Persons and, with respect to Insuring Agreement C., the Insured Company.

E.     Insured Persons, either in the singular or plural, means any one or more persons who were, now are or shall be duly elected directors or duly elected or appointed officers of the Insured Company, or, with respect to an Insured Subsidiary incorporated outside the United States, their functional equivalent. Insured Persons also will include Employees of the Insured Company.

F.     Loss means the total amount which the Insured Persons or, with respect to Insuring Agreement C., the Insured Company are legally obligated to pay on account of any Claim made against them for Wrongful Acts for which coverage applies, including, but not limited to, damages, judgments and settlements negotiated with our consent.  Loss shall also include Defense Costs in excess of the applicable Self-Insured Retention.

Loss does not include: (1) any amount not indemnified by the Insured Company for which the Insureds are absolved from payment by reason of any covenant, agreement or court order; (2) any amount incurred by the Insured Company (including its board of directors or any committee of the board of directors) in connection with its investigation or evaluation of any Claim or potential Claim by or on behalf of the Insured Company; (3) taxes, fines or penalties imposed by law; and (4) matters uninsurable under the law pursuant to which this Policy is construed.

G.     Wrongful Act(s) means any error, misstatement, misleading statement, act, omission, neglect, or breach of duty actually or allegedly committed or attempted before or during the Policy Period:

(1)     by any of the Insured Persons acting in their capacity as such,  including any matter claimed against such Insured Persons solely by reason of their serving in such capacity;

(2)     by the Insured Company;  or

(3)     by any of the Insured Persons acting as a director, officer, trustee, governor, executive director or similar position of any not-for-profit organization, provided that such Insured Persons serve with the knowledge and consent of the Insured Company.

## III.   EXCLUSIONS

We are not obligated to defend or pay Loss, including Defense Costs, on account of any Claim:

A     for bodily injury, assault, battery, invasion of privacy, mental anguish, emotional distress, sickness, disease or death of any person, false arrest, false imprisonment, defamation, libel, slander or damage to or destruction of any tangible property, including loss of use thereof;

B.     for any actual or alleged violation of ERISA, the Fair Labor Standards Act, the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, any workers' compensation, unemployment insurance, social security, or disability benefits law, other similar

provisions of any federal, state, or local statutory or common law, including any actual or alleged violations of any federal, state or local wage and hour laws or regulations, or foreign statutory law or common law that governs the same topic or subject, and any rules, regulations and amendments promulgated thereto;

C.     brought or maintained by or on behalf of the **Insured Company** or any **Insured Person** in any capacity except;

     (i)     a **Claim** that is a derivative action brought or maintained on behalf of the **Insured Company** by one or more persons who are not **Insured Persons** and who bring and maintain the **Claim** without the solicitation, assistance or active participation of the **Insured Company** or any **Insured Person**;

     (ii)     a **Claim** brought by a bankruptcy trustee or creditor's committee;

     (iii)     a **Claim** brought by a former employee, director or officer who has not been employed by, or associated with, the **Insured Company** for more than three (3) years;

     (iv)     a **Claim** brought or maintained by any **Insured Person** for contribution or indemnity, if the **Claim** directly results from another **Claim** which is otherwise covered under this **Policy**; or

     (v)     a **Claim** brought or maintained by a shareholder in its capacity as such who is not a duly elected director or duly elected or appointed officer of the **Insured Company** if such **Claim** is made without the solicitation, assistance or active participation of a duly elected director or duly elected or appointed officer of the **Insured Company.**

Provided, however, that this Exclusion III.C. shall not apply to any **Claim** that is brought or maintained outside of the United States, Canada, Australia or any other common law jurisdiction.

D.     based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any **Wrongful Employment Practice** or **Third-Party Discrimination** as those terms are defined in the Employment Practices Liability Coverage Section;

E.     based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving:

     (i)     any initial public offering undertaken and consummated by the **Insured Company**, including all activities in connection therewith, or

     (ii)     the actual or alleged violation of the Securities Act of 1933, the Securities Exchange Act of 1934, rules or regulations of the Securities and Exchange Commission promulgated thereunder, any other federal, state, local or provincial statute relating to securities, or any rules or regulations promulgated thereunder, all as amended, for any **Wrongful Act** actually or allegedly committed subsequent to such initial public offering.

F.     based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving:

     (i)     any actual or alleged infringement, misappropriation, or violation of copyright, patent, service marks, trade secrets, title or other proprietary or licensing rights or intellectual property of any products, technologies or services; or

(ii)    the use or performance of any goods or products manufactured, produced, processed, packaged, sold, marketed, distributed, advertised or developed by the **Insured Company;**

provided, however, that these Exclusions F(i) and F(ii) shall apply only to the **Insured Company** and except that these Exclusions shall not apply to any **Claim** brought by a shareholder of the **Insured Company** in its capacity as such.

(iii)   the performance of or failure to perform services or professional services for others, or any actual or alleged act, error or omission relating to such services or professional services;

G.      for liability of **Insured Company** under any contract or agreement, except to the extent the **Insured Company** would have been liable in the absence of the contract or agreement;

H.      arising out of, based upon, attributable to, or alleging any conduct, act, error or omission of any **Insured** serving in any capacity other than as your principal, officer, director, trustee, fiduciary or **Employee;**

I.      based on, arising out of, or in any way involving an **Insured** serving in any capacity in any organization which at the time of such service was not an **Insured Company** or **Insured Subsidiary;**

J.      for, based upon, or arising from any conduct or **Wrongful Act** by any **Insured** involving an **Insured Subsidiary** where such conduct or **Wrongful Act** occurred before such entity became an **Insured Subsidiary** or after such entity ceased to be an **Insured Subsidiary;**

K.      based on, arising out of, or in any way involving an **Insured** or the **Insured Company** gaining any profit, remuneration or financial advantage to which such party was not legally entitled, as determined by a judgment or other final adjudication; and

L.      for, based upon, or arising from any deliberately dishonest, malicious, criminal or fraudulent act or omission or any willful violation of law by an **Insured,** as determined by a judgment or other final adjudication.

No fact pertaining to or knowledge possessed by an **Insured Person** shall be imputed to any other **Insured Person** for purposes of the above-listed exclusions.

## IV.    OUTSIDE BOARD EXTENSION

This **Policy** shall cover **Loss,** including **Defense Costs,** for any **Claim** arising from an **Insured Person** having served, at the direction of and with the express written consent of the **Insured Company,** as director, officer or trustee for any eleemosynary or not-for-profit corporation or other organization as defined under Section 501(c)(3) of the Internal Revenue Code of 1986 (as amended) where such **Insured Person** is entitled to indemnification by the **Insured Company;** provided, however, this extension shall be excess of any indemnification and/or insurance that may be provided by such eleemosynary corporation or organization regardless of payment made by or on behalf of such eleemosynary corporation or organization, including but not limited to, any other director and officer liability insurance or similar insurance provided for, to, or by any such eleemosynary corporation or organization.

[THIS SPACE INTENTIONALLY LEFT BLANK]

## COVERAGE SECTION C

## FIDUCIARY LIABILITY COVERAGE SECTION

### I.      INSURING AGREEMENT

We will pay all **Loss** that an **Insured** becomes legally obligated to pay as a result of **Claims** first made against such **Insured** during the **Policy Period**, or the Extended Reporting Period if applicable, and reported in accordance with the notice provisions of Section VIII. of the General Terms and Conditions, for any **Fiduciary Wrongful Act**.

### II.     DEFINITIONS

The following terms, whenever used in this Coverage Section, shall have the meanings indicated below.  Other terms shall have the meanings found in the General Terms and Conditions of the **Policy**.

   A.    **Claim** shall mean:

         (1)    an oral or written demand for monetary or injunctive relief commenced by the receipt of such demand by any **Insured**,

         (2)    a judicial, administrative or arbitration proceeding commenced against any **Insured** in which such Insured may be subjected to a binding adjudication of liability for damages or injunctive relief, or

         (3)    a regulatory proceeding or investigation commenced against any **Insured** by the filing or service of a notice of charges, formal investigative order or similar document, including but not limited to any proceeding or investigation brought by the U.S. Department of Labor, the Pension Benefit Guaranty Corporation or any similar federal, state or local government body.

   B.    **Fiduciary Wrongful Act** shall mean:

         (1)    any actual or alleged breach of the responsibilities, obligations or duties imposed upon fiduciaries of any **Insured Plan** by **ERISA** or any similar law of any state or other jurisdiction anywhere in the world;

         (2)    any actual or alleged negligent act, error or omission in handling records, counseling employees, effecting enrollment of employees, and termination or cancellation of benefits in connection with an **Insured Plan**; or

         (3)    any other matter claimed against any **Sponsor Company** or any **Insured Fiduciary** solely by reason of their serving as fiduciaries of an **Insured Plan**.

   C.    **Insured(s)**, either in the singular or plural, shall mean for purposes of this Coverage Section C:

         (1)    **Sponsor Company**,

         (2)    **Insured Plan**,

         (3)    **Insured Fiduciary**, or

26

(4)     any other person or organization who were, now are, or shall be acting as a plan administrator of any of **Insured Plan** with the consent of the **Sponsor Company**.

D.     **Loss** shall mean that amount an **Insured** is legally obligated to pay solely as a result of a covered **Claim**, including compensatory damages, settlement amounts and legal fees and costs awarded pursuant to judgments, and **Defense Costs** in excess of the applicable self-Insured Retention, but excluding fines, penalties, taxes or matters uninsurable pursuant to applicable law, except that **Loss** shall include the five (5) percent or less and the twenty (20) percent or less penalties imposed upon an **Insured Fiduciary** under Section 502(i) and Section 502(l) of **ERISA**, as amended, with respect to covered settlements or judgments.

## III.     EXCLUSIONS

We are not obligated to defend, or pay **Defense Costs** or **Loss** on account of any **Claim**:

A.     for, based upon, arising out of, resulting from, in consequence of, in connection with, or in any way related to, directly or indirectly, any bodily injury, sickness, disease, emotional distress, mental anguish, outrage, humiliation or death of any person, or damage to or destruction of any tangible property including loss of use thereof; or false arrest, detention or imprisonment, assault or battery, or malicious prosecution; the publication or utterance of a libel or slander or of other defamatory or disparaging material; a publication or utterance in violation of an individual's right of privacy; wrongful entry or eviction; or the invasion of the right of private occupancy;

B.     for, based upon, arising out of, resulting from, in consequence of, in connection with, or in any way related to, directly or indirectly, any conduct or **Fiduciary Wrongful Act** by any **Insured** that actually or allegedly occurred at any time when such **Insured Plan** was not sponsored by a **Sponsor Company**;

C.     for, based upon, arising out of, resulting from, in consequence of, in connection with, or in any way related to, directly or indirectly, the failure of the **Insured** to comply with any law governing workers' compensation, unemployment or employment insurance benefits, social security, old age security benefits or government disability benefits or any similar law;

D.     for, based upon, arising out of, resulting from, in consequence of, in connection with, or in any way related to, directly or indirectly, an **Insured** serving as a fiduciary of any plan, fund or program which is not an **Insured Plan**, even if such service is at the direction or request of the **Sponsor Company**;

E.     for, based upon, arising out of, resulting from, in consequence of, in connection with, or in any way related to, directly or indirectly, the liability of any **Insured**, or the liability of others assumed by any **Insured**, under any contract or agreement, either oral or written, except in accordance with the agreement or declaration of trust pursuant to which any **Insured Plan** was established, unless the **Insured** would have been liable in the absence of such contract or agreement;

F.     based on, arising out of, or in any way involving an **Insured** gaining any profit, remuneration or financial advantage to which such party was not legally entitled, as determined by a judgment or other final adjudication;

G.     for, based upon, or arising from any deliberately dishonest, malicious, criminal or fraudulent act or omission or any willful violation of law by an **Insured**, as determined by a judgment or other final adjudication.

H.  for, based upon, or arising from, directly or indirectly, or in consequence of, or in any way involving, any **Wrongful Employment Practice** or **Third-Party Discrimination**, as those terms are defined in the Employment Practices Liability Coverage Section;

I.  for, based upon, arising out of, resulting from, in consequence of, in connection with, or in any way related to, directly or indirectly, any actual or alleged taking or retention of a surplus or reversion from any **Insured Plan** by the **Sponsor Company** or to any successor or assign of the **Sponsor Company;**

J.  for, based upon, arising out of, resulting from, in consequence of, in connection with, or in any way related to, directly or indirectly, the failure to fund an **Insured Plan** in accordance with **ERISA** or the **Insured Plan's** document or to collect contributions owed to an **Insured Plan;** or

K.  for benefits due or to become due under the terms of an **Insured Plan** unless, and to the extent that, (1) the **Insured** is a natural person and the benefits are payable by such **Insured** as a personal obligation, and (2) recovery for the benefits is based upon a covered **Fiduciary Wrongful Act.**

Except that with respect to a **Claim** alleging those excluded matters identified in Exclusions I., J. and K. only, we will pay **Defense Costs.**

The **Fiduciary Wrongful Act** of any **Insured Fiduciary** shall not be imputed to any other **Insured Fiduciary** for purposes of applying the exclusions set forth in this Section III.

## IV.  NON-RECOURSE

We will have all rights of recourse permitted by law.  In the event, however, this **Policy** has been purchased by an **Insured** other than an **Insured Plan**, we will have no right of recourse against an **Insured Fiduciary.**

[THIS SPACE INTENTIONALLY LEFT BLANK]

## COVERAGE SECTION D

## CRIME COVERAGE SECTION

We will pay you for direct loss that you sustain which is directly caused by a **Covered Event** taking place at any time and which is **Discovered** by you during the **Policy Period** or during the Extended Discovery Period, pursuant to the terms set forth in Section V. of this Coverage Section.

### I.    INSURING AGREEMENTS

This Coverage Section shall provide coverage under each of the following Insuring Agreements.

#### A.    FIDELITY

1.    Employee Theft

We will pay you for your direct loss of, or your direct loss from damage to, **Money, Securities** and **Other Property** directly caused by **Theft** or **Forgery** committed by an **Employee**, whether identified or not, acting alone or in collusion with other persons.

2.    ERISA Fidelity

We will pay you for direct loss of, or direct loss from damage to, **Money, Securities** and **Other Property** that belongs to an **Insured Plan**, directly caused by **Theft** or **Forgery** committed by an **Insured Fiduciary**, whether identified or not, acting alone or in collusion with other persons.

3.    Employee Theft of Client Property

We will pay you for direct loss of, or direct loss from damage to, **Money, Securities** and **Other Property** sustained by your **Client**, directly caused by **Theft** or **Forgery** committed by an identified **Employee**.

#### B.    ON PREMISES

We will pay you for:

1.    your direct loss of **Money** and **Securities** located inside the **Premises** directly caused by **Theft**, committed by a person present inside such **Premises**;

2.    your direct loss of **Money** and **Securities** located inside the **Premises** directly caused by disappearance or destruction;

3.    your direct loss of, or your direct loss from damage to, **Other Property** located inside the **Premises**:

   a.    directly caused by an actual or attempted **Robbery**; or

   b.    in a safe or vault, directly caused by an actual or attempted **Safe Burglary**; and

4.    your direct loss from damages to the **Premises** or its exterior resulting directly from an actual or attempted **Theft, Robbery** or **Safe Burglary**, if you are the owner of the **Premises** or are liable for damages to it; or

29

5.   your direct loss of, or loss from damages to, a locked safe, vault, cash register, cash box or cash drawer located inside the Premises resulting directly from an actual or attempted **Theft, Robbery** or **Safe Burglary**, if you are the owner of the locked safe, vault, cash register, cash box or cash drawer or are liable for damages thereto.

## C.   FORGERY OR ALTERATION

1.   We will pay you for your direct loss directly caused by **Forgery** or alteration of, on or in any written **Covered Instruments** that are:

   a.   made by, drawn by, or drawn upon, you, or purported to have been so made or drawn; or

   b.   made or drawn by one acting as your agent, or purported to have been so made or drawn; and

2.   We will reimburse you for reasonable legal defense expenses that you have paid if you are sued for refusing to pay any written **Covered Instrument** under this Insuring Agreement C. on the basis that it has been **Forged** or altered.  Reimbursement of such legal expenses is conditioned upon your receipt of our prior written consent to defend against such suit.  A signature that is a mechanical or electronic reproduction of a handwritten signature produced by a mechanical check-writing machine or a computer printer shall be treated the same as a handwritten signature.  An **Electronic Signature** is not treated the same as a mechanical or electronic reproduction of a handwritten signature and is not a **Forgery** under this Insuring Agreement C.

## D.   MONEY ORDERS AND COUNTERFEIT MONEY

We will pay you for your direct loss directly caused by your good faith acceptance of:

1.   original money orders, issued or purportedly issued by any post office, express company or bank located in the United States of America, its territories and possessions, Canada, or any other country in which you maintain a physical **Premises**, that are not paid upon presentation; or

2.   Counterfeit **Money**, of the United States of America, its territories and possessions, Canada, or any other country in which you maintain a physical presence, that is acquired during the regular course of business;

in exchange for merchandise, **Money** or services.

## E.   IN TRANSIT

1.   We will pay you for your direct loss of **Money** and **Securities** directly caused by **Theft**, disappearance or destruction while in transit outside the **Premises** and in the care and custody of a **Messenger** (including while temporarily within the living quarters of a **Messenger)** or an armored motor vehicle company.

2.   We will pay you for your direct loss of, or your direct loss from damage to, your **Other Property** directly caused by an actual or attempted **Robbery** while in transit outside the **Premises** and in the care and custody of a **Messenger** or an armored motor vehicle company.

3.      We will pay you for your direct loss of, or your direct loss from damage to, your **Other Property** directly caused by an actual or attempted **Theft** of your **Other Property** while it is temporarily within the living quarters of a **Messenger.**

Coverage under this Insuring Agreement E. begins immediately upon receipt of the **Money, Securities** or **Other Property** by the transporting party and ends immediately upon delivery to the designated recipient or its agent.

### F.      COMPUTER FRAUD

We will pay you for your direct loss of, or your direct loss from damage to, **Money, Securities** and **Other Property** directly caused by **Computer Fraud**.

### G.      FUNDS TRANSFER FRAUD

We will pay you for your direct loss of **Money** and **Securities** contained in your **Transfer Account** on deposit as a **Financial Institution** directly caused by **Funds Transfer Fraud**.

### H.      CLAIM EXPENSE

We will pay you for reasonable **Claim Expenses** incurred and paid by you to establish the existence, amount and preparation of your proof of loss in support of a covered claim for loss under any Insuring Agreement of this Coverage Section.

The following conditions specifically apply to this Insuring Agreement H.:

1.      Any **Claim Expenses** payable to you are only applicable to any covered loss which exceeds the Self-Insured Retention amount for the Insuring Agreement that is the subject of a claim under this Coverage Section;

2.      **Claim** Expenses that are payable to you are part of and not in addition to the Limit of Liability for the Insuring Agreement that is the subject of a claim under this Coverage Section; and

3.      **Claim** Expenses payable to you will be paid to you at the same time as the payment of the valid and collectible loss under the Insuring Agreement that is the subject of a claim under this Coverage Section.

## II.    DEFINITIONS

The following terms, whenever used in this Coverage Section, shall have the meanings indicated below.  Other terms shall have the meanings found in the General Terms and Conditions of the **Policy**.

A.      **Claim Expenses** means reasonable fees, costs and expenses of attorneys, consultants, outside accountants, or experts retained by you to determine the amount and extent of loss covered under this Coverage Section. The reasonableness of such expenses shall be determined by us.  The phrase does not mean or include any of your internal corporate fees, costs (direct or indirect), obligations or **Employee** wages and salaries.

B.      **Client** means an entity for which you perform services as specified in a written agreement, but only while the written agreement is in effect.

C.      **Computer Fraud** means:

31

The use of any computer to fraudulently cause a transfer of **Money, Securities** or **Other Property** from inside the **Premises**:

    1.    to a person (other than a **Messenger**) outside the **Premises**; or

    2.    to a place outside the **Premises**.

D.    **Counterfeit** means an imitation of **Money** that is intended to deceive and to be taken as genuine.

E.    **Covered Event** means:

    1    for purposes of Insuring Agreement A.:

        a.    an individual act;

        b.    the combined total of all separate acts; or

        c.    a series of related acts;

committed by an **Employee** or committed by more than one **Employee** acting alone or in collusion with other persons both during and before the **Policy Period**;

    2.    for purposes of Insuring Agreement C., all loss caused by any person, or loss in which that person is involved, whether the loss involves one or more written **Covered Instruments** or **Covered Personal Instruments**; and

    3.    for purposes of all other Insuring Agreements:

        a.    any act or series of related acts or events involving one or more persons; or

        b.    any act, acts or events involving a person or group of persons acting together;

        whether identified or not both during and before the **Policy Period**.

F.    **Covered Instruments** means:

    1.    checks, drafts, promissory notes, bills of exchange or similar written promises, orders or directions to pay a sum certain in **Money**; and

    2.    written instruments required in conjunction with any transaction involving any **Credit, Debit** or **Charge Card** issued to you, your **Employees** or your **Management Person** for business purposes.

G.    **Covered Personal Instruments** means:

    1.    checks, drafts, promissory notes or similar written promises, orders or directions to pay a sum certain in **Money**; and

    2.    written instruments required in conjunction with any transaction involving any **Credit, Debit** or **Charge Card** issued to a **Management Person** for personal use.

H.    **Credit, Debit or Charge Card** means any card, plate or other similar device used for the purpose of obtaining **Money**, property, labor or services on credit or for immediate payment. The terms do not mean a note, check, draft, money order or other negotiable instrument.

32

I.    **Digital Signature** means an electronic identifier created by computer, within, attached to or logically associated with a record and executed or adopted by a person with the intent to sign the record.

J.    **Discover, Discovered, or Discovery** means the moment when you, your partner or **Management Person:**

1.    first become(s) aware of facts which would cause a reasonable person to assume that a loss of a type covered by this Coverage Section has been or will be incurred regardless of when the act or acts causing or contributing to such loss occurred, even though the exact details of loss may not then be known; or

2.    first receive(s) notice of an actual or potential claim against you alleging facts which if true would constitute a loss under this Coverage Section.

K.    **Electronic Signature** means a **Digital Signature**, an electronic sound, symbol or process, within, attached to, or logically associated with a record and executed or adopted by a person with the intent to sign the record.

L.    **Financial Institution** means:

1.    a bank, savings bank, credit union, savings and loan association or similar thrift institution; or

2.    a stock brokerage firm, mutual fund, liquid assets fund or similar investment institution;

where you maintain a **Transfer Account.**

M.    **Forgery, or Forged** means the signing of the name of another person or organization with a handwritten signature physically affixed directly to **Covered Instruments** or **Covered Personal Instruments,** without authority and with the intent to deceive; it does not mean a signature which consists in whole or in part of one's own name signed with or without authority in any capacity, for any purpose.

N.    **Funds Transfer Fraud** means:

1.    an electronic, telegraphic, cable, teletype or telephone instruction fraudulently transmitted to a **Financial Institution** directing such institution to debit your **Transfer Account** and to transfer, pay or deliver **Money** or **Securities** from your **Transfer Account** which instruction purports to have been transmitted by you, but was in fact fraudulently transmitted by someone other than you without your knowledge or consent;

2.    a fraudulent written instruction, other than one covered under Insuring Agreement C., issues to a **Financial Institution** directing such **Financial Institution** to debit a **Transfer Account** and to transfer, pay or deliver **Money** or **Securities** from such **Transfer Account** by use if an electronic funds transfer system at specified intervals or under specified conditions which written instruction purports to have been issued by you but was in fact fraudulently issued, **Forged** or altered by someone other than you without your knowledge or consent; or

3.    an electronic, telegraphic, cable, teletype or telefacsimile, telephone or written instruction initially received by you which purports to have been transmitted by an

      **Employee,** but which was in fact fraudulently transmitted by someone else without your or the **Employee's** consent.

O.    **Management Person** means your proprietor, natural person partner, member of the board of directors, member of the board of trustees, officer, risk manager, in-house general counsel, **Manager,** or **Member.**

P.    **Manager** means any natural person who was, is or becomes a manager, member of the board of managers, or a functionally equivalent executive of a limited liability company.

Q.    **Member** means any natural person who has an ownership interest in a limited liability company.

R.    **Messenger** means any **Management Person,** or relative thereof, any **Shareholder-Officer,** or any **Employee,** duly authorized, while having care and custody of covered property outside the **Premises.**

S.    **Money** means a medium of exchange in current use and authorized or adopted by a domestic or foreign government, including currency, coins, bank notes, bullion, travelers checks, registered checks and money orders held for sale to the public.

T.    **Other Property** means any tangible property other than **Money** and **Securities** that has intrinsic value.

U.    **Premises** means the interior of that portion of any building you occupy in conducting your business.

V.    **Robbery** means the unlawful taking of **Money, Securities** and **Other Property** from the care and custody of you, your partners or any other person (except any person acting as a watchperson or janitor) by one who has:

    1.    caused or threatened to cause that person bodily harm; or

    2.    committed an unlawful act witnessed by that person.

W.    **Safe Burglary** means the unlawful taking of:

    1.    **Money, Securities** and **Other Property** from within a locked safe or vault by a person lawfully entering the safe or vault as evidenced by marks or forcible entry upon its exterior; or

    2.    a safe or vault from inside the **Premises.**

X.    **Securities** means written negotiable and non-negotiable instruments or contracts representing **Money** or property including but not limited to:

    1.    tokens, tickets, revenue and other stamps (whether represented by actual stamps or unused value in a meter) in current use; and

    2.    evidence of debt issued in connection with any **Credit, Debit** or **Charge Card,** which is not issued by you; but does not include **Money.**

Y.    **Shareholder-Officer** means any officer who has a twenty-five percent (25%) or greater ownership interest in any **Insured Company.**

Z.   **Theft** means:

    1.    under Insuring Agreement A.3., the intentional unlawful taking of **Money, Securities** and **Other Property** to the deprivation of a **Client;**

    2.    under Insuring Agreement B or E., the intentional unlawful taking of **Money** and **Securities** to your deprivation.

    3.    under all other Insuring Agreements, the intentional unlawful taking of **Money, Securities** and **Other Property** to your deprivation.

AA.   **Transfer Account** means an account maintained by you at a **Financial Institution** from which you can initiate the transfer, payment or delivery of **Money** or **Securities:**

    1.    by means of electronic, telegraphic, cable, teletype, telefacsimile or telephone instructions communicated directly or through an electronic funds transfer system; or

    2.    by means of written instructions (other than those described in Insuring Agreement C.) establishing the conditions under which such transfers are to be initiated by such **Financial Institutions** through an electronic funds transfer system.

## III.   EXCLUSIONS

This Coverage Section does not cover:

A.   loss resulting directly or indirectly from war, whether or not declared; civil war; insurrection; rebellion or revolution; military, naval or usurped; governmental intervention, expropriation or nationalization; or any act or condition related to any of the foregoing;

B.   loss resulting directly or indirectly from seizure or destruction of property by order of governmental authority;

C.   loss resulting directly or indirectly from any fraudulent, dishonest or criminal act committed by you, your natural person partners, any **Member** or **Shareholder-Officer** whether acting alone or in collusion with others; provided, this Exclusion C. shall not apply to loss covered under Insuring Agreement A.2.;

D.   loss resulting directly or indirectly from any other fraudulent, dishonest or criminal act by any **Employee** or **Insured Fiduciary** whether acting alone or in collusion with others, unless covered under Insuring Agreements A.1., A.2. or A.3.;

E.   loss resulting directly or indirectly from any **Funds Transfer Fraud**, unless covered under Insuring Agreements A.1., A.2., A.3., or G.;

F.   loss resulting directly or indirectly from your acceptance of money orders or **Counterfeit Money**, unless covered under Insuring Agreements A.1., A.2., A.3., or D.;

G.   loss resulting directly or indirectly from forged, altered or fraudulent documents or written instruments used as source documentation in the preparation of electronic data, unless covered under Insuring Agreements A.1., A.2., or A.3.;

H.   any expenses incurred by you in establishing the existence or the amount of any loss covered under this Coverage Section, unless covered under Insuring Agreement H.;

I.      loss of income, whether or not earned or accrued, or potential income, including interest and dividends, not realized by you as the result of any loss covered under this Coverage Section;

J.      damages of any type, except your direct compensatory damages resulting from a loss covered under this Coverage Section;

K.      indirect or consequential loss of any nature, including, but not limited to, fines, penalties, multiple or punitive damages;

L.      loss resulting directly or indirectly from any **Theft,** disappearance, damage, destruction or disclosure of any intangible property or confidential information including trade secret information, confidential processing methods or other confidential information or intellectual property of any kind, or electronic data;

M.      loss of, or damage to, manuscripts, records, accounts, microfilm, tapes or other records, whether written or electronic, or the cost of reproducing any information contained in such lost or damaged records, except when covered under Insuring Agreement B. or E.;

N.      loss, or that part of any loss, the proof of which as to its existence or amount is dependent solely upon:

   1.      an inventory computation or physical count; or

   2.      a profit and loss computation;

   provided that where you establish wholly apart from such computations or physical count that you have sustained a loss covered under Insuring Agreements A.1., A.2., A.3. or F. then you may offer your inventory records and an actual physical count of inventory in support of other evidences as to the amount of loss claimed;

O.      loss resulting directly or indirectly from trading whether or not in the name of any **Insured Company** and whether or not in a genuine or fictitious account, unless covered under Insuring Agreement A.1, A.2. and A.3.;

P.      loss resulting directly or indirectly from fire, except:

   1.      loss of or damage to **Money** or **Securities**; or

   2.      damage to any safe or vault caused by the application of fire thereto in connection with any actual attempted **Safe Burglary** when covered under Insuring Agreement B.;

Q.      loss resulting directly or indirectly from the giving or surrendering of **Money, Securities** or **Other Property** in any exchange or purchase, whether or not fraudulent, with any other party not in collusion with an **Employee,** except when covered under Insuring Agreement E.;

R.      loss of **Money, Securities** or **Other Property** while in custody of any bank, trust company, or similarly recognized place of safe deposit or armored motor vehicle company unless the loss is in excess of the amount recovered or received by you under your contract, if any, with, or insurance carried by, any of the aforementioned;

S.      loss of **Money, Securities** or **Other Property** held by an armored motor vehicle company for you and which is stored by such company overnight inside buildings used in the conduct of its business;

T.   loss resulting directly or indirectly from nuclear reaction, nuclear radiation, radioactive contamination, biological or chemical contamination or to any related act or incident;

U.   loss of **Money, Securities** or **Other Property** resulting directly or indirectly from kidnap, extortion or ransom payments (other than **Robbery**) surrendered to any person as a result of a threat;

V.   loss resulting directly or indirectly from **Forgery** or alteration, except when covered under Insuring Agreements A.1., A.2., A.3., or C.;

W.   loss resulting directly or indirectly from **Computer Fraud**, except when covered under Insuring Agreements A.1., A.2., A.3., or F.;

X.   loss under Insuring Agreements B. or E. resulting directly or indirectly from:

　　1.   an accounting or arithmetical error or omission;

　　2.   the loss of property from within any **Money** operated device, unless the amount of **Money** deposited in it is recorded by a continuous recording device;

　　3.   anyone, acting on your express or implied authority, being induced by any dishonest act to voluntarily part with title to or possession of any property;

　　4.   damage to motor vehicles, trailers or semi-trailers or equipment and accessories attached to them; or

　　5.   damage to the **Premises** or its exterior or to containers of covered property by vandalism or malicious mischief;

Y.   loss resulting directly or indirectly from the diminution in value of **Money, Securities** or **Other Property;**

Z.   loss arising from any **Credit, Debit** or **Charge Card** if you, your **Employee** or **Management Person** has not fully complied with the provisions, conditions or other terms under which any card was issued;

AA.   loss sustained by any **Insured Company** or **Insured Plan**, occurring at any time during which such entity was not an **Insured Company** or **Insured Plan; or**

BB.   loss sustained by any **Insured Company** to the extent it results in a benefit, gain or transfer to any **Insured Company**, except to the extent that such loss is covered under Insuring Agreement A.2.

## IV.   OWNERSHIP

Our liability under this Coverage Section shall apply only to **Money, Securities** and other property owned by any **Insured Company** or for which any **Insured Company** is legally liable, or held by any **Insured Company** in any capacity, whether or not such **Insured Company** is liable, provided, however, that we shall not be liable for damage to the **Premises** unless the **Insured Company** is the owner or is liable for such damage.

## V.   EXTENDED DISCOVERY PERIOD

A.    We will pay for loss that the **Insured Company** sustains prior to the effective date of termination or cancellation of this policy, which is discovered by it no later than 1 year from the date of that termination or cancellation.

B.    However, this extended period to discover loss terminates immediately upon the effective date of any other insurance obtained by the **Insured Company** replacing in whole or in part the insurance afforded by this policy, whether or not such insurance provides coverage for loss sustained prior to its effective date.

## VI.    JOINT INSURED

Only the **Insured Company** shall have the right to claim, adjust, receive or enforce payment of any loss and shall be deemed to be the sole agent of the others for such purposes and for the giving and receiving of any notice or proof required to be given by the terms hereof and for the purpose of effecting or accepting amendments to or termination of this Coverage Section. Each and every other party claiming to be entitled to coverage under this Policy shall be conclusively deemed to have consented and agreed that none of them shall have any direct beneficiary interest herein or any right of action hereon shall not be assignable; but knowledge possessed or discovery made by any such party or by any partner or officer of the **Insured Company** shall constitute knowledge possessed or discovery made by such parties and persons for the purposes of this Coverage Section.

All losses and other payments, if any, payable by us, shall be payable to the **Insured Company**, without regard to such Insured Company's obligations to others, and we shall not be responsible for the proper application of any payment made. We shall not be liable for loss sustained by one party claiming entitlement to coverage to the disadvantage of any other party claiming entitlement to coverage. If we agree to and shall make payment to any party in interest other than the **Insured Company**, such payment shall be treated as though made to the **Insured Company**.

## VII.    OTHER INSURANCE

If the Insured Company or any other party at interest in any loss covered by this Coverage Section has any bond, indemnity or insurance which would cover such loss in whole or in part in the absence of this Coverage Section, then this Coverage Section shall be null and void to the extent of the amount of such other bond, indemnity or insurance, but this Coverage Section shall cover such loss, subject to its exclusions, conditions and other terms, only to the extent of the amount of such loss in excess of the amount of such other bond, indemnity or insurance.

## VIII.    LIABILITY FOR PRIOR LOSSES

Our liability for loss sustained prior to:

A.    the effective date of this Coverage Section; or

B.    the effective date any additional **Insured Company** or coverages are subsequently added, is subject to the following:

(1) any **Insured Company** or some predecessor in interest of such **Insured Company** who carried some other bond or policy (other than a fidelity bond or policy with respect to such loss under Insuring Agreement I.B. which, at the time such loss was sustained, afforded on or at the **Premises** at which the loss was sustained or on the person or persons (whether **Employee** of the **Insured Company** or not) causing the loss, some or all of the coverage of the Insuring Agreements of this Coverage Section applicable to the loss;

(2) such prior coverage and the right of claim for loss thereunder continued under the same or some superseding bond or policy without interruption from the time the loss was sustained until the date specified in 1. and 2. above; and

(3) the loss shall have been discovered after the expiration of the time for discovery of such loss under the last such bond or policy.

Our liability with respect to such loss shall not exceed the amount which would have been recoverable under the coverage in force at the time the loss was sustained, or the amount recoverable under the Insuring Agreement of this Coverage Section applicable to the loss, whichever is smaller.

## IX.    NON-ACCUMULATION OF LIABILITY

Regardless of the number of years this policy shall continue in force, and the number of premiums which shall be payable or paid or any other circumstances whatsoever, our liability under this **Policy** with respect to any loss or losses shall not be cumulative from year to year or from period to period.  When there is more than one insured, our aggregate liability for all loss or losses sustained shall not exceed the amount for which we would be liable if all losses were sustained by any one of them.

## X.    NOTICE, PROOF, AND LEGAL PROCEEDINGS

Upon **Discovery** by a proprietor, partner, director or officer of the **Insured Company** of loss or of any occurrence which may become a loss, the **Insured Company** shall make reasonable efforts to determine which **Employee(s)** caused the loss or occurrence and written notice to us shall be given at the earliest practicable moment, and in no event later than sixty days after such **Discovery**.  Within four months after such discovery, the **Insured Company** shall furnish to us a proof of loss with full particulars.  Legal proceedings for recovery of any loss hereunder shall not be brought after the expiration of two years from the **Discovery** of such loss, except that any legal proceedings to recover hereunder on account of any judgment in such suit shall become final.  Proof of loss under Insuring Agreement C. shall include the instrument which is the basis of claim for the loss; but if it shall be impossible to file the instrument, the affidavit of the **Insured Company** or the bank of deposit of the **Insured Company** setting forth the amount and cause of the loss shall be accepted instead.  If any limitation embodied herein is prohibited by any law controlling the construction thereof, such limitation shall be deemed to be amended so as to be equal to the minimum period of limitation permitted by such law.

At our request, your representatives shall submit to examination by us, under oath, if required, and produce for examination by us all pertinent records at such reasonable times and places as we shall designate, and shall cooperate with us in all matters pertaining to any loss or claim.

## XI.    VALUATION

In no event shall we be liable for more than:

A.    the actual market value of lost, damaged or destroyed **Securities** at the close of business on the business day immediately preceding the day on which the loss is discovered, or for more than the actual cost of replacing the **Securities**, whichever is less;

B.    the cost of blank books, pages, tapes or other blank materials to replace lost or damaged books of account or other records;

C.    the actual cash value at the time of other lost, damaged or destroyed property for more than the actual cost of repairing or replacing the property with property of similar quality and value, whichever is less; or

D.    the United States dollar value of a foreign currency based on the free rate of exchange in effect on the day any loss involving foreign currency is discovered.

## XII.    RECOVERIES

If the **Insured Company** shall sustain any loss covered by this Coverage Section, all recoveries (except from suretyship, insurance, reinsurance or indemnity taken by or for our benefit) made after the loss, less the actual cost of recovery, shall be distributed as follows:

39

A.  if the loss is not subject to a self-Insured Retention,, the **Insured Company** shall be fully reimbursed from such recoveries for the amount of the loss which exceeds the amount of coverage provided by this Coverage Section and any balance shall be applied to the reimbursement of Underwriters; or

B.  if the loss is subject to a self-Insured Retention, the **Insured Company** shall be reimbursed from such recoveries for any loss which exceeds the amount of coverage provided by this Coverage Section less the self-Insured Retention amount any balance shall be applied to reimbursement of Underwriters to the extent of their loss and any remainder paid to the **Insured Company.** If there is no excess loss the total recoveries shall be distributed first in reimbursement to Underwriters to the extent of their loss and any remainder paid to the **Insured Company.**

## XIII.  KNOWLEDGE OF PRIOR THEFT

For the purposes of this Coverage Section and the exclusions contained in Section III., knowledge possessed by any of the **Insureds** means knowledge possessed by a partner, director or an officer who is aware of the employment of a person and that person's prior acts of **Theft**, fraud or dishonesty.

## XIV.  ADDITIONAL INSUREDS

At our sole discretion, coverage may be extended to any individual upon written application by the **Insured Company** and our written consent.

## XV.  TERMINATION PROVISIONS

A.  Termination as to any **Employee** or as to any Unidentified **Employee**

This Coverage Section shall terminate as to any **Employee** or Unidentified **Employee**:

(1) immediately upon discovery by the **Insured Company**, any partner of the **Insured Company** or officer of the **Insured Company** (not in collusion with such **Employee**) of any act of **Theft** or other fraudulent or dishonest act by the **Employee**, without prejudice to the loss of any property then being conveyed by the **Employee** outside the **Premises**, or

(2) immediately upon discovery by the **Insured Company**, any partner of the **Insured Company** or officer of the **Insured Company** that an Unidentified **Employee** caused a loss by fraudulent or dishonest acts; or

(3) twenty days after the receipt by the **Insured Company** of a written notice of termination from us, whichever first occurs.

B.  Termination of this Coverage Section or Insuring Agreements.

This Coverage Section shall terminate in its entirety:

(1) upon our receipt of a written notice of termination from the **Insured Company**;

(2) thirty days after the receipt by the **Insured Company** of a written notice of termination from us;

(3) at such other time as may be agreed upon by us and the **Insured Company**;

(4) upon the voluntary liquidation or dissolution of the **Insured Company**;

(5) upon the appointment of or court order appointing a receiver, receiver-manager, trustee appointed pursuant to the Bankruptcy and Insolvency Act, R.S.C. 1985, c. B-3, or monitor appointed under the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36 or other fiduciary of the property of the **Insured Company**; or

(6) as to any party claiming entitlement to coverage other than the **Insured Company** upon the appointment of:

(a) a receiver, trustee or other fiduciary of the property of any such **Insured**, or

(b) a committee for the dissolution thereof;

whichever occurs first.

Any Insuring Agreement or coverage for any Insured Subsidiary or party claiming entitlement to coverage other than the **Insured Company** shall terminate thirty days after receipt by the **Insured Company** of a written notice of termination from us or upon the request of the **Insured Company.**

## XVI.   TERMINATION OF PRIOR BONDS OR POLICIES

Immediately upon this Coverage Section of this **Policy** taking effect, the rights of the **Insured Company**, if any, shall terminate, if not already terminated, in respect of any and all previous liability we may have to the **Insured Company** under any other bonds or policies.  By reason of the issuance of this Coverage Section, the prior bonds or policies shall not cover any loss not discovered and notified to us prior to the effective date of this Coverage Section.

ARCH/Combo

## ADDITIONAL CLAUSES AND ENDORSEMENTS

### ENDORSEMENT NUMBER 1

It is hereby understood and agreed that wherever the word "Policy" appears herein same shall be deemed to read "Certificate".

### ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED

---

### POLICY COMPLAINTS NOTICE

Should you have a dispute concerning your policy you should contact the agent first.  If the dispute is not resolved, you may contact any of the following to make a complaint:

Policy Correspondent:    ARCH Intermediaries Limited
52-54 Gracechurch Street,
London EC3V 0EH
England
Email: info@archbrokers.com
Tel: +44 (0)20 7398 4350

Lloyds Complaints
Department:    Lloyd's Market Services
G6/86
One Lime Street
London
EC3M 7HA
Email: complaints@lloyds.com
Tel: +44 (0)20 7327 5693

This notice is for information only and does not become a part or condition of the policy.

---

42

## FREE LOSS CONTROL SERVICE

It is hereby understood and agreed that that within the terms of this policy a free loss control service is provided to the Insured by ePlace Solutions, Inc.

ePlace Solutions, Inc is a premier provider of HR services. One size does not fit all employers. Accordingly, ePlace Solutions, Inc offers a broad range of services; employers implement those services that work best for their unique environment. The full suite of pre-paid HR services include (1) unlimited support from qualified HR experts who provide real answers to tough HR questions; (2) practical, state-specific HR advice, forms, and handbooks on-line; (3) on-line training (including California's mandatory sexual harassment training AB1825); (4) monthly training bulletins; (5) podcast training programs; (6) audio seminars; (7) an employee complaint hotline; and more. For more information please see: www.eplacesolutions.com or call (800) 387 4468 or email mlittlewood@eplaceinc.com.

ARCH002

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED

## CHOICE OF LAW CLAUSE

It is hereby understood and agreed by both the Insured and Underwriters that any dispute concerning the interpretation of this Policy shall be governed by the laws of New York, U.S.A.

623AFB00113

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED

### SMALL ADDITIONAL OR RETURN PREMIUMS CLAUSE (U.S.A.)

NOTWITHSTANDING anything to the contrary contained herein and in consideration of the premium for which this Insurance is written, it is understood and agreed that whenever an additional or return premium of US$2 or less becomes due from or to the Assured on account of the adjustment of a deposit premium or of an alteration in coverage or rate during the term or for any other reason, the collection of such premium from the Assured will be waived or the return of such premium to the Assured will not be made, as the case may be.

NMA1168

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED

**NUCLEAR INCIDENT EXCLUSION CLAUSE-LIABILITY-DIRECT (BROAD) (U.S.A.)**

For attachment to insurances of the following classifications in the U.S.A., its Territories and Possessions, Puerto Rico and the Canal Zone:

Owners, Landlords and Tenants Liability, Contractual Liability, Elevator Liability, Owners or Contractors (including railroad) Protective Liability, Manufacturers and Contractors Liability, Product Liability, Professional and Malpractice Liability, Storekeepers Liability, Garage Liability, Automobile Liability (including Massachusetts Motor Vehicle or Garage Liability),

not being insurances of the classifications to which the Nuclear Incident Exclusion Clause-Liability-Direct (Limited) applies.

This Policy* does not apply:

I.      Under any Liability Coverage, to injury, sickness, disease, death or destruction:

(a)  with respect to which an insured under the Policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

(b)  resulting from the hazardous properties of nuclear material and with respect to which (1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (2) the insured is, or had this Policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

II.     Under any Medical Payments Coverage, or under any Supplementary Payments Provision relating to immediate medical or surgical relief, to expenses incurred with respect to bodily injury, sickness, disease or death resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization.

III.    Under any Liability Coverage, to injury, sickness, disease, death or destruction resulting from the hazardous properties of nuclear material, if:

(a)  the nuclear material (1) is at any nuclear facility owned by, or operated by or on behalf of, an insured or (2) has been discharged or dispersed therefrom;

(b)  the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

(c)  the injury, sickness, disease, death or destruction arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (c) applies only to injury to or destruction of property at such nuclear facility.

IV.   As used in this endorsement:

"hazardous properties" include radioactive, toxic or explosive properties; "nuclear material" means source material, special nuclear material or by-product material; "source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act 1954 or in any law amendatory thereof; "spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor; "waste" means any waste material (1) containing by-product material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (a) or (b) thereof; "nuclear facility" means:

(a) any nuclear reactor,

(b) any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,

(c) any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

(d) any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste,

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations; "nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material. With respect to injury to or destruction of property, the word "injury" or "destruction" includes all forms of radioactive contamination of property.

It is understood and agreed that, except as specifically provided in the foregoing to the contrary, this clause is subject to the terms, exclusions, conditions and limitations of the Policy to which it is attached.

* NOTE: As respects policies which afford liability coverages and other forms of coverage in addition, the words underlined should be amended to designate the liability coverage to which this clause is to apply.

17/3/60
NMA1256

## RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE-LIABILITY-DIRECT (U.S.A.)

For attachment (in addition to the appropriate Nuclear Incident Exclusion Clause-Liability-Direct) to liability insurances affording worldwide coverage.

In relation to liability arising outside the U.S.A., its Territories or Possessions, Puerto Rico or the Canal Zone, this Policy does not cover any liability of whatsoever nature directly or indirectly caused by or contributed to by or arising from ionising radiations or contamination by radioactivity from any nuclear fuel or from any nuclear waste from the combustion of nuclear fuel.

13/2/64
NMA1477

## WAR AND TERRORISM EXCLUSION ENDORSEMENT

Notwithstanding any provision to the contrary within this insurance or any endorsement thereto it is agreed that this insurance excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any of the following regardless of any other cause or event contributing concurrently or in any other sequence to the loss;

1. war, invasion, acts of foreign enemies, hostilities or warlike operations (whether war be declared or not), civil war, rebellion, revolution, insurrection, civil commotion assuming the proportions of or amounting to an uprising, military or usurped power; or

2. any act of terrorism.

   For the purpose of this endorsement an act of terrorism means an act, including but not limited to the use of force or violence and/or the threat thereof, of any person or group(s) of persons, whether acting alone or on behalf of or in connection with any organisation(s) or government(s), committed for political, religious, ideological or similar purposes including the intention to influence any government and/or to put the public, or any section of the public, in fear.

This endorsement also excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any action taken in controlling, preventing, suppressing or in any way relating to 1 and/or 2 above.

If the Underwriters allege that by reason of this exclusion, any loss, damage, cost or expense is not covered by this insurance the burden of proving the contrary shall be upon the Assured.

In the event any portion of this endorsement is found to be invalid or unenforceable, the remainder shall remain in full force and effect.

08/10/01
NMA2918

## US. TERRORISM RISK INSURANCE ACT OF 2002 AS AMENDED
## NEW & RENEWAL BUSINESS ENDORSEMENT

*This Endorsement is issued in accordance with the terms and conditions of the "U.S. Terrorism Risk Insurance Act of 2002" as amended, as summarized in the disclosure notice.*

In consideration of an additional premium of USD NIL paid, it is hereby noted and agreed with effect from inception that the Terrorism exclusion to which this Insurance is subject, shall not apply to any "insured loss" directly resulting from any "act of terrorism" as defined in the "U.S. Terrorism Risk Insurance Act of 2002", as amended ("TRIA").

The coverage afforded by this Endorsement is only in respect of any "insured loss" of the type insured by this Insurance directly resulting from an "act of terrorism" as defined in TRIA. The coverage provided by this Endorsement shall expire at 12:00 midnight December 31, 2020, the date on which the TRIA Program is scheduled to terminate, or the expiry date of the policy whichever occurs first, and shall not cover any losses or events which arise after the earlier of these dates. The Terrorism exclusion, to which this Insurance is subject, applies in full force and effect to any other losses and any act or events that are not included in said definition of "act of terrorism".

This Endorsement only affects the Terrorism exclusion to which this Insurance is subject. All other terms, conditions, insured coverage and exclusions of this Insurance including applicable limits and deductibles remain unchanged and apply in full force and effect to the coverage provided by this Insurance.

Furthermore the Underwriter(s) will not be liable for any amounts for which they are not responsible under the terms of TRIA (including subsequent action of Congress pursuant to the Act) due to the application of any clause which results in a cap on the Underwriter's liability for payment for terrorism losses.

LMA5218
12 January 2015

## SEVERAL LIABILITY NOTICE

The subscribing insurers' obligations under contracts of insurance to which they subscribe are several and not joint and are limited solely to the extent of their individual subscriptions. The subscribing insurers are not responsible for the subscription of any co-subscribing insurer who for any reason does not satisfy all or part of its obligations.

08/94
LSW1001 (Insurance)

## WAGE AND HOUR ENHANCEMENT ENDORSEMENT

In consideration of the premium charged, the following changes to EMPLOYMENT PRACTICES LIABILITY COVERAGE SECTION A are hereby understood and agreed:

1.  Notwithstanding EXCLUSIONS, Section III, EXCLUSION A, we agree to provide **Defense Costs** coverage for **Wage and Hour Claims**.

    For purposes of this endorsement, **Wage and Hour Claim** shall mean any **Claim** solely alleging violations of any federal, state or local law governing or relating to the payment of wages, including the payment of overtime, on-call time, rest periods, minimum wages or the classification of **Employees** for the purposes of determining **Employees'** eligibility for compensation under such law(s) (collectively referred to herein as "wage and hour laws").

    Our maximum aggregate Limit of Liability pursuant to this endorsement shall be $150,000      and shall only apply to **Defense Costs** ("the Wage and Hour Limit"). The Wage and Hour Limit shall be part of, and not in addition to, the applicable Limits of Liability identified in the Declarations for COVERAGE SECTION A. In no event shall the Wage and Hour Limit apply to Loss, other than **Defense Costs**, incurred in connection with **Wage and Hour Claims** and in no event shall we be obligated to pay more than the applicable Limits of Liability identified in the Declarations as applying to COVERAGE SECTION A.

    As respects coverage for **Claims** that allege violations of any wage and hour law(s) and also contain allegations of otherwise covered **Wrongful Employment Practices**, the $150,000      Wage and Hour Limit shall apply to those **Defense Costs** attributable solely to that portion of the **Claim** alleging violations of any wage and hour law(s). Notwithstanding the provisions of DEFENSE AND SETTLEMENT Section II of the GENERAL TERMS AND CONDITIONS, the applicable Limit of Liability stated in the Declarations for COVERAGE SECTION A shall apply to **Loss** and/or **Defense Costs** attributable solely to that portion of such **Claim** alleging the covered **Wrongful Employment Practices**.

2.  No coverage shall be available for any **Wage and Hour Claim**, or that portion of any **Claim** that alleges violations of any wage and hour law(s) if any **Insured** who is a principal, partner, officer, director, trustee, in-house counsel, **Employee(s)** within the HR or Risk Management department or **Employee(s)** with personnel and risk management responsibilities was aware of the violations of the wage and hour law(s) by actual knowledge prior to the inception date identified in Item 2 of the Declarations.

3.  In excess of the applicable Self-Insured Retention amount, and subject to the Wage and Hour Limit, the **Insured Company** shall bear uninsured and at its own risk 0% of **Defense Costs** resulting from any **Wage and Hour Claim** brought as a class action (whether certified or not) or by multiple claimants or in multiple plaintiff suits arising out of related **Wrongful Employment Practices**, and our liability shall apply only to the remaining percentage of such **Defense Costs**.

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.

51

**ARCH INTERMEDIARIES / BEAZLEY**

**EMPLOYMENT PRACTICES LIABILITY COVERAGE**
**IMMIGRATION PRACTICES ENHANCEMENT ENDORSEMENT**

In consideration of the premium charged, the following changes to EMPLOYMENT PRACTICES LIABILITY COVERAGE SECTION A are hereby understood and agreed:

1.    We will pay **Defense Costs** that an **Insured**, other than an **Employee** alleged to be employed in violation of any Immigration Practices Law, becomes obligated to pay as a result of an **Immigration Practices Claim** first made against any such **Insured** during the Policy Period, or the Extended Reporting Period, if applicable.

2.    **Immigration Practices Claim** means any **Claim** solely alleging violations of the Immigration Reform Control Act of 1986 or any other similar federal or state laws or regulations ("Immigration Practices Law").

3.    Our maximum aggregate Limit of Liability pursuant to this endorsement shall be $150,000 and shall only apply to **Defense Costs** ("the Immigration Practices Sub-Limit"). The Immigration Practices Sub-Limit shall be part of, and not in addition to, the applicable Limits of Liability identified in the Declarations for COVERAGE SECTION A. In no event shall the Immigration Practices Sub-Limit apply to **Loss**, such as damages, judgments, settlements, verdicts and awards, incurred in connection with **Immigration Practices Claims** and in no event shall we be obligated to pay more than the Limits of Liability identified in the Declarations as applying to COVERAGE SECTION A.

4.    DEFINITIONS, Section II. E, of the EMPLOYMENT PRACTICES LIABILITY COVERAGE SECTION is amended by the addition of the following:

      **Wrongful Employment Practice** shall not include any actual or alleged violations of any Immigration Practices Law.

5.    No coverage shall be available for any **Immigration Practices Claim**, or for that portion of any **Claim** that alleges violations of any Immigration Practices Law, if any **Insured** who is a principal, partner, officer, director, trustee, in-house counsel, **Employee(s)** within the HR or Risk Management department or **Employee(s)** with personnel and risk management responsibilities was aware of such alleged violations of or non-compliance with such Immigration Practices Law prior to the Inception Date of this Policy.

6.    No coverage shall be available for any **Immigration Practices Claim** upon a judgment, final adjudication or admission of a violation of any Immigration Practices Law.

52

**EMPLOYMENT EVENT ENDORSEMENT**

In consideration of the premium charged, the following changes to EMPLOYMENT PRACTICES LIABILITY COVERAGE SECTION A are hereby understood and agreed:

I.      Section I., **INSURING AGREEMENT**, is amended to add the following:

We will also pay the **Employment Event Loss** incurred by the **Insured Company** solely with respect to an **Employment Event** first occurring during the **Policy Period,** or Extended Reporting Period if applicable, and reported in writing to our Authorized Representatives identified in the Declarations as soon as practicable but in no event later than seventy-five (75)  days after the expiration of the **Policy Period** or the last day of the Extended Reporting Period if applicable, from first dollar, provided that the payment of **Employment Event Loss** shall not waive any of our rights under this Policy or at law. Coverage under this Employment Event Endorsement shall apply regardless of whether a **Claim** is ever made against an **Insured** arising from such **Employment Event** and, in the case where a **Claim** is made, regardless of whether the **Employment Event Loss** is incurred prior to or subsequent to the making of such **Claim**.

An **Employment Event** commences when the **Insured Company** or any of its executive officers shall first become aware of such **Employment Event**.  An **Employment Event** shall conclude ninety (90) days after it first commences or when the **Employment Event** Sublimit has been exhausted.

II.     Section II., Definitions, for purposes of this endorsement is amended to include the following terms:

P.      **"Employment Advisor"** means any public relations firm, security firm or mental health professional selected by the **Insured** with our prior consent, such consent not to be unreasonably withheld.

Q.      **"Employment Event"** means any of the following events, which shall be deemed to commence (i) when an executive officer of the **Insured Company** first believes in good faith that it is more likely than not that such event will occur within the next sixty (60) days, or (ii) with respect to 5. below, when the event occurs, whichever is earlier:

(i)     layoff/termination of 20% or greater of the **Insured Company's** workforce;

(ii)    acquisition of an organization that necessitates a material change in employment status or terms of employment of 20% or greater of the **Insured Company's** workforce;

(iii)   the public announcement in the media of allegations of discrimination or harassment implicating an executive officer of the **Insured Company,** or a **Claim** alleging a **Third Party Discrimination;**

(iv)    receipt by the **Insured Company** of notice that a civil rights organization, public interest group or similar organization is investigating the **Insured Company** for violations of state or federal employment laws or mass distributing literature that accuses the **Insured Company** of violations of state or federal employment laws;

(v)     a workplace disaster resulting in loss of life or the imminent threat of or actual use of a lethal weapon which occurs on the **Insured Company's** premises, including without limitation, flood, fire, or workplace violence, which involves discrimination

53

R.  **"Employment Event Loss"** means reasonable fees and expenses charged by **Employment Advisor** in connection with:

    a.  advising the **Insured Company** with respect to minimizing potential loss or liability on account of an **Employment Event**;

    b.  retaining an independent security consultant or for independent security guard services with respect to an **Employment Event** described in Definitions Q.(i), (ii) or (v) of this endorsement;

    c.  managing or administering disclosures to clients, customers, suppliers, investors or the public regarding an **Employment Event**; or

    d.  providing counseling to any **Employee** on account of an **Employment Event**

    provided, that **Employment Loss** shall not include salaries, regular or overtime wages, fees or benefit expenses associated with **Employees** or the **Insured Company's** overhead expenses.

III.  Section IV. **Limit of Liability and Self-Insured Retention**, and the Declarations, are amended to include the following:

The following **Employment Event** Sublimit is our maximum aggregate Limit of Liability for all **Employment Event Loss** resulting from all **Employment Events**, which amount shall be part of, and not in addition to, the Maximum Limit of Liability for each **Claim** shown in Item 4.A of the Declarations:

<strong>Employment Event</strong> Sublimit:  USD 5,000.

## PRIVACY VIOLATION ENDORSEMENT

In consideration of the premium charged, the following changes to EMPLOYMENT PRACTICES LIABILITY COVERAGE SECTION A are hereby understood and agreed:

I.   Section II.   Definition E, **Wrongful Employment Practices,** is amended to include **Privacy Violation(s),** as defined herein.

II.   Section II. Definitions, is amended for purposes of this endorsement to include the following terms.

   A.   **"Breach Notice Law"** means any state, federal or foreign statute or regulation that requires notice to persons whose **Personally Identifiable Non-Public Information** was accessed or may reasonably have been accessed by an unauthorized person.

   B.   **"Personally Identifiable Non-Public Information"** means information about an **Employee** obtained by the **Insured Company** solely in its capacity as the employer of such individual. **Personally Identifiable Non-Public Information** does not include any information obtained by an **Insured** in any other capacity including without limitation information obtained as a result of the **Employee** being a customer of the **Insured Company**.

   C.   **"Privacy Policy"** means the internal or publicly accessible written documents that set forth the **Insured Company's** policies, standards and procedures for collection, use, disclosure, sharing, dissemination and correction or supplementation of, and access to, **Personally Identifiable Non-Public Information**.

   D.   **"Privacy Violation"** means:

      1.   theft of **Personally Identifiable Non-Public Information** that is in the care, custody or control of the **Insured Company**, or an independent contractor that is holding or processing such information on behalf of the **Insured Company**;

      2.   the **Insured Company's** failure to timely disclosure a incident or event triggering a violation of any **Breach Notice Law**;

      3.   failure by the **Insured** to comply with that part of a **Privacy Policy** that specifically:

         a.   prohibits or restricts the **Insured Company's** disclosure, sharing or selling of an **Employee's Personally Identifiable Non-Public Information**;

         b.   requires the **Insured Company** to provide access to **Personally Identifiable Non-Public Information** or to correct incomplete or inaccurate **Personally Identifiable Non-Public Information** after a request is made by an **Employee**; or

         c.   mandates procedures and requirements to prevent the loss of **Personally Identifiable Non-Public Information**.

## ADVERTISING EXCLUSION

In consideration of the premium charged for this **Policy**, it is hereby understood and agreed that Clause **III. EXCLUSIONS** of Coverage Section B. is amended by the addition of the following:

M.     based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving:

   (i)      any false, deceptive or misleading labeling or advertising; or

   (ii)     any piracy or idea misappropriation under an implied contract,

   committed in the course of the **Insureds** advertising activities.

All limitations, conditions, provisions and other terms of this **Policy** remain unchanged.

## BREACH OF CONTRACT EXCLUSION

In consideration of the premium charged for this **Policy**, it is hereby understood and agreed that Clause **III. EXCLUSION** G. of Coverage Section B. is deleted in its entirety and replaced with the following:

G.     based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving any liability of **Insured Company** under any contract or agreement, except to the extent the **Insured Company** would have been liable in the absence of the contract or agreement;

All limitations, conditions, provisions and other terms of this **Policy** remain unchanged.

## ADDITIONAL SIDE A D&O LIMIT

In consideration of the premium charged, it is hereby understood and agreed that with respect to Claims under Coverage Section B, **Directors' and Officers' Liability Coverage**, an Additional USD 1,000,000 Side A D&O Limit shall be available under Insuring Agreement I. A, only (the "Additional Side A D&O Limit"). This Additional Side A D&O Limit shall be separate and in addition to any other limit shown in Item 4.B of the Declarations.  The Additional Side A D&O Limit shall apply excess of the aggregate Limit of Liability applicable to all Claims under Section B, and all policies of insurance providing excess coverage.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

**OCCUPATIONAL SAFETY AND HEALTH ACT ENHANCEMENT ENDORSEMENT**

In consideration of the premium charged, the following changes to EMPLOYMENT PRACTICES LIABILITY COVERAGE SECTION A are hereby understood and agreed, notwithstanding anything contained in this **Policy** to the contrary including Exclusion A., Underwriters shall pay on behalf of the **Insureds**:

1) **Assistance Costs** only resulting from:

    a)    any **Work-Related Fatality** which happens during the **Policy Period** provided that, as a condition precedent to their right to payment under this Endorsement, such **Work-Related Fatality** is reported by the **Insureds** in writing to the Occupational Safety and Health Administration in accordance with their reporting requirements and to Underwriters within twenty-four (24) hours of such **Work-Related Fatality**; or

    b)    any **Serious Work-Related Incident** which happens during the **Policy Period** provided that, as a condition precedent to their right to payment under this Endorsement, such **Serious Work-Related Incident** is reported by the **Insureds** in writing to the Occupational Safety and Health Administration in accordance with their reporting requirements and to Underwriters within forty-eight (48) hours of such **Serious Work-Related Incident**; or

2) **Defense Costs** only resulting from any **OSHA Citation** first made against any **Insured** during the **Policy Period**, provided that, as a condition precedent to their right to payment under this Endorsement, such **OSHA Citation** is reported by the **Insureds** in writing to the Underwriters within five days after any in-house counsel, human resources department, risk manager, executive officer or any safety officer of the **Insured Company** becomes aware of such **OSHA Citation**.

For purposes of this Endorsement:

a)    Notice to Underwriters as described above shall be given in writing to the following firm.  Notice shall be deemed to be received and effective upon actual receipt thereof by the addressee.

        Lehr Middlebrooks Vreeland & Thompson, P.C.
        2021 Third Avenue North
        Birmingham
        Alabama 35203

        or

        osha@lehrmiddlebrooks.com

b)    the following Definitions shall apply:

**"Assistance Costs"** means reasonable and necessary legal fees, costs, and expenses charged to the **Insureds** by Lehr Middlebrooks Vreeland & Thompson, P.C. where appointed by us in assisting the **Insureds** in investigating or mitigating any **Work-Related Fatality** or **Serious Work-Related Incident**, but shall not include:

1.  any fees, costs, or expenses incurred in defending, settling, appealing or investigating any **Claim** brought by or on behalf of any **Employee** or any spouse (or person living together as spouse), **child**, parent, brother, sister or dependent of such **Employee** who suffered such **Work-Related Fatality** or such **Serious Work-Related Incident** or brought by or on behalf of any other third party; or

2.  any wages, salaries, fees, or expenses of any **Insured**.

"**Claim**" shall include any **OSHA Citation**.

**Defense Costs** means reasonable and necessary legal fees, costs, and expenses charged to the **Insureds** by Lehr Middlebrooks Vreeland & Thompson, P.C. where appointed by us in the investigation, defense and appeal of any **OSHA Citation** pursuant to DEFENSE AGREEMENT Section II; but **Defense Costs** do not include any wages, salaries, fees, or expenses of any **Insured**.

"**OSHA Citation**" means any citation brought by:

1.  the Occupational Safety and Health Administration, or

2.  any safety and health plan of any state approved and monitored by the Occupational Safety and Health Administration under 29 U.S.C. § 667,

solely alleging any violation of the Occupational Safety and Health Act or alleging any violation of a state-specific occupational safety and health standard which addresses standards or hazards above and beyond those addressed by the Occupational Safety and Health Act.

"**Serious Work-Related Incident**" means inpatient hospitalization of, amputation suffered by, or loss of an eye to an **Employee** which happens in the course of performing their duties in relation to the **Insured Company's** business.

"**Work-Related Fatality**" means the fatality of an **Employee** which happens in the course of performing their duties in relation to the **Insured Company's** business.

c)  The Underwriters' maximum aggregate Sub-Limit of Liability pursuant to this Endorsement for all **Assistance Costs** and **Defense Costs** shall be US$25,000. Such Sub-Limit of Liability shall be part of, and not in addition to, the Limit of Liability set forth in Item 3. of the Declarations. In no event shall such Sub-Limit of Liability apply to other parts of **Loss**, such as such as damages, judgments, settlements, verdicts and awards incurred in connection with any **Work-Related Fatality**, **Serious Work-Related Incident** or **OSHA Citation**. No self-insured retention shall apply to the coverage afforded under this Endorsement.

d)  The Underwriters are not obligated to defend, or pay **Defense Costs**, on account of any **OSHA Citation**, or for that portion of any **Claim** that alleges any violation of the Occupational Safety and Health Act or a state-specific occupational safety and health law or regulation if the **Insured's** in-house counsel, human resources department, risk manager or any executive officer was aware of such violations of or non-compliance with the Occupational Safety and Health Act or a state-specific occupational safety and health law or regulation prior to the Inception Date of this Policy.

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.

## SECURITY DETAILS

ATTACHING TO CERTIFICATE NUMBER: AC1601986
ATTACHING TO AUTHORITY REFERENCE NUMBER: B0391AZ1602006

HEREON:          100%

SECURITY:        CERTAIN UNDERWRITERS AT LLOYD'S

| PROPORTION | SYNDICATE | |
| --- | --- | --- |
| 18.00% | AFB | 623 |
| 82.00% | AFB | 2623 |

# LLOYD'S

One Lime Street London EC3M 7HA

**Exhibit C**



## SUPERIOR COURT OF CALIFORNIA
## COUNTY OF SAN FRANCISCO

# Document Scanning Lead Sheet

Jan-18-2017  3:04 pm

Case Number: CGC-17-556547

Filing Date: Jan-18-2017 2:58

Filed by:  ARLENE RAMOS

Image: 05709350

COMPLAINT

KAMBIZ ALI KAZEMI VS. TIPSY PIG ET AL

001C05709350

**Instructions:**
Please place this sheet on top of the document to be scanned.

23pgs

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*

K. Cathy Kazemi (225006
Kazemi Law
2708 Wilshire Blvd., #190, Santa Monica, CA 90403
TELEPHONE NO.: 858-692-7401   FAX NO.:
ATTORNEY FOR *(Name):* Plaintiff Kambiz Ali Kazemi

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Francisco
STREET ADDRESS: 400 McAllister
MAILING ADDRESS: 400 McAllister
CITY AND ZIP CODE: San Francisco, CA 94102
BRANCH NAME: Civil Unlimited Jurisdiction

**NO SUMMONS ISSUED**

# F I L E D
Superior Court of California
County of San Francisco

JAN 18 2017

CLERK OF THE COURT
BY: _Arlene Ramos_
Deputy Clerk

CASE NAME:
Kazemi vs. Tipsy Pig, et al

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: |
|---|---|---|---|---|
| ☑ **Unlimited** (Amount demanded exceeds $25,000) | ☐ **Limited** (Amount demanded is $25,000 or less) | ☐ **Counter**   ☐ **Joinder** Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | | CGC-17-556547 JUDGE: DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
- ☐ Auto (22)
- ☐ Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- ☐ Asbestos (04)
- ☐ Product liability (24)
- ☐ Medical malpractice (45)
- ☑ Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- ☐ Business tort/unfair business practice (07)
- ☐ Civil rights (08)
- ☐ Defamation (13)
- ☐ Fraud (16)
- ☐ Intellectual property (19)
- ☐ Professional negligence (25)
- ☐ Other non-PI/PD/WD tort (35)

**Employment**
- ☐ Wrongful termination (36)
- ☐ Other employment (15)

**Contract**
- ☐ Breach of contract/warranty (06)
- ☐ Rule 3.740 collections (09)
- ☐ Other collections (09)
- ☐ Insurance coverage (18)
- ☐ Other contract (37)

**Real Property**
- ☐ Eminent domain/Inverse condemnation (14)
- ☐ Wrongful eviction (33)
- ☐ Other real property (26)

**Unlawful Detainer**
- ☐ Commercial (31)
- ☐ Residential (32)
- ☐ Drugs (38)

**Judicial Review**
- ☐ Asset forfeiture (05)
- ☐ Petition re: arbitration award (11)
- ☐ Writ of mandate (02)
- ☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
- ☐ Antitrust/Trade regulation (03)
- ☐ Construction defect (10)
- ☐ Mass tort (40)
- ☐ Securities litigation (28)
- ☐ Environmental/Toxic tort (30)
- ☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- ☐ Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- ☐ RICO (27)
- ☐ Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
- ☐ Partnership and corporate governance (21)
- ☐ Other petition *(not specified above)* (43)

2. This case ☐ is ☑ is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties
   b. ☐ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. ☐ Substantial amount of documentary evidence
   d. ☐ Large number of witnesses
   e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. ☑ monetary   b. ☐ nonmonetary; declaratory or injunctive relief   c. ☑ punitive
4. Number of causes of action *(specify):* Eight
5. This case ☐ is ☑ is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: January 17 2017

K. Cathy Kazemi (SBN 225006)
(TYPE OR PRINT NAME)        ▶ *C Kazemi* (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on **all** other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California                **CIVIL CASE COVER SHEET**                Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740; Cal. Standards of Judicial Administration, std. 3.10

*File By Fax*

**CM-010**

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property
　Damage/Wrongful Death
Uninsured Motorist (46) *(if the
　case involves an uninsured
　motorist claim subject to
　arbitration, check this item
　instead of Auto)*
**Other PI/PD/WD (Personal Injury/
Property Damage/Wrongful Death)
Tort**
Asbestos (04)
　Asbestos Property Damage
　Asbestos Personal Injury/
　　Wrongful Death
Product Liability *(not asbestos or
　toxic/environmental)* (24)
Medical Malpractice (45)
　Medical Malpractice–
　　Physicians & Surgeons
　Other Professional Health Care
　　Malpractice
Other PI/PD/WD (23)
　Premises Liability (e.g., slip
　　and fall)
　Intentional Bodily Injury/PD/WD
　　(e.g., assault, vandalism)
　Intentional Infliction of
　　Emotional Distress
　Negligent Infliction of
　　Emotional Distress
　Other PI/PD/WD
**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
　Practice (07)
Civil Rights (e.g., discrimination,
　false arrest) *(not civil
　harassment)* (08)
Defamation (e.g., slander, libel)
　(13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
　Legal Malpractice
　Other Professional Malpractice
　　*(not medical or legal)*
Other Non-PI/PD/WD Tort (35)
**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
　Breach of Rental/Lease
　　Contract *(not unlawful detainer
　　or wrongful eviction)*
　Contract/Warranty Breach–Seller
　　Plaintiff *(not fraud or negligence)*
　Negligent Breach of Contract/
　　Warranty
　Other Breach of Contract/Warranty
Collections (e.g., money owed, open
　book accounts) (09)
　Collection Case–Seller Plaintiff
　Other Promissory Note/Collections
　　Case
Insurance Coverage *(not provisionally
　complex)* (18)
　Auto Subrogation
　Other Coverage
Other Contract (37)
　Contractual Fraud
　Other Contract Dispute
**Real Property**
Eminent Domain/Inverse
　Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
　Writ of Possession of Real Property
　Mortgage Foreclosure
　Quiet Title
　Other Real Property *(not eminent
　　domain, landlord/tenant, or
　　foreclosure)*
**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal
　drugs, check this item; otherwise,
　report as Commercial or Residential)*
**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
　Writ–Administrative Mandamus
　Writ–Mandamus on Limited Court
　　Case Matter
　Writ–Other Limited Court Case
　　Review
Other Judicial Review (39)
　Review of Health Officer Order
　Notice of Appeal–Labor
　　Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal.
Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
　*(arising from provisionally complex
　case type listed above)* (41)
**Enforcement of Judgment**
Enforcement of Judgment (20)
　Abstract of Judgment (Out of
　　County)
　Confession of Judgment *(non-
　　domestic relations)*
　Sister State Judgment
　Administrative Agency Award
　　*(not unpaid taxes)*
　Petition/Certification of Entry of
　　Judgment on Unpaid Taxes
　Other Enforcement of Judgment
　　Case
**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified
　above)* (42)
　Declaratory Relief Only
　Injunctive Relief Only *(non-
　　harassment)*
　Mechanics Lien
　Other Commercial Complaint
　　Case *(non-tort/non-complex)*
　Other Civil Complaint
　　*(non-tort/non-complex)*
**Miscellaneous Civil Petition**
Partnership and Corporate
　Governance (21)
Other Petition *(not specified
　above)* (43)
　Civil Harassment
　Workplace Violence
　Elder/Dependent Adult
　　Abuse
　Election Contest
　Petition for Name Change
　Petition for Relief From Late
　　Claim
　Other Civil Petition

**CIVIL CASE COVER SHEET**

**NO SUMMONS ISSUED**

K. Cathy Kazemi, Esq. (SBN 225006)
KAZEMI LAW
2708 Wilshire Blvd., #190
Santa Monica, CA 90403
Telephone: (858) 692-7401
kat@kazemilaw.com

Attorney for Plaintiff
KAMBIZ ALI KAZEMI

**F I L E D**
Superior Court of California
County of San Francisco

JAN 18 2017

CLERK OF THE COURT
BY: _Arline Ramos_
Deputy Clerk

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN FRANCISCO

KAMBIZ ALI KAZEMI, an individual;

Plaintiff,

vs.

TIPSY PIG; OUR NEIGHBHORHOOD
PLACE, LLC; SAMUEL SCOTT JOSI, an
individual, NATHAN DEVIN VALENTINE,
an individual, STRYKER MCGALLIARD
SCALES, an individual, and DOES 1 through
50, inclusive,

Defendants.

CASE NO. **CGC-17-556547**

**PLAINTIFF'S COMPLAINT FOR DAMATES FOR:**

1. **ASSAULT**
2. **BATTERY**
3. **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
4. **DEFAMATION PER SE**
5. **PREMISES LIABLITY**
6. **VIOLATION OF THE UNRUH CIVIL RIGHTS ACT CIV. CODE § 51.7)**
7. **VIOLATION OF THE RALPH ACT (CIV. CODE § 51.7)**
8. **NEGIGENT HIRING, SUPERVISION AND RETENTION**

**DEMAND FOR JURY TRIAL**

File By Fax

-1-

COMES NOW Plaintiff, KAMBIZ ALI KAZEMI, and for his complaint, alleges as follows:

## JURISDICTION AND VENUE

1. This is an unlimited case, over which this Court has jurisdiction. The total amount of damages sought by the Plaintiff exceeds $25,000.

2. This Court has personal jurisdiction over Defendants because at all times mentioned herein, Defendants resided, were organized, existed in, or conducted business in the State of California, including, but not limited to, in/around the County of San Francisco, State of California.

3. In addition, venue is proper in the County of San Francisco pursuant to California Code of Civil Procedure Section 395(a) because Defendants, or some of them, reside in the County of San Francisco.

## PARTIES

4. Plaintiff KAMBIZ ALI KAZEMI (hereinafter "Plaintiff") is a resident of the County of San Francisco, State of California.

5. Plaintiff is informed and believes, and thereon alleges, that at all times alleged herein, Defendant OUR NEIGHBORHOOD PLACE LLC is authorized to conduct business and conducts business in California, including the operation of an American gastrotavern more commonly known as "the Tipsy Pig" located in San Francisco, California.

6. Plaintiff is informed and believes, and thereon alleges, that at all times alleged herein, Defendant SAMUEL SCOTT JOSI was, and is now, a resident of San Francisco County, California.

7. Plaintiff is informed and believes, and thereon alleges, that at all times alleged herein, Defendant NATHAN DEVIN VALENTINE was, and is now, a resident of San Francisco County, California.

8. Plaintiff is informed and believes, and thereon alleges, that at all times alleged herein, Defendant STRYKER MCGALLIARD SCALES was, and is now, a resident of San Francisco County, California.

9. Defendants OUR NEIGHBORHOOD PLACE LLC, SAMUEL SCOTT JOSI, NATHAN DEVIN VALENTINE and STRYKER MCGALLIARD SCALES are hereinafter collectively referred to as the TIPSY PIG.

10. Plaintiff is informed and believes, and thereon alleges, that at all times alleged herein

-2-

1   TIPSY PIG and/or Does 1 through 10 owned, operated, managed, maintained, and/or otherwise

2   exercised control over "the Tipsy Pig", located at 2231 Chestnut St, San Francisco, CA 94123,

    County of San Francisco, California (hereinafter "Subject Premises").

3       11. Plaintiff is informed and believes, and thereon alleges, that at all times alleged herein,

4   Does 11 through 20 are individuals employed by Defendant TIPSY PIG and/or Does 1 through 10

5   as managers, directors, officers, managing agents, doormen, bartenders, employees, security

6   personnel and/or bouncers, who are sued herein under fictitious names.

7       12. The true names and capacities, whether individual, corporate, associate or otherwise, of

8   Defendants Does 1 through 50, inclusive, are unknown to Plaintiff at this time, who therefore

    sues said defendants by such fictitious names. When the true names and capacities of said

9   Defendants are ascertained, they will be inserted into the Complaint by way of amendment.

10      13. Plaintiff is informed and believes, and thereon alleges, that each Defendant designated

11  herein as a "Doe" is responsible in some manner for each other Defendant's acts and omissions

12  and for the resulting injuries and damages to Plaintiff, as alleged herein.

13      14. Plaintiff is informed and believes, and thereon alleges, that at all times herein mentioned,

    defendants TIPSY PIG and Does 1 through 50 were acting as the agent and employee of each

14  other, and in doing the things hereinafter alleged were acting within the course and scope of said

15  agency and employment.

16                          **FACTUAL ALLEGATIONS**

17      15. On or about February 13, 2016, Plaintiff was lawfully on the subject premises as a patron

18  at the Subject Premises.

19      16. Plaintiff arrived at the Subject Premises at approximately 5:30 p.m. with seven other of

20  his friends/work colleagues to have dinner. When the Tipsy Pig host informed them that their

    table was ready and they would be seated, Plaintiff and his friends proceeded to follow the host to

21  their table in a near single file fashion. Plaintiff was the second to last person to follow his

22  friends to his table, and just as he was walking towards the table he was singled out and abruptly

23  stopped by another Tipsy Pig employee who rudely ordered Plaintiff to leave the Subject

24  Premises immediately without reason.

25      17. Plaintiff calmly asked the Tipsy Pig employee why he was being singled out and asked to

26  Leave, and requested to speak to management regarding same. In response to his request to speak

    to management, Plaintiff was forcibly removed from the Subject Premises by about two

27  employees and/or agents of TIPSY PIG, sued herein as Does 11-12. Said Does 11-12 were

28

                                    -3-

1 unlicensed, inadequately trained, and negligently hired to act as security guards for the TIPSY
PIG.

2 18. Does 11-20 threatened to beat and forcefully remove Plaintiff from the Subject Premises,
3 and ultimately made good on their threats. Said Defendants deliberately, intentionally, and
4 unlawfully clenched hold of Plaintiff, grasping powerfully his forearm and wrist placing him in a
5 position of painful submission whereupon said Defendants brutally beat Plaintiff to the ground.
6 They then violently smashed Plaintiff's face into the ground, pulled Plaintiff's hoodie over his
7 face so as to diffuse Plaintiff's cry for help and tied the hoodie drawstrings around his neck
8 choking him. Said Defendants then proceeded to slam Plaintiff's left hand into the ground,
handcuffed his wrist, and struck Plaintiff in his back, thereby assaulting and battering Plaintiff.
9 Does 11 through 20 repeatedly beat Plaintiff without justification, causing severe injuries
10 including, but not limited to, scratches on the front and back of his body, trauma to his face, neck,
11 acute cervical pain, and broken left hand (Plaintiff's dominant hand) which remains weak and
12 debilitated to this day, requiring ongoing professional medical services and treatment. Plaintiff
13 was beaten for the sole purpose of inflicting great bodily injury upon him and to humiliate and
14 shame him. As a result of the beating, Plaintiff also suffered severe emotional distress and
psychological injuries.

15 19. Other employees and/or agents of Defendants and/or Does 1 through 10, sued herein as
16 Does 11 through 20, knew of and were aware of the beating, looked on as Plaintiff was severely
17 beaten, and took no steps to intervene and/or stop the beating although they had the ability to do
18 so.

19 20. Plaintiff is informed and believes, and based thereon alleges, that directors, officers,
20 and/or managing agents of Defendants TIPSY PIG and/or Does 1 through 10 were present at the
21 Subject Premises when Plaintiff was beaten, authorized and directed Does 11 through 20 to beat
22 Plaintiff, and failed to take action to stop the attack on Plaintiff and to seek police and medical
assistance. While Plaintiff was being attacked and beaten to the ground, he screamed for help
23 and implored that someone call the police. The police eventually came to the scene in response to
24 911 calls from witnesses who saw Plaintiff being beaten by Defendants.

25 21. Plaintiff is informed and believes, and based thereon alleges, that he was targeted by
26 Defendants to be subjected to intimidation, violence, harassment, assault, battery and
discrimination because he is a dark-skinned middle eastern Muslim male.
27
22. Plaintiff is informed and believes, and thereon alleges, that Does 11 through 20 acted
28

-4-

1  with authorization, consent, and at the direction of directors, officers, and/or managing agents of

2  Defendants TIPSY PIG. As a result, Defendant TIPSY PIG is vicariously liable for the

   intimidation, violence, harassment, assault, battery and discrimination based upon the respondeat

3  superior doctrine. On information and belief, Defendants TIPSY PIG was negligent in the hiring

4  and supervising of Defendants 11-20.

5      23. Plaintiff is informed and believes, and based thereon alleges, that Defendants, each and

6  all of them, agreed with one another, and gave each other substantial assistance and

7  encouragement to commit the tortious acts described above, which resulted in harm and damage

   to Plaintiff.
8

                           **FIRST CAUSE OF ACTION**
9
                                **ASSAULT**
10
                          **(Against All Defendants)**
11
       24. Plaintiff hereby repeats, realleges and incorporates by reference all preceding
12
   paragraphs in this Complaint as though set forth in full herein.

13     25. On or about February 13, 2016, two or more individuals, previously identified herein as

14  Does 11 through 20, threatened to beat and to forcefully remove Plaintiff from the subject

15  premises, where he was lawfully present as a patron.

       26. Does 11 through 20 surrounded Plaintiff in a menacing manner and informed him he
16
   would be beaten and thrown out of the premises, intending to cause Plaintiff to fear harmful and
17
   offensive contact with his person. Such Defendants knew that their acts of collectively shouting
18
   and threatening Plaintiff were substantially certain to result in putting Plaintiff in fear of
19  immediate harmful and offensive contact.

20     27. Plaintiff did not consent to the aforementioned acts.

21     28. As a direct and proximate result of the aforementioned acts of the Defendants, Plaintiff

22  believed he was about to be beaten and forcefully removed from the subject premises, and was in

   fact placed in great apprehension of harmful and offensive conduct with his person and ultimately
23
   forcefully removed from the Subject Premises.
24
       29. As a direct and proximate result of the aforementioned acts of the Defendants, Plaintiff
25  was caused to and did suffer great and extreme emotional distress including shock, anxiety,

26  worry, depression, sleeplessness, mortification, humiliation, and indignity. Said emotional

27  distress was of such a substantial and enduring quality that no reasonable person in a civilized

28  society should be expected to endure such distress.

                                    -5-

30. Plaintiff is informed and believes, and based thereon alleges, that threatening to beat and to forcefully remove patrons from the subject premises was required of their employees and/or agents by Defendant TIPSY PIG and/or Does 1 through 10, and incidental to the duties of Does 11 through 20.

31. Plaintiff is informed and believes, and based thereon alleges, that Defendant TIPSY PIG and/or Does 1 through 10 implemented an ongoing practice and procedure of encouraging and allowing their employees to assault and batter patrons, and assist others to assault and batter patrons in their presence.

32. Therefore, in committing the aforementioned acts, Does 11 through 20 were acting within the course and scope of their employment with Defendants TIPSY PIG and Does 1 through 10.

33. Plaintiff is informed and believes, and based thereon alleges, that Defendants, each and all of them, agreed with one another, and gave each other substantial assistance and encouragement to commit the tortious acts described above, which resulted in harm and damage to Plaintiff.

34. Plaintiff is informed and believes, and based thereon alleges, that Does 11-20 committed the aforementioned acts at the direction of officers, directors, and/or managing agents of Defendants TIPSY PIG and/or Does 1 through 10.

35. Defendants Does 11 through 50 carried out the aforementioned acts knowing that great fear of harm and emotional distress were substantially certain to be caused to Plaintiff; yet Defendants Does 11 through 50 proceeded to engage in said despicable acts maliciously and with a conscious disregard of the rights and safety of the Plaintiff during the course of their employment with Defendant Tipsy Pig.

36. Officers, directors, and/or managing agents of Defendants TIPSY PIG and/or Does 1 through 10 were actually aware of the aforementioned actions of their employees and/or agents, and said acts took place in and around the presence of and under the direction and encouragement of managing agents, officers, and directors of Defendant TIPSY PIG and Does 1 through 10. Defendant TIPSY PIG is vicariously viable for the assault committed by under the respondeat superior doctrine. The assault was generally foreseeable consequence of Tipsy Pig's business.

37. In ratifying, condoning, encouraging, and directing the aforementioned actions, Defendant TIPSY PIG and Does 1 through 10 engaged in malicious and despicable conduct purposely intended to cause severe and debilitating injuries to Plaintiff, with a conscious disregard of Plaintiff's rights and safety.

1    38. Therefore, Plaintiff is entitled to an award of punitive damages against Defendant TIPSY

2    PIG and Does 1 through 50, to punish and make an example of said Defendants, and deter

3    Defendants and others from engaging in the same or similar acts in the future.

4

5                          **SECOND CAUSE OF ACTION**

6                                    **BATTERY**

7                              **(Against All Defendants)**

8    39. Plaintiff hereby repeats, realleges and incorporates by reference all preceding

9    paragraphs in this Complaint as though set forth in full herein.

10   40. On or about February 13, 2016, two or more individuals, previously identified herein as

     Defendants Does 11 through 20, grasped powerfully Plaintiff's forearm and wrist placing him in a

11   position of painful submission whereupon he was brutally beat to the ground, then sat on top of

12   his body and beaten in the back. They then violently smashed Plaintiff's face into the ground,

13   pulled Plaintiff's hoodie over his face so as to diffuse Plaintiff's cry for help and tied the hoodie

14   drawstrings around his neck choking him. Said Defendants then proceeded to slam Plaintiff's left

15   hand into the ground, handcuffed his wrist, and struck Plaintiff in his back, thereby battering

16   Plaintiff.

17   41. Does 11 through 20 repeatedly and intentionally beat Plaintiff without justification,

     intending to harm and offend Plaintiff, and continued to beat him for the sole purpose of inflicting

18   great bodily injury upon him and humiliating him.

19   42. Plaintiff did not consent to the aforementioned acts.

20   43. As a direct and proximate result of the aforementioned acts of the Defendants, Plaintiff

21   was caused to and did sustain severe injuries including, but not limited to, scratches on the front

22   and back of his body, trauma to his face, neck, acute cervical pain, and broken dominant left

     hand, requiring professional medical services and treatment.

23
     44. As a further direct and proximate result of the aforementioned actions of the Defendants,

24   Plaintiff has been caused to expend money and incur financial obligations for medical services

25   and treatment in an effort to recover from said injuries. Said injuries are believed to be permanent

26   in nature and will require Plaintiff to expend money and incur additional financial obligations in

27   the future for further medical treatment and services. To this day, Plaintiff's ability to use his left

28   hand is still compromised.

                                        -7-

45. As a direct and proximate result of the aforementioned acts, Plaintiff was caused to and did suffer great and extreme emotional distress including insomnia, shock, anxiety, worry, depression, sleeplessness, mortification, humiliation, and indignity. Said emotional distress was of such a substantial and enduring quality that no reasonable person in a civilized society should be expected to endure it.

46. As a further direct and proximate result of the aforementioned acts of the Defendants, Plaintiff was prevented from attending to his usual occupation and was thereby caused to lose earnings while recovering from the aforementioned injuries.

47. Plaintiff is informed and believes, and based thereon alleges, that beating and forcefully throwing patrons from the subject premises was required of their employees and/or agents by Defendant TIPSY PIG and/or Does 1 through 10, and incidental to the duties of Does 11 through 20.

48. Defendant TIPSY PIG and/or Does 1 through 10 should have reasonably foreseen that employees and/or agents such as Does 11 through 20, some of which were hired as bouncers and bartenders, would beat, kick, punch, pull, forcefully remove, or otherwise batter patrons such as Plaintiff.

49. Plaintiff is informed and believes, and based thereon alleges, that Defendant TIPSY PIG and/or Does 1 through 10 implemented an ongoing practice and procedure of encouraging and allowing their employees to assault and batter patrons, and assist others to assault and batter patrons in their presence.

50. Therefore, in committing the aforementioned acts, Does 11 through 20 were acting within the course and scope of their employment with Defendant TIPSY PIG and Does 1 through 10.

51. Plaintiff is informed and believes, and based thereon alleges, that Defendants, each and all of them, agreed with one another, and gave each other substantial assistance and encouragement to commit the tortious acts described above, which resulted in harm and damage to Plaintiff.

52. Plaintiff is informed and believes, and based thereon alleges, that Does 11-20 committed the aforementioned acts at the direction of officers, directors, and/or managing agents of Defendant TIPSY PIG and/or Does 1 through 10.

53. Defendants Does 11 through 50 carried out the aforementioned acts knowing that great bodily injury and emotional distress were substantially certain to be caused to Plaintiff; yet Defendants Does 11 through 50 proceeded to engage in said despicable acts maliciously and with a conscious disregard of the rights and safety of the Plaintiff during the course of their

employment with Tipsy Pig.

54. Officers, directors, and/or managing agents of Defendants TIPSY PIG and/or Does 1 through 10 were actually aware of the aforementioned actions of their employees and/or agents, and said acts took place in and around the presence of and under the direction and encouragement of managing agents, officers, and directors of Defendant TIPSY PIG and Does 1 through 10. Defendant TIPSY PIG is vicariously viable for the assault committed by under the respondeat superior doctrine. The battery was generally foreseeable consequence of Tipsy Pig's business.

55. In ratifying, condoning, encouraging, and directing the aforementioned actions, Defendant TIPSY PIG and Does 1 through 10 engaged in malicious and despicable conduct purposely intended to cause severe and debilitating injuries to Plaintiff, with a conscious disregard of Plaintiffs rights and safety.

56. Therefore, Plaintiff is entitled to an award of punitive damages against Defendant TIPSY PIG and Does 1 through 50, to punish and make an example of said Defendants, and deter Defendants and others from engaging in the same or similar acts in the future.

### THIRD CAUSE OF ACTION
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Against All Defendants)

57. Plaintiff hereby repeats, realleges and incorporates by reference all preceding paragraphs in this Complaint as though set forth in full herein.

58. On or about February 13, 2016, two or more individuals, previously identified herein as Does 11 through 20, cornered Plaintiff in a menacing manner, shouting and threatening to beat and to forcefully remove him from the Subject Premises, and ultimately did, all the while he was lawfully present as a patron. Those individuals then proceeded to hit Plaintiff. They brutally beat him to the ground, then sat on top of his body and beat Plaintiff in the back. Said Defendants pulled Plaintiff's hoodie over his face so as to diffuse Plaintiff's cry for help and tied the hoodie drawstrings around his neck choking him. They then violently smashed Plaintiff's left hand into the ground and break it. All the while, other individuals, previously identified herein as Does 21 through 20, watched Plaintiff get beaten all the while Plaintiff was begging the Defendants to call for medical help, but they did not. The Police that eventually came to the scene had been called by witnesses who saw Plaintiff being beaten by Defendants.

59. The aforementioned actions were directed at Plaintiff and so extreme, callous, harsh, and

-9-

outrageous that they are utterly intolerable in a civilized society.

60. Said Defendants, and each of them, intended their actions to cause Plaintiff severe and extreme emotional distress. Does 11 through 20 repeatedly and intentionally beat Plaintiff without justification, intending to harm and offend Plaintiff, and continued to beat him for the sole purpose of inflicting great bodily injury upon him and humiliating him.

61. As a direct and proximate result of the aforementioned acts, Plaintiff was caused to and did suffer severe and extreme emotional distress including shock, anxiety, worry, depression, sleeplessness, mortification, humiliation, and indignity. Said emotional distress was of such a substantial and enduring quality that no reasonable person in a civilized society should be expected to endure it. To this day, when Plaintiff is questioned about his debilitated left hand, he relives the psychological trauma caused him by Defendants.

62. Plaintiff is informed and believes, and based thereon alleges, that inflicting distress by threatening, beating and forcefully throwing patrons from the subject premises was required of their employees and/or agents by Defendant TIPSY PIG and/or Does 1 through 10, and incidental to the duties of Does 11 through 20.

63. Defendant TIPSY PIG and/or Does 1 through 10 should have reasonably foreseen that employees and/or agents such as Does 11 through 20, some of which were hired as bouncers, security personnel, and bartenders, would inflict severe emotional distress when they threaten, beat, kick, punch, pull, forcefully remove, or otherwise batter patrons such as Plaintiff.

64. Plaintiff is informed and believes, and based thereon alleges, that Defendants TIPSY PIG and/or Does 1 through 10 implemented an ongoing practice and procedure of encouraging and allowing their employees to engage in the aforementioned acts.

65. Therefore, in committing the aforementioned acts, Does 11 through 20 were acting within the course and scope of their employment with Defendant TIPSY PIG.

66. Plaintiff is informed and believes, and based thereon alleges, that Defendants, each and all of them, agreed with one another, and gave each other substantial assistance and encouragement to commit the tortious acts described above, which resulted in harm and damage to Plaintiff.

67. Plaintiff is informed and believes, and based thereon alleges, that Does 11-20 committed the aforementioned acts at the direction of officers, directors, and/or managing agents of Defendants TIPSY PIG.

68. Defendants Does 11 through 20 carried out the aforementioned acts knowing that great

1  fear of harm and emotional distress were substantially certain to be caused to Plaintiff; yet

2  Defendants Does 11 through 20 proceeded to engage in said despicable acts maliciously and with
a conscious disregard of the rights and safety of the Plaintiff.

3  69. Officers, directors, and/or managing agents of Defendants TIPSY PIG and/or Does 1

4  through 10 were actually aware of the aforementioned actions of their employees and/or agents,

5  and said acts took place in and around the presence of and under the direction and encouragement

6  of managing agents, officers, and directors of Defendants TIPSY PIG and Does 1 through 10.

7  Defendant TIPSY PIG is vicariously viable for the assault committed by under the respondeat

8  superior doctrine. The injury to Plaintiff was a generally foreseeable consequence of Tipsy Pig's
business.

9  70. In ratifying, condoning, encouraging, and directing the aforementioned actions,

10  Defendants TIPSY PIG and Does 1 through 10 engaged in malicious and despicable conduct

11  purposely intended to cause severe and debilitating injuries to Plaintiff, with a conscious

12  disregard of Plaintiff's rights and safety.

13  71. Therefore, Plaintiff is entitled to an award of punitive damages against Defendants TIPSY

14  PIG and Does 1 through 50, to punish and make an example of said Defendants, and deter
Defendants and others from engaging in the same or similar acts in the future.

15

16  ## FOURTH CAUSE OF ACTION

17  ### Defamation Per Se

18  ### (Against All Defendants)

19  72. Plaintiff hereby repeats, realleges and incorporates by reference all preceding

20  paragraphs in this Complaint as though set forth in full herein.

21  73. Defendants falsely accused Plaintiff of being excessively intoxicated as grounds to

22  forcibly remove him from the Subject Premises in front of all TIPSY PIG employees and patrons.
Every face that witnessed the encounter between Plaintiff and Defendants stared at Plaintiff,

23  several of which included Plaintiff's personal friends and work colleagues.

24  74. Defendants told one another and out loud in public for patrons to hear that Plaintiff was

25  too intoxicated to remain in the Subject Premises. The statements were false and unprivileged at

26  the time they were made. Indeed, when the Police finally arrived to the scene after Plaintiff had
been beaten to the floor Defendants, Plaintiff offered to take a breathalyzer test to prove that

27  Defendants allegations made against him were wholly false.

28

-11-

75. The statements were published to others than the Plaintiff.

76. The statement injured the Plaintiff's reputation in both his personal and professional capacities.

77. As a proximate result of Defendants' defamation of Plaintiff, Plaintiff has suffered and continues to suffer embarrassment, humiliation and mental anguish all to their damage in an amount according to proof.

78. Defendants TIPSY PIG and Does 1 through 10 committed the acts alleged herein maliciously, fraudulently and oppressively, with the wrongful intention of injuring Plaintiff, from an improper and evil motive based upon an improper racial profiling, violating his rights all amounting to despicable conduct, and in conscious disregard of Plaintiff's rights.  Plaintiffs is thus entitled to recover punitive damages from Defendants in an amount according to proof.

## FIFTH CAUSE OF ACTION
## PREMISES LIABILITY
### (Against All Defendants)

79. Plaintiff hereby repeats, realleges and incorporates by reference all preceding paragraphs in this Complaint as though set forth in full herein.

80. Defendants TIPSY PIG and/or Does 1 through 10 owned, managed, maintained, and/or controlled the subject premises on February 13, 2016.

81. At all times relevant to the acts and omissions herein alleged, Defendants TIPSY PIG and/or Does 1 through 10 owed a duty to exercise reasonable and ordinary care in managing the subject premises.

82. At all times relevant to the acts and omissions herein alleged, Defendants TIPSY PIG and/or Does 1 through 10 owed an affirmative duty to prevent harm and to avoid an unreasonable risk of harm to any and all persons, including Plaintiff, while in the subject premises.

83. At all times relevant to the acts and omissions herein alleged, Defendants TIPSY PIG and/or Does 1 through 10 owed a duty to protect its patrons from being harmed by the foreseeable criminal conduct of others such as their own employees.

84. These Defendants, and each of them, should have foreseen, based on prior violent behavior of several agents and/or employees of Defendants TIPSY PIG and/or Does 1 through 10, that patrons such as Plaintiff were exposed to an unreasonable risk of being assaulted and beaten in the subject premises.

-12-

**SIXTH CAUSE OF ACTION**

**VIOLATION OF THE UNRUH CIVIL RIGHTS ACT (CIV. CODE § 51.7)**

**(Against All Defendants)**

85. Plaintiff hereby repeats, realleges and incorporates by reference all preceding paragraphs in this Complaint as though set forth in full herein.

86. The Defendants actions constitute violation of Civil Code § 51 (the Unruh Civil Rights Act), in that Plaintiff was not afforded full and equal treatment, accommodations advantages, facilities, privileges, or services by the TIPSY PIG because he was dark-skinned, middle eastern and/or of Muslim descent.

87. Plaintiff was subjected to the above referenced conduct including but not limited to harassment and/or discrimination on the basis of his middle eastern complexion and descent at the hands of Defendants.

88. By Defendants' actions, Defendants have denied, aided or incited a denial, discriminated and/or distinguished against Plaintiff in violation of Civil Code §§ 51 and 52.

89. Plaintiff is informed and believes, and based thereon alleges, that it was the routine practice and/or defacto policy of Defendants to profile and target minority individuals, intimidate them, threaten them, forcefully remove them, and violently beat them without justification. Other patrons of the Subject Premises were discriminated against, forcefully removed, and violently beaten by employees and/or agents of Defendants TIPSY PIG and/or Does 1 through 10 on several occasions prior to February 23, 2016.

90. As a direct and proximate result of the aforementioned acts of the Defendants, Plaintiff suffered severe injuries including, but not limited to scratches on the front and back of his body, trauma to his face, neck, acute cervical pain, and broken dominant left hand (Plaintiff's dominant hand), which remains debilitated to this day, requiring ongoing professional medical services and treatment.

91. As a further direct and proximate result of the aforementioned actions of the Defendants, Plaintiff has been caused to expend money and incur financial obligations for medical services and treatment in an effort to recover from said injuries. Said injuries are believed to be permanent in nature and will require Plaintiff to expend money and incur additional financial obligations in the future for further medical treatment and services. To this day, Plaintiff's left had remains in a weak and debilitated condition.

-13-

92. As a direct and proximate result of the aforementioned acts of the Defendants, Plaintiff was caused to and did suffer severe and extreme emotional distress including insomnia, shock, anxiety, worry, depression, mortification, humiliation, and indignity. Said emotional distress was of such a substantial and enduring quality that no reasonable person in a civilized society should be expected to endure it.

93. As a further direct and proximate result of the aforementioned acts of the Defendants, Plaintiff was prevented from attending to his usual occupation and was thereby caused to lose earnings while recovering from the aforementioned injuries.

94. As a direct and proximate result of the conduct of Defendants, and each of them, Plaintiff was forced to retain an attorney in order to protect his rights. Accordingly, Plaintiff seeks the reasonable attorney's fees incurred in this litigation, in an amount according to proof at trial.

95. Plaintiff is informed and believes, and based thereon alleges, that Defendants, each and all of them, agreed with one another, and gave each other substantial assistance and encouragement to commit the tortious acts described above, which resulted in harm and damage to Plaintiff.

96. Plaintiff is informed and believes, and based thereon alleges, that Does 11-20 committed the aforementioned acts at the direction of officers, directors, and/or managing agents of Defendants TIPSY PIG and/or Does 1 through 10.

97. Defendants Does 11 through 20 carried out the aforementioned acts knowing that great fear of harm and emotional distress were substantially certain to be caused to Plaintiff; yet Defendants Does 11 through 20 proceeded to engage in said despicable acts maliciously and with a conscious disregard of the rights and safety of the Plaintiff.

98. Officers, directors, and/or managing agents of Defendants TIPSY PIG and/or Does 1 through 10 were actually aware of the aforementioned actions of their employees and/or agents, and said acts took place in and around the presence of and under the direction and encouragement of managing agents, officers, and directors of Defendants TIPSY PIG and Does 1 through 10.

99. In ratifying, encouraging, and directing the aforementioned actions, Defendants TIPSY PIG and Does 1 through 10 engaged in malicious and despicable conduct purposely intended to cause severe and debilitating injuries to Plaintiff, with a conscious disregard of Plaintiff's rights and safety.

100.     Therefore, Plaintiff is entitled to an award of punitive damages against Defendants TIPSY PIG and Does 1 through 50, to punish and make an example of said Defendants, and deter

-14-

1   Defendants and others from engaging in the same or similar acts in the future, and consequently suffering bodily injury.

2   101.    Defendants TIPSY PIG and/or Does 1 through 10 had actual and constructive notice

3   of prior similar incidents of hostile, aggressive, and violent behavior by their agents and/or

4   employees.

5   102.    Defendants TIPSY PIG and Does 1 through 10 knew or should have known that

6   Does 11 through 20 would assault and beat, and assist others to assault and beat Plaintiff, as they

7   did on February 13, 2016, and as they had done similarly to other individuals on previous

8   occasions.

9   103.    Defendants TIPSY PIG and/or Does 1 through 10 failed to exercise due care in inviting, allowing, and encouraging their employees to engage in the aforementioned acts of

10  violence, hostility, and aggression towards patrons.

11  104.    Defendants TIPSY PIG and/or Does 1 through 10 breached their duty to Plaintiff in

12  that they negligently operated, controlled, maintained, and/or managed the subject premises by

13  allowing their agents and/or employees to do whatever they pleased without intervention or

14  obstruction, including assaulting and battering patrons.

15  105.    As a direct and proximate result of the acts and omissions of Defendants TIPSY PIG

16  and/or Does 1 through 10, on February 13, 2016, Plaintiff was profiled, cornered, threatened, and

16  violently beaten by employees and/or agents of said Defendants. Those individuals brutally

17  threatened to beat and forcefully remove Plaintiff from the Subject Premises, and ultimately made

18  good on their threats. Said Defendants deliberately, intentionally, and unlawfully clenched hold

19  of Plaintiff, grasping powerfully his forearm and wrist placing him in a position of painful

20  submission whereupon said Defendants brutally beat Plaintiff to the ground. They then violently

21  smashed Plaintiff's face into the ground, pulled Plaintiff's hoodie over his face so as to diffuse

21  Plaintiff's cry for help and tied the hoodie drawstrings around his neck choking him. Said

22  Defendants then proceeded to slam Plaintiff's left hand into the ground breaking it, handcuffed

23  his wrist, and struck Plaintiff in his back, thereby assaulting and battering Plaintiff. All the while,

24  other individuals, also employees and/or agents of Defendants TIPSY PIG and/or Does 1 through

25  10, watched Plaintiff get beaten, laughed, applauded, cheered, and encouraged the battery of

26  Plaintiff to continue, resulting in increased injury to Plaintiff. Finally, when Plaintiff was lying on

27  the ground face smashed in, severely injured, bruised and bones broken, he begged the

Defendants to call for help, but they did not. Directors, officers, and/or managing agents of

28

-15-

1  Defendants TIPSY PIG and/or Does 1 through 10 were also present at the TIPSY PIG, and acting

2  in the course and scope of their employment, when Plaintiff was assaulted and beaten. Those

3  Defendants failed to act to stop the assault and beating on Plaintiff, and to otherwise assist

   Plaintiff by calling for police and medical intervention.

4  106.    Defendants TIPSY PIG and Does 1 through 10 knew or should have known that

5  their failure to exercise due care as set forth above would cause Plaintiff to suffer severe

6  emotional distress and personal injuries.

7  107.    As a direct and proximate result of the aforementioned acts of the Defendants,

   Plaintiff suffered severe injuries including, scratches on the front and back of his body, trauma to

8  his face, neck, acute cervical pain, and broken dominant left hand (Plaintiff's dominant hand),

9  which remains weak and debilitated to this day, requiring ongoing professional medical services

10 and treatment.

11 108.    As a further direct and proximate result of the aforementioned actions of the

12 Defendants, Plaintiff has been caused to expend money and incur financial obligations for

13 medical services and treatment in an effort to recover from said injuries. Said injuries are believed

   to be permanent in nature and will require Plaintiff to expend money and incur additional

14 financial obligations in the future for further medical treatment and services.

15 109.    As a direct and proximate result of the aforementioned acts of the Defendants,

16 Plaintiff was caused to and did suffer severe and extreme emotional distress including shock,

17 anxiety, worry, depression, sleeplessness, mortification, humiliation, and indignity. Said

18 emotional distress was of such a substantial and enduring quality that no reasonable person in a

19 civilized society should be expected to endure it.

20 110.    As a further direct and proximate result of the aforementioned acts of the

   Defendants, Plaintiff was prevented from attending to his usual occupation and was thereby

21 caused to lose earnings while recovering from the aforementioned injuries.

22 111.    As a direct and proximate result of the conduct of Defendants, and each of them,

23 Plaintiff was forced to retain an attorney in order to protect his rights. Accordingly, Plaintiff seeks

24 the reasonable attorney's fees incurred in this litigation, in an amount according to proof at trial.

25 112.    Plaintiff is informed and believes, and based thereon alleges, that Defendants, each

26 and all of them, agreed with one another, and gave each other substantial assistance and

   encouragement to commit the tortious acts described above, which resulted in harm and damage

27 to Plaintiff

28

-16-

113.   Plaintiff is informed and believes, and based thereon alleges, that Does 11-20 committed the aforementioned acts at the direction of officers, directors, and/or managing agents of Defendants TIPSY PIG and/or Does 1 through 10.

114.   Defendants Does 11 through 50 carried out the aforementioned acts knowing that great fear of harm and emotional distress were substantially certain to be caused to Plaintiff; yet Defendants Does 11 through 50 proceeded to engage in said despicable acts maliciously and with a conscious disregard of the rights and safety of the Plaintiff.

115.   Officers, directors, and/or managing agents of Defendants TIPSY PIG and/or Does 1 through 10 were actually aware of the aforementioned actions of their employees and/or agents, and said acts took place in and around the presence of and under the direction and encouragement of managing agents, officers, and directors of Defendants TIPSY PIG and Does 1 through 10.

116.   In ratifying, condoning, encouraging, and directing the aforementioned actions, Defendants TIPSY PIG and Does 1 through 10 engaged in malicious and despicable conduct purposely intended to cause severe and debilitating injuries to Plaintiff, with a conscious disregard of Plaintiff's rights and safety.

117.   Therefore, Plaintiff is entitled to an award of punitive damages against Defendants TIPSY PIG and Does 1 through 50, to punish and make an example of said Defendants, and deter Defendants and others from engaging in the same or similar acts in the future.

## SEVENTH CAUSE OF ACTION
## VIOLATION OF THE RALPH ACT (CIV. CODE § 51.7)
### (Against All Defendants)

118.   Plaintiff hereby repeats, realleges and incorporates by reference all preceding paragraphs in this Complaint as though set forth in full herein.

119.   The Defendants actions constitute violation of Civil Code § 51.7 (the Ralph Act), in that the Plaintiff was subjected to violence and the threat of violence because of his middle eastern complexion and descent.

120.   The actions, statements and conduct by defendants TIPSY PIG and Does 1 through 50 resulted in acts of violence and intimidation by threat of violence committed against the person of Plaintiff.

121.   That a substantial motivating reason for Defendants' conduct was their perception of Plaintiff's middle eastern and/or Muslim descent.

-17-

122.  Plaintiff was subjected to the above referenced conduct including but not limited to harassment and/or discrimination on the basis of the racial profiling and bigotry.

123.  Plaintiff here was harmed by such conduct and such conduct was a substantial factor in such harm.  Plaintiff incorporates herein paragraphs 90 through 117 and each and every part thereof with the same force and effect as though set out at length herein.

## EIGHTH CAUSE OF ACTION
## NEGLIGENT HIRING, SUPERVISION AND RETENTION
### (Against All Defendants)

124.  Plaintiff hereby repeats, realleges and incorporates by reference all preceding paragraphs in this Complaint as though set forth in full herein.

125.  Defendants TIPSY PIG and/or Does 1 through 10 knew or should have known that Does 11 through 20 would assault and beat, and/or assist others to assault and beat Plaintiff, as they did on February 13, 2016, and as they had done similarly to other individuals on previous occasions.

126.  Defendants TIPSY PIG and/or Does 1 through 10 should have foreseen, based on their inadequate training of their employees and security personnel, including but not limited to Does 11-20, that patrons such as Plaintiff were exposed to an unreasonable risk of being assaulted and beaten in the subject premises, and consequently suffering bodily injury.

127.  Defendants TIPSY PIG and/or Does 1 through 10 had actual and constructive notice of prior similar incidents of hostile, aggressive, and violent behavior by Does 11 through 20. Yet, Defendants TIPSY PIG and Does 1 through 10 chose to retain such employees and took no action to assure these employees would not subject others to harm.

128.  Defendants TIPSY PIG and Does 1 through 10 breached their duty to Plaintiff in that they acted unreasonably and failed to exercise due care when they hired, and/or retained violent, aggressive, careless, and unfit individuals such as DOES 11 through 20.

129.  Defendants TIPSY PIG and Does 1 through 10 breached their duty to Plaintiff in that they acted unreasonably and failed to exercise due care when they trained, supervised, and/or managed DOES 11 through 20, allowing them and other agents and/or employees to do whatever they pleased, including assaulting and battering patrons, and failing to use reasonable measures to prevent patrons from continuing to be assaulted and battered by other patrons, or to provide for a

-18-

reasonably safe environment for patrons.

130.     As a proximate result of the negligent hiring, training, and/or retention of Does 11 through 20, Plaintiff was unnecessarily exposed to a high degree of risk of being assaulted and beaten, and was in fact assaulted and beaten.

131.     Defendants TIPSY PIG and Does 1 through 10 knew and/or should have known that their failure to exercise due care as set forth above would cause plaintiff to suffer severe emotional distress and personal injuries.

132.     As a direct and proximate result of the aforementioned acts of the Defendants, Plaintiff suffered severe injuries including but not limited to, scratches on the front and back of his body, trauma to his face and neck, acute cervical pain, and broken left hand (Plaintiff's dominant hand), which to this day remains weak and debilitated.

133.     As a further direct and proximate result of the aforementioned actions of the Defendants, Plaintiff has been caused to expend money and incur financial obligations for medical services and treatment in an effort to recover from said injuries. Said injuries are believed to be permanent in nature and will require Plaintiff to expend money and incur additional financial obligations in the future for further medical treatment and services.

134.     As a direct and proximate result of the aforementioned acts of the Defendants, Plaintiff was caused to and did suffer severe and extreme emotional distress including shock, anxiety, worry, depression, sleeplessness, mortification, humiliation, and indignity. Said emotional distress was of such a substantial and enduring quality that no reasonable person in a civilized society should be expected to endure it.

135.     As a further direct and proximate result of the aforementioned acts of the Defendants, Plaintiff was prevented from attending to his usual occupation and was thereby caused to lose earnings while recovering from the aforementioned injuries.

WHEREFORE, Plaintiff prays for judgment against Defendants TIPSY PIG and Does 1 through 50, inclusive, as follows:

    1. For general and special damages according to proof;

    2. For past and future medical and related expenses according to proof;

    3. For lost earnings according to proof;

    4. For attorney's fees;

5. For costs of suit incurred herein;

6. For civil penalty provided by law including, but not limited to, that provided by California Civil Code Section 52;

7. For punitive and exemplary damages according to proof;

8. For interest at the prevailing legal rate;

9. For such other and further relief as the Court deems proper.

Dated:  January 17, 2017

KAZEMI LAW

K. Cathy Kazemi
Attorney for Plaintiff
Kambiz Ali Kazemi

**DEMAND FOR JURY TRIAL**

Plaintiff, KAMBIZ ALI KAZEMI, hereby demands a trial of all causes by jury.

Dated:  January 17, 2017

KAZEMI LAW

K. Cathy Kazemi
Attorney for Plaintiff
Kambiz Ali Kazemi

-20-